No. 23-13138

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

AMERICAN ALLIANCE FOR EQUAL RIGHTS,

*Plaintiff-Appellant,*

v.

FEARLESS FUND MANAGEMENT, LLC; FEARLESS FUND II, GP, LLC;
FEARLESS FUND II, LP; FEARLESS FOUNDATION, INC.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Georgia
No. 1:23-cv-03424-TWT (Judge Thomas W. Thrash, Jr.)

## BRIEF FOR APPELLEES

Alphonso David
GLOBAL BLACK ECONOMIC FORUM
34 35th Street, Suite 5A
Brooklyn, NY  11232

Gregg J. Costa
GIBSON, DUNN & CRUTCHER LLP
811 Main Street, Suite 3000
Houston, TX  77002

Patrick J. Fuster
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071

Mylan L. Denerstein
Mark J. Cherry
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
(212) 351-4000

Jason C. Schwartz
Molly T. Senger
Zakiyyah Salim-Williams
Katherine Moran Meeks
Alex Bruhn
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC  20036

*Counsel for Appellees*
(*Additional counsel listed on following page*)

*American Alliance for Equal Rights v. Fearless Fund Mgmt., LLC, et al.*,
No. 23-13138

Dennis S. Ellis
ELLIS GEORGE CIPOLLONE
2121 Avenue of the Stars, Suite 3000
Los Angeles, CA  90067
(310) 274-7100

Benjamin L. Crump
BEN CRUMP LAW, PLLC
122 S. Calhoun Street
Tallahassee, FL  32301
(850) 224-2020

*Counsel for Appellees*

*American Alliance for Equal Rights v. Fearless Fund Mgmt., LLC, et al.*,
No. 23-13138

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Appellees certify that the following have an interest in the outcome of this appeal:

1. American Alliance for Equal Rights, *Plaintiff-Appellant*

2. American Civil Rights Project, *Amicus Curiae*

3. America First Legal Foundation, *Amicus Curiae*

4. Anderson, R. Gabriel, *Attorney for Plaintiff-Appellant*

5. Barnett, Alexandra Garrison, *Attorney for Defendants-Appellees*

6. Branch, Aria, *Attorney for Amicus Curiae Black Economic Alliance Foundation*

7. Bruhn, Alex, *Attorney for Defendants-Appellees*

8. Buckeye Institute, *Amicus Curiae*

9. Cacabelos, Kevin, *Attorney for Amici Curiae Lawyers Committee for Civil Rights*, *Leadership Conference on Civil and Human Rights*, *National Action Network, National Association for the Advancement of Colored People, National Urban League, National Coalition on Black Civic Participation, and LatinoJustice PRLDEF*

10. Cherry, Mark, *Attorney for Defendants-Appellees*

11. Cluse, Brooke, *Attorney for Defendants-Appellees*

12. Cohen, David, *Attorney for Amici Curiae National Venture Capital Association and Venture Forward*

*American Alliance for Equal Rights v. Fearless Fund Mgmt., LLC, et al.*,
No. 23-13138

13.    Costa, Gregg, *Attorney for Defendants-Appellees*

14.    Crain, Lee, *Attorney for Defendants-Appellees*

15.    Crump, Benjamin, *Attorney for Defendants-Appellees*

16.    David, Alphonso, *Attorney for Defendants-Appellees*

17.    Denerstein, Mylan, *Attorney for Defendants-Appellees*

18.    Dickey, Gilbert, *Attorney for Plaintiff-Appellant*

19.    Ellis, Dennis S., *Attorney for Defendants-Appellees*

20.    Equal Protection Project, *Amicus Curiae*

21.    Fawcett, J. William, *Attorney for Plaintiff-Appellant*

22.    Farrell, Naima, *Attorney for Defendants-Appellees*

23.    Fuster, Patrick, *Attorney for Defendants-Appellees*

24.    Fearless Foundation, Inc., *Defendant-Appellee*

25.    Fearless Fund II, GP, LLC, *Defendant-Appellee*

26.    Fearless Fund II, LP, *Defendant-Appellee*

27.    Fearless Fund Management, LLC, *Defendant-Appellee*

28.    Gonsalves, Terance, *Attorney for Defendant-Appellees*

29.    Gonzales, Amber, *Attorney for Amici Curiae Lawyers Committee for Civil Rights*, *Leadership Conference on Civil and Human Rights*, *National Action Network, National Association for the Advancement of Colored People, National Urban League, National Coalition on Black Civic Participation, and LatinoJustice PRLDEF*

30.    Greenbaum, Jon, *Attorney for Amici Curiae Lawyers Committee for Civil Rights* , *Leadership Conference on Civil and Human Rights*, *National Action Network, National Association for the Advancement of Colored People, National Urban*

*American Alliance for Equal Rights v. Fearless Fund Mgmt., LLC, et al.*,
No. 23-13138

League, National Coalition on Black Civic Participation, and
LatinoJustice PRLDEF

31.  Hamilton, Gene, *Attorney for Amicus Curiae America First Legal Foundation*

32.  Harrison, Keith, *Attorney for Amici Curiae Lawyers Committee for Civil Rights, Leadership Conference on Civil and Human Rights, National Action Network, National Association for the Advancement of Colored People, National Urban League, National Coalition on Black Civic Participation, and LatinoJustice PRLDEF*

33.  Hawley, Jonathan, *Attorney for Amicus Curiae Black Economic Alliance Foundation*

34.  Hylton, Ellie, *Attorney for Amici Curiae National Venture Capital Association and Venture Forward*

35.  Jacobson, William, *Attorney for Amicus Curiae Equal Protection Project*

36.  Kastorf, Kurt, *Attorney for Amicus Curiae Lawyers Committee for Civil Rights Under Law*

37.  Knox, Leila, *Attorney for Defendants-Appellees*

38.  LatinoJustice PRLDEF, *Amicus Curiae*

39.  Lawyers Committee for Civil Rights, *Amicus Curiae*

40.  Leadership Conference on Civil and Human Rights, *Amicus Curiae*

41.  Lewis, Joyce, *Attorney for Amicus Curiae Black Economic Alliance Foundation*

42.  Lifland, Charles, *Attorney for Amici Curiae National Venture Capital Association and Venture Forward*

*American Alliance for Equal Rights v. Fearless Fund Mgmt., LLC, et al.*,
No. 23-13138

43.  Malson, Laurel, *Attorney for Amici Curiae Lawyers Committee for Civil Rights*, *Leadership Conference on Civil and Human Rights*, *National Action Network, National Association for the Advancement of Colored People, National Urban League, National Coalition on Black Civic Participation, and LatinoJustice PRLDEF*

44.  Manhattan Institute, *Amicus Curiae*

45.  Marquart, Katherine, *Attorney for Defendants-Appellees*

46.  McCarthy, Thomas, *Attorney for Plaintiff-Appellant*

47.  Meeks, Katherine Moran, *Attorney for Defendants-Appellees*

48.  Mitchell, Jonathan, *Attorney for Amicus Curiae America First Legal Foundation*

49.  Mixon, Meaghan, *Attorney for Amicus Curiae Black Economic Alliance Foundation*

50.  Morales, Tristan, *Attorney for Amici Curiae National Venture Capital Association and Venture Forward*

51.  National Action Network, *Amicus Curiae*

52.  National Association for the Advancement of Colored People, *Amicus Curiae*

53.  National Coalition on Black Civic Participation, *Amicus Curiae*

54.  National Urban League, *Amicus Curiae*

55.  Nault, James, *Attorney for Amicus Curiae Equal Protection Project*

56.  Norris, Cameron, *Attorney for Plaintiffs-Appellant*

57.  Pak, Byung, *Attorney for Defendants-Appellees*

58.  Pauli, Amy, *Attorney for Amici Curiae Lawyers Committee for*

*American Alliance for Equal Rights v. Fearless Fund Mgmt., LLC, et al.*,
No. 23-13138

*Civil Rights*, *Leadership Conference on Civil and Human Rights*, *National Action Network, National Association for the Advancement of Colored People, National Urban League, National Coalition on Black Civic Participation, and LatinoJustice PRLDEF*

59.   Pettig, Bruce, *Attorney for Amici Curiae National Venture Capital Association and Venture Forward*

60.   Rhoades, Meshach, *Attorney for Amici Curiae Lawyers Committee for Civil Rights*, *Leadership Conference on Civil and Human Rights*, *National Action Network, National Association for the Advancement of Colored People, National Urban League, National Coalition on Black Civic Participation, and LatinoJustice PRLDEF*

61.   Rodriguez, Dariely, *Attorney for Amici Curiae Lawyers Committee for Civil Rights*, *Leadership Conference on Civil and Human Rights, National Action Network, National Association for the Advancement of Colored People, National Urban League, National Coalition on Black Civic Participation, and LatinoJustice PRLDEF*

62.   Salim-Williams, Zakiyyah, *Attorney for Defendants-Appellees*

63.   Santos, Marlee, *Attorney for Amici Curiae Lawyers Committee for Civil Rights, Leadership Conference on Civil and Human Rights, National Action Network, National Association for the Advancement of Colored People, National Urban League, National Coalition on Black Civic Participation, and LatinoJustice PRLDEF*

64.   Schwartz, Jason, *Attorney for Defendants-Appellees*

65.   Senger, Molly, *Attorney for Defendants-Appellees*

66.   Shapiro, Ilya, *Attorney for Amici Curiae American Civil Rights Project, Manhattan Institute, and Buckeye Institute*

67.   Thurman, Ashley, *Attorney for Amici Curiae National Venture*

*American Alliance for Equal Rights v. Fearless Fund Mgmt., LLC, et al.*,
No. 23-13138

Capital Association and Venture Forward

68. Waddell, T. Brandon, *Attorney for Amici Curiae National Venture Capital Association and Venture Forward*

69. Youker, Kathryn, *Attorney for Amici Curiae Lawyers Committee for Civil Rights*, *Leadership Conference on Civil and Human Rights*, *National Action Network, National Association for the Advancement of Colored People, National Urban League, National Coalition on Black Civic Participation, and LatinoJustice PRLDEF*

*American Alliance for Equal Rights v. Fearless Fund Mgmt., LLC, et al.*,
No. 23-13138

The following publicly held corporations have a 10% or greater ownership interest in Fearless Fund II, LP: General Mills, Inc. (GIS), Costco Wholesale Corporation (COST), Mastercard Inc. (MA), and Bank of America Corp (BAC).

No publicly held corporation has a 10% or greater ownership interest in Fearless Fund Management, LLC, Fearless Fund II, GP, LLC, or Fearless Foundation.

Per Circuit Rule 26.1-2(c), Appellees certify that the CIP contained in this response is complete.

Dated:  December 6, 2023                     /s/ *Mylan L. Denerstein*
                                                          Mylan L. Denerstein

## STATEMENT REGARDING ORAL ARGUMENT

Defendants-Appellees (collectively, the "Fearless Foundation" or "Foundation") respectfully request oral argument.  The Court has already granted the Foundation's unopposed motion to expedite oral argument and scheduled argument for January 31, 2024.  11th Cir. Dkts. 37-38, 48.

Oral argument will assist the Court in resolving the important statutory and constitutional questions this case raises.   To the Foundation's knowledge, this action by the American Alliance for Equal Rights ("Alliance") represents the first attempt to extend § 1981 to a charitable endeavor.  This novel challenge to the Foundation's charitable grant and mentorship program for Black female entrepreneurs threatens the First Amendment right to make donations to individuals of one's choosing—a right that charities focused on aiding a particular ethnic or religious group have exercised throughout American history.  This appeal also raises important questions as to whether the Alliance has standing, whether § 1981 applies to charitable grants that serve a remedial purpose, and whether the Alliance has satisfied the demanding standard for preliminary injunctive relief.

## PREFACE REGARDING RECORD CITATIONS

Under Circuit Rule 28-5, Defendants-Appellees note that they have referred to the district court record using the citation format:  Dkt. # at page #.  Each docket entry cited in this brief is also contained in the Appellant's Appendix.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................ C-2

STATEMENT REGARDING ORAL ARGUMENT ................................... i

PREFACE REGARDING RECORD CITATIONS .................................... ii

TABLE OF CONTENTS ...................................................................... iii

TABLE OF CITATIONS ........................................................................ v

INTRODUCTION ................................................................................. 1

STATEMENT OF THE ISSUES .............................................................. 3

STATEMENT OF THE CASE ................................................................. 4

I.     Racial Inequalities Pervade Access to Funding for Small Businesses. ................................................................................ 4

II.    The Fearless Foundation Seeks to Address Racially Unequal Funding through Grants, Mentorship, and Education. ................. 6

III.   The District Court Denies the Alliance's Motion to Preliminarily Enjoin the Foundation's Grant Program. ................. 9

IV.   A Motions Panel Enjoins the Grant Program Pending Appeal. ................................................................................... 10

SUMMARY OF THE ARGUMENT ....................................................... 11

STANDARD OF REVIEW .................................................................... 15

ARGUMENT ...................................................................................... 16

I.     The District Court Correctly Held that Applying § 1981 to Alter the Foundation's Charitable Giving and Mentorship Program Would Violate the First Amendment. ............................ 16

A.    The Fearless Strivers Program Involves Expressive Activity Protected by the First Amendment. .........................17

B.    Applying § 1981 as the Alliance Requests Would Violate the First Amendment. ...............................................24

C.    The Alliance Does Not Even Try to Satisfy Strict Scrutiny. ....................................................................................30

II.    The Alliance's Claim Is Unlikely to Succeed for Additional Reasons. ...............................................................................33

A.    The Alliance Lacks Standing Under Article III....................34

1.    The Alliance has not named any members who have standing to sue in their own right.......................36

2.    The Alliance has not proved that any member is able and ready to apply for a grant in the imminent future.............................................................41

B.    The Alliance's § 1981 Claim Likely Fails on the Merits.......48

1.    Section 1981 does not cover the Foundation's grant program. .............................................................49

2.    The Foundation's grant program is a valid remedial plan. ..............................................................51

III.    The Other Factors Weigh Against a Preliminary Injunction........60

A.    The District Court Did Not Abuse Its Discretion in Finding No Irreparable Injury. .............................................61

B.    The Balance of Equities and Public Interest Also Disfavor Injunctive Relief..................................................66

CONCLUSION .........................................................................................67

iv

# TABLE OF CITATIONS

Page(s)

## Cases

*303 Creative LLC v. Elenis*,
   600 U.S. 570 (2023) .......................................................... 2, 3, 12, 25, 31

*Aaron Private Clinic Mgmt. LLC v. Berry*,
   912 F.3d 1330 (11th Cir. 2019) ................................................... 43, 45

*Access Now, Inc. v. Sw. Airlines Co.*,
   385 F.3d 1324 (11th Cir. 2004) .......................................................... 30

*Acheson Hotels, LLC v. Laufer*,
   601 U.S. ___, 2023 WL 8378965 (Dec. 5, 2023) ................................... 48

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier
   Safety Admin.*,
   41 F.4th 586 (D.C. Cir. 2022) ............................................................ 38

*Allen v. Wright*,
   468 U.S. 737 (1984) ............................................................................ 48

*Am. College of Emergency Physicians v. Blue Cross &
   Blue Shield of Ga.*,
   833 F. App'x 235 (11th Cir. 2020) ................................................. 38, 39

*Am. for Prosperity Found. v. Bonta*,
   141 S. Ct. 2373 (2021) ....................................................................... 18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................... 45

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
   481 U.S. 537 (1987) ..................................................................... 18, 28

*BellSouth Telecomms., Inc. v. MCIMetro Access
   Transmission Servs., LLC*,
   425 F.3d 964 (11th Cir. 2005) ........................................................... 15

*In re Birmingham Reverse Discrimination Emp. Litig.*,
  20 F.3d 1525 (11th Cir. 1994).........................................................53, 59

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000)................................................................................ 18

*Buckley v. Valeo*,
  424 U.S. 1 (1976).................................................................................... 18

*Carney v. Adams*,
  141 S. Ct. 493 (2020).................................................... 13, 42, 45, 47, 48

*Carroll v. Nakatani*,
  342 F.3d 934 (9th Cir. 2003).............................................................43, 46

*CBOCS West, Inc. v. Humphries*,
  553 U.S. 442 (2008)................................................................................ 55

*Citizens United v. FEC*,
  558 U.S. 310 (2010)................................................................................ 27

*Civil Rights Cases*,
  109 U.S. 3 (1883).................................................................................... 58

*Claybrooks v. ABC, Inc.*,
  898 F. Supp. 2d 986 (M.D. Tenn. 2012) ............................................... 29

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
  140 S. Ct. 1009 (2020).......................................................................56, 63

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
  6 F.4th 1247 (11th Cir. 2021) ............................. 2, 9, 11, 12, 16, 17, 20,
                                                          22, 23, 26, 27, 31, 67

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
  473 U.S. 788 (1985).............................................................................18, 20

*Do No Harm v. Pfizer Inc.*,
  646 F. Supp. 3d 490 (S.D.N.Y. 2022).................................................... 44

*Doe v. Kamehameha Schs.*,
  470 F.3d 827 (9th Cir. 2006)........................................................50, 55

*Doe v. Stincer*,
  175 F.3d 879 (11th Cir. 1999).................................................................39

*Domino's Pizza, Inc. v. McDonald*,
  546 U.S. 470 (2006)........................................................................49, 51

*Drazen v. Pinto*,
  74 F.4th 1336 (11th Cir. 2023) ...............................................................15

*Edmonson v. U.S. Steel Corp.*,
  659 F.2d 582 (5th Cir. Unit B 1981)........................................................52

*Faculty v. N.Y. Univ.*,
  11 F.4th 68 (2d Cir. 2021)......................................................................43

*Ferrill v. Parker Grp., Inc.*,
  168 F.3d 468 (11th Cir. 1999).........................................................13, 52

*Fla. Ass'n of Med. Equip. Dealers v. Apfel*,
  194 F.3d 1227 (11th Cir. 1999)...............................................................34

*Fla. Right to Life, Inc. v. Lamar*,
  273 F.3d 1318 (11th Cir. 2001)...............................................................17

*Fla. State Conf. of the NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008)...............................................................37

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015).................................................................35

*Fort Lauderdale Food Not Bombs v. Fort Lauderdale*,
  901 F.3d 1235 (11th Cir. 2018).........................................................20, 21

*Free the Nipple-Fort Collins v. Fort Collins*,
  916 F.3d 792 (10th Cir. 2019).................................................................65

*Fulton v. Philadelphia*,
  141 S. Ct. 1868 (2021).............................................................................33

*FW/PBS, Inc. v. Dallas*,
    493 U.S. 215 (1990).................................................................36, 37, 40

*Ga. Republican Party v. SEC*,
    888 F.3d 1198 (11th Cir. 2018)......................................................37, 39

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*,
    458 U.S. 375 (1982)................................................................................58

*Gratz v. Bollinger*,
    539 U.S. 244 (2003)..........................................................41, 57, 58

*Green v. Miss U.S.A., LLC*,
    52 F.4th 773 (9th Cir. 2022) .........................................................28, 29

*Gresham v. Windrush Partners, Ltd.*,
    730 F.2d 1417 (11th Cir. 1984)......................................................63, 64

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
    527 U.S. 308 (1999)................................................................................62

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of
    Boston, Inc.*,
    515 U.S. 557 (1995).................................................. 20, 25, 26, 31, 67

*Jacobson v. Fla. Sec'y of State*,
    974 F.3d 1236 (11th Cir. 2020)..........................................................37

*Johnson v. Transp. Agency, Santa Clara Cnty.*,
    480 U.S. 616 (1987)..........................................................52, 53, 54, 55

*Jones v. Alfred H. Mayer Co.*,
    392 U.S. 409 (1968)..........................................................................58, 59

*Keister v. Bell*,
    879 F.3d 1282 (11th Cir. 2018)..........................................................66

*KeyView Labs, Inc. v. Barger*,
    2020 WL 8224618 (M.D. Fla. Dec. 22, 2020) ......................................44

*Laufer v. Arpan, LLC*,
    29 F.4th 1268 (11th Cir. 2022) ........................................................ 48

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)........................................................................ 35

*McDonald v. Santa Fe Trail Transp. Co.*,
    427 U.S. 273 (1976)........................................................................ 51

*Nixon v. Shrink Mo. Gov't PAC*,
    528 U.S. 377 (2000).......................................................................20

*Northeastern Fla. Chapter of Ass'n of Gen. Contractors of
    Am. v. Jacksonville*,
    896 F.2d 1283 (11th Cir. 1990)..............................................14, 62, 64

*Northeastern Fla. Chapter, Associated Gen. Contractors of
    Am. v. Jacksonville*,
    508 U.S. 656 (1993)....................................................................41, 62

*Otto v. Boca Raton*,
    981 F.3d 854 (11th Cir. 2020)......................................................22, 30

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*,
    2 F.4th 1002 (7th Cir. 2021) .......................................................38, 39

*Rabbani v. Gen. Motors Corp.*,
    2000 WL 36752977 (N.D. Fla. July 26, 2000)....................................55

*Religious Sisters of Mercy v. Becerra*,
    55 F.4th 583 (8th Cir. 2022) ...........................................................37

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988)....................................................................17, 23

*Rivers v. Roadway Express, Inc.*,
    511 U.S. 298 (1994).......................................................................55

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
    490 U.S. 477 (1989).......................................................................57

*Rogers v. Windmill Pointe Vill. Club Ass'n, Inc.*,
  967 F.2d 525 (11th Cir. 1992)............................................................ 64

*Rojas v. City of Ocala*,
  40 F.4th 1347 (11th Cir. 2022) ......................................................... 15

*Roy v. Ivy*,
  53 F.4th 1338 (11th Cir. 2022) ......................................................... 44

*Rumsfeld v. FAIR*,
  547 U.S. 47 (2006)............................................................................ 21

*Runyon v. McCrary*,
  427 U.S. 160 (1976)............................................... 28, 29, 50, 51, 58, 60

*Sampson v. Murray*,
  415 U.S. 61 (1974)............................................................................ 61

*Setser v. Novack Inv. Co.*,
  657 F.2d 962 (8th Cir. 1981)............................................................ 55

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000)........................................................ 62

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020)............................................................ 35

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998)............................................................................ 39

*Steelworkers v. Weber*,
  443 U.S. 193 (1979)............................................................. 52, 53, 54

*Stein v. Reynolds Sec., Inc.*,
  667 F.2d 33 (11th Cir. 1982)............................................................ 52

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  261 F. Supp. 3d 99 (D. Mass. 2017).................................................. 41

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ................................................................ 34, 40, 59

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ................................................ 13, 36, 37, 38, 40

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ...................................................... 34, 40, 46

*United States v. Hansen*,
  599 U.S. 762 (2023) ............................................................................ 50

*Uzuegbunam v. Preczewski*,
  141 S. Ct. 792 (2021) ....................................................................... 66

*Vill. of Schaumburg v. Citizens for a Better Env't*,
  444 U.S. 620 (1980) ................................................................... 18, 24

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
  900 F.3d 250 (6th Cir. 2018) ....................................................... 35

*Williams v. D'Argent Franchising, LLC*,
  2023 WL 3059192 (W.D. La. Apr. 24, 2023) ........................... 44

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................. 15

*Women's Emergency Network v. Bush*,
  323 F.3d 937 (11th Cir. 2003) ..................................................... 43

*Wreal, LLC v. Amazon.com, Inc.*,
  840 F.3d 1244 (11th Cir. 2016) .............................. 15, 35, 60, 65, 66

## Constitutional Provisions

U.S. Const. amend. I .............................................................................. 2, 16

U.S. Const. amend. XIII ................................................................ 14, 52, 58

U.S. Const. amend. XIV ................................................................... 52, 57

## Statutes

15 U.S.C. § 631...............................................................................67

28 U.S.C. § 1746.............................................................................44

42 U.S.C. § 1981.................................................................... 1, 9, 48

Act of Mar. 3, 1865, ch. 92, § 5, 13 Stat. 510, 511 ....................56

Financial Institutions Reform, Recovery, and Enforcement
    Act of 1989, Pub. L. No. 101-73, § 308, 103 Stat. 183, 353 ...............56

## Regulations

26 C.F.R. § 53.4945-4......................................................................33

## Rules

11th Cir. R. 27-1 ............................................................................15

11th Cir. R. 36-2 ............................................................................38

Fed. R. Civ. P. 10 ...........................................................................39

## Other Authorities

Charitable Irish Society, *Our History*,
    https://www.charitableirishsociety.org/ .............................................33

Elna C. Green, *This Business of Relief* (2003).........................................32

Erica Armstrong Dunbar, *A Fragile Freedom* (2008) .............................32

Fearless Foundation, *Our Mission*,
    https://www.fearlessfund.foundation/ .................................................19

Hebrew Free Burial Association,
    https://www.hebrewfreeburial.org/ .....................................................33

Jessica Gordon Nembhard, *Collective Courage* 23 (2014) ......................32

Mary Margaret Schley, *The United Order of Tents and 73 Cannon Street: A Study of Identity and Place* (2013)..........................32

New York Heritage Digital Collections, *Mutual Aid Societies*, https://nyheritage.org/exhibits/immigration/mutual-aid-societies ..............................................................................................33

Restatement (Second) of Contracts § 45(2) (1981) ..................................50

Texas State Historical Association, *Mexican-American Organizations*, https://www.tshaonline.org/handbook/entries/mexican-american-organizations..........................................................................................33

W.E.B. DuBois, *Economic Co-Operation Among Negro Americans* (1907) ............................................................................................32

## INTRODUCTION

Congress enacted 42 U.S.C. § 1981 after the Civil War to secure economic rights to formerly enslaved people, including the "same right" to make and enforce contracts "as is enjoyed by white citizens." Invoking this seminal civil rights law, the Alliance seeks to enjoin a grant and mentorship program designed to "bridge the gap in venture capital funding" that Black women entrepreneurs face as a result of historical discrimination. Dkt. 2-5 at 3. The Alliance's unprecedented interpretation of § 1981 would pervert the statute's text, history, and purpose, turning it against the very class of persons it was designed to protect. The district court did not abuse its discretion in refusing the Alliance's request for extraordinary relief.

The Fearless Foundation is a 501(c)(3) nonprofit that aims to increase access to capital for small businesses owned by women of color. Among other charitable endeavors, the Foundation four times per year awards a grant of $20,000 and one-on-one mentorship to a small business owned by one or more Black women, who as a class secured only 0.13% of all venture-capital funding last year. The Alliance seeks a preliminary

1

injunction under § 1981 to bar the Foundation from limiting its Fearless Strivers Grant Contest to businesses majority-owned by Black women.

The Alliance fails to satisfy any of the four factors necessary to obtain preliminary injunctive relief. As the district court correctly held, the Alliance hasn't shown a likelihood of success on the merits because the First Amendment protects the Foundation's right to donate its time and money as it sees fit. This Court has held, in a case that controls here, that "donating money" to a cause qualifies as protected speech. *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1254 (11th Cir. 2021). So, too, do "acts of expressive association" like personal mentorship. *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). As such, the First Amendment prohibits the Alliance from using § 1981 to force the Foundation to espouse the Alliance's colorblind-at-all-costs viewpoint instead of the Foundation's "desired message." *Id.* at 596.

The Alliance's attempt at ideological conscription is reason enough to affirm. But the Alliance also fails to establish a substantial likelihood of associational standing. The Alliance's three anonymous member declarations contain no facts showing that the Alliance's unnamed members are able and ready to apply for the Fearless Strivers program.

2

Separately, § 1981 does not apply to discretionary charitable grants or to valid remedial programs, like the Foundation's, that seek to remedy the effects of discrimination against minorities without unduly limiting the rights of non-minorities. And the Alliance hasn't shown that its members would suffer irreparable injury without preliminary injunctive relief.

At bottom, this manufactured lawsuit on behalf of nameless, uninjured members seeks to suppress expressive activity with which the Alliance disagrees. The Alliance opposes race-conscious remedial programs in all forms and exists for the sole purpose of attacking them in the courts. But § 1981 cannot be used to hijack the Foundation's message and force the Foundation "to speak in ways that align with" the Alliance's views but "defy" its own "about a matter of major significance." *303 Creative*, 600 U.S. at 602-03. This Court should affirm the district court's denial of preliminary injunctive relief.

### STATEMENT OF THE ISSUES

1. Whether the First Amendment bars the Alliance's attempt to transform the purpose and message of the Foundation's charitable grant program.

2.    Whether the Alliance lacks Article III standing because it did not name its allegedly affected members or prove they likely are able and ready to apply for a grant.

3.    Whether the Alliance's claim likely fails on the merits because the Foundation's charitable grant program is not covered by § 1981 or is a valid remedial program to address racial disparities in access to funding.

4.    Whether the Alliance has failed to prove an irreparable injury, a favorable balance of equities, or public interest supporting a preliminary injunction.

## STATEMENT OF THE CASE

## I.    Racial Inequalities Pervade Access to Funding for Small Businesses.

Black women are the fastest growing entrepreneurial demographic in the United States, having launched 42% of new businesses from 2014 through 2019.  Dkt. 59-2 at 17.  But this boom in entrepreneurship all too often fails to translate into well-funded businesses.  Although Black women constitute roughly 6% of the U.S. population, they own only 2% of the country's businesses with more than one employee.  Dkt. 59-4 at 17.

A principal reason that Black women struggle to sustain businesses at the same rate as their non-Black peers is a lack of equal access to capital. According to the Federal Reserve System's 2016 Small Business Credit Survey, 66% of Black women businessowners describe access to funds as one of their greatest challenges, while only 39% of their non-Black peers say the same. Dkt. 59-4 at 17. One traditional path for funding a new business is to rely first on friends and family. But when Black entrepreneurs seek capital through personal relationships, they are disadvantaged compared to their white counterparts, given this country's well-documented racial wealth and income gap. *Id.* at 12.

With less access to funding from friends and family, Black entrepreneurs must find other sources of capital to start businesses. Dkt. 59-4 at 13. But Black entrepreneurs face disproportionate challenges in accessing other kinds of capital, too. The 2021 survey by the 12 Federal Reserve Banks found that a majority of Black business owners who sought credit reported receiving less than the amount they requested, while only a quarter of white business owners reported the same. *Id.* This lack of equal access to private capital is particularly acute for Black women, who face a rejection rate three times higher than that

of white business owners when seeking funding. *Id.* at 18. Of the $288 billion in venture-capital funding that went to U.S. startups in 2022, only 0.13% went to startups with at least one Black woman founder. *Id.*

## II. The Fearless Foundation Seeks to Address Racially Unequal Funding through Grants, Mentorship, and Education.

Arian Simone is a Black woman who herself struggled to secure funding for her startup. Dkt. 59-2 at 4. She later launched the Fearless Foundation to offer "grants, mentorship, and educational opportunities" that seek to remedy the historical obstacles faced by women of color entrepreneurs. *Id.* at 5-7.

The Foundation is a 501(c)(3) nonprofit that serves as the Fearless Fund's "philanthropic arm." Dkt. 59-3 at 5. In the past two years, the Foundation has partnered with corporate sponsors to award more than $3.6 million in charitable grants. Dkt. 59-2 at 7. These grants "deepen[]" the Foundation's "relationships with the community of women-of-color entrepreneurs" and express the Foundation's vision of "systemic change through economic empowerment and investment in" those same entrepreneurs. *Id.* at 6-8.

In 2021, the Foundation launched the Fearless Strivers Grant Contest. The program is open to Black women who are principal owners

of a U.S. business with annual revenue up to $3 million.  Dkt. 2-3 at 3.
The Foundation opens the application process four times per year and
selects one winner each round.  *Id.* at 4.  This year's winners each receive
a $20,000 grant, formal one-on-one mentorship, and tools to help grow
their businesses.  *Id.* at 12.  Upon selection, grantees can join trainings
and mentoring sessions in the Foundation's private online community
and gain access to the Foundation's close-knit network of founders and
alumni, becoming full-fledged members of the "Fearless Family."
Dkt. 59-3 at 7.

Like the Foundation's other grant programs, the Fearless Strivers
Grant Contest is "a means by which the Foundation . . . promote[s] its
values of advancing access to capital for women of color-led businesses."
Dkt. 59-3 at 7.  But the grant program is also a "skill-based contest."
Dkt. 2-3 at 2.  The Foundation evaluates applicants based on the viability
and strength of their businesses, their intended uses of the grant, and
the potential growth of the businesses.  *Id.* at 10.  The rules also vest the
Foundation with "sole discretion" to "void and disqualify" entries that
would undermine its philanthropic agenda, including entries that
espouse "any particular political agenda or message" or "communicat[e]

7

messages inconsistent with the positive images" with which the Foundation "wishes to associate." *Id.* at 6-7.

The Foundation "publicly announce[s]" the winners of the Fearless Strivers contest online and leverages "the publicity surrounding the grants [to] rais[e] awareness of the racial and gender disparities in venture capital and other small business funding." Dkt. 59-3 at 7; *see, e.g.*, Dkt. 2-8 at 2. To protect its ability to publicly convey this message, the Foundation previously required applicants to agree that the Foundation could use their entry, name, and likeness in its communications. Dkt. 2-3 at 7-8. After the Alliance filed this lawsuit, however, the Foundation amended its rules and removed the terms and conditions that the Alliance contends form a contract. Dkt. 59-3 at 11-25.[1]

---

[1] The Alliance notes (at 5-6) that the Foundation "reverted to the original rules" while this appeal was pending. When this Court issued an injunction pending appeal and prevented the Foundation from closing the latest grant cycle until further notice, the Foundation updated its website to reflect the injunction and inadvertently reposted the original rules in so doing. The Foundation has since fixed the error and republished the updated rules on its site with an explanatory note. *See* https://www.fearlessfund.foundation/official-rules.

## III. The District Court Denies the Alliance's Motion to Preliminarily Enjoin the Foundation's Grant Program.

The Alliance challenged the Foundation's grant program under 42 U.S.C. § 1981, which prohibits racial discrimination in contracting. Dkt. 1 at 10-11. The same day, the Alliance moved to preliminarily enjoin the Foundation to keep open its final application period for 2023 and to not select a grant recipient. Dkt. 2-1 at 10-11.

The district court denied the motion because the Alliance could not meet its "heavy burden of showing a clear likelihood of success on the merits." Dkt. 115 at 17. The court found that the Alliance likely could establish Article III standing, *id.* at 5-11, and that the grant program likely was a contract and wasn't justified as a valid remedial program under § 1981, *id.* at 18-20. But the court held that the First Amendment protects the grant program because the Foundation "clearly intends to convey a particular message in promoting and operating its grant program." *Id.* at 15-16. Forcing the Foundation to alter the eligibility criteria for the program under the banner of § 1981 "would impermissibly 'modify the content of [the Foundation's] expression'—and thus modify [the] 'speech itself.'" *Id.* at 17 (quoting *Coral Ridge*, 6 F.4th at 1256).

9

Independently, the district court concluded that the Alliance had not "carried its burden to clearly show" its members would suffer "irreparable injury" in the absence of an injunction. Dkt. 115 at 22. The court rejected the Alliance's argument that a violation of § 1981 necessarily gives rise to a presumption of irreparable injury and noted that the Alliance hadn't alleged "that its members will be irreparably harmed unless they receive the money from the Foundation's grant." *Id.*

## IV. A Motions Panel Enjoins the Grant Program Pending Appeal.

After the Alliance filed an emergency motion for an injunction pending appeal, a divided motions panel enjoined the Foundation from closing the Fearless Strivers Grant Contest or selecting a winner "until further order of this Court." Mot. Order 3. The panel majority determined that the First Amendment doesn't protect "the right to exclude persons from a contractual regime based on their race," even for the Foundation's charitable grant program, and that the Alliance had established irreparable injury. *Id.* at 2-3.

Dissenting, Judge Wilson expressed skepticism about the Alliance's standing and criticized the majority for ignoring *Coral Ridge*. Mot. Dissent 2 nn.1-2. He also argued that the Alliance's claim sought to

"weaponize[]" § 1981 in a manner contrary to its history and status as Thirteenth Amendment legislation designed to help Black Americans. *Id.* at 4-5. And he agreed with the district court that the Alliance had failed to prove irreparable harm and had inexplicably delayed in challenging the Foundation's program. *Id.* at 5-6.

## SUMMARY OF THE ARGUMENT

**I.** As the district court held, applying § 1981 to subvert the Foundation's mission violates the First Amendment.

**A.** The Foundation is an expressive association that empowers women of color entrepreneurs and fights historic discrimination in access to capital. The Foundation furthers this message of antidiscrimination and economic freedom through charitable grants and mentorship for Black female business owners. The First Amendment protects these core expressive activities. *Coral Ridge*, 6 F.4th at 1254. The Alliance's attempt to recast this program as pure conduct distorts the Foundation's charitable mission and conflicts with this Court's recognition in *Coral Ridge* that expressive activity can be paired with contracts without losing First Amendment protection.

11

**B.**    Forcing the Foundation to provide grants and mentorship to the Alliance's members would compel it to change its message into something unrecognizable.  Both the Supreme Court and this Court have rejected such attempts to use antidiscrimination laws to commandeer private parties' expression.  *E.g.*, *Coral Ridge*, 6 F.4th at 1255-56; *303 Creative*, 600 U.S. at 594.

**C.**    For the first time on appeal, the Alliance argues that the district court should have applied intermediate scrutiny after determining that the Foundation's program is expressive.  This forfeited argument conflicts with decisions like *Coral Ridge* and *303 Creative*, which held that other attempts to forcibly alter the defendant's message violate the First Amendment *per se* or trigger strict scrutiny.  There is no compelling interest in prohibiting self-help programs by and for Black women, which have existed alongside § 1981 since Reconstruction.

**II.**    The Alliance is unlikely to succeed on the merits for additional reasons.

**A.**    The Alliance has not shown a substantial likelihood of establishing that its anonymous members have Article III standing.  Associational standing requires proof that "at least one identified

12

member" has suffered an Article III injury.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009).  The Alliance's use of placeholders—Owners A, B, and C—to mask the identities of its members violates the *Summers* naming requirement.  Separately, the Alliance's anonymous declarations do not satisfy its burden at the preliminary-injunction stage to substantiate its assertion that these unnamed individuals are "'able and ready' to apply" for a grant "in the imminent future" if this Court forces open the program to non-Black women.  *Carney v. Adams*, 141 S. Ct. 493, 503 (2020).  *Summers* and *Carney*, each an independent basis to affirm, reinforce that this lawsuit is disconnected from any real case or controversy.

**B.**    The Alliance is also unlikely to prove a § 1981 violation.  Section 1981 does not apply here because the Foundation's discretionary charitable grants confer no enforceable rights.  In addition, § 1981 does not prohibit private, race-conscious efforts to remedy manifest racial imbalances, provided the efforts do not unnecessarily trammel the rights of others.  *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 474 (11th Cir. 1999).  The Foundation satisfies this test because Black women receive a disproportionately tiny fraction of startup capital, and the modest

13

charitable grants at issue do not trammel other small business owners' access to funding.  The district court was wrong to cabin this doctrine to the employment context—a distinction that appears nowhere in § 1981. And the Alliance's argument that strict scrutiny applies to all race-conscious efforts to remediate the effects of historical discrimination, public and private alike, erroneously conflates the Thirteenth Amendment with the Fourteenth Amendment.

**III.**    The Alliance also has not proved the other three prerequisites for a preliminary injunction.

**A.**    The Alliance hasn't identified any irreparable injury that its members would suffer in the absence of an injunction.  Although the Alliance argues that race-conscious programs inflict a *per se* irreparable harm, this Court rejected that very argument in *Northeastern Florida Chapter of Ass'n of General Contractors of America v. Jacksonville*, 896 F.2d 1283, 1285-86 (11th Cir. 1990).

**B.**    The balance of equities and public interest also do not support a preliminary injunction that would hijack the Foundation's charitable mission and exacerbate racial inequalities in access to funding.

14

## STANDARD OF REVIEW

A preliminary injunction may not be entered unless the Alliance establishes that (1) it "is likely to succeed on the merits," (2) it "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Alliance must "clearly establish" each prerequisite, and "failure to meet even one dooms its appeal." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247-48 (11th Cir. 2016).

This Court reviews the district court's denial of a preliminary injunction for "clear abuse of discretion." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005). But this Court reviews "*de novo* the threshold jurisdictional question" whether the Alliance "enjoy[s] standing to sue." *Drazen v. Pinto*, 74 F.4th 1336, 1342 (11th Cir. 2023) (en banc). The motion panel's order entering an injunction pending appeal "is not binding upon the panel to which the appeal is assigned on the merits." 11th Cir. R. 27-1(g); *Rojas v. City of Ocala*, 40 F.4th 1347, 1349 n.1 (11th Cir. 2022).

15

## ARGUMENT

### I. The District Court Correctly Held that Applying § 1981 to Alter the Foundation's Charitable Giving and Mentorship Program Would Violate the First Amendment.

The district court correctly held that the First Amendment bars the Alliance from weaponizing § 1981 to alter the content of the Fearless Foundation's speech. The Foundation is an expressive association that exists to support and promote women of color entrepreneurs—a group that has been historically discriminated against in the commercial marketplace. The Foundation carries out its mission by providing charitable grants and mentorship to Black women and then publicizing these efforts to bring attention to its cause—activities at the heart of the First Amendment's protection. Although the Alliance attempts to recast this quintessential speech activity as garden-variety "contracting" subject to § 1981, the district court saw the claim for what it is—an attempt to use an antidiscrimination law to "impermissibly 'modify the content of [the Foundation's] expression.'" Dkt. 115 at 17 (quoting *Coral Ridge*, 6 F.4th at 1256). The First Amendment forbids this ideological interference.

16

## A.    The Fearless Strivers Program Involves Expressive Activity Protected by the First Amendment.

The Alliance argues that the First Amendment erects no barrier to its § 1981 claim because the Fearless Strivers program comprises "conduct" rather than "speech."   Br. 14.   That is a false dichotomy: "Constitutional protection for freedom of speech does not end at the spoken or written word," but "also protects expressive conduct."  *Coral Ridge*, 6 F.4th at 1254.  Here, both the grant and mentorship aspects of the program are expressive activities that enjoy the fullest protection of the First Amendment.

First Amendment "expressive conduct" unquestionably includes "donating money" in support of a cause.  *Coral Ridge*, 6 F.4th at 1254. That protection extends to both sides of a charitable transaction: soliciting money on the front end, *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 789 (1988), and donating it on the back end, *Fla. Right to Life, Inc. v. Lamar*, 273 F.3d 1318, 1329 (11th Cir. 2001).

Soliciting and donating money to charitable causes serves several communicative ends.  Making "charitable appeals for funds" involves "a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of

17

causes." *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980). Similarly, donating money aligns the donor with a cause and "functions as a general expression of support for the recipient and its views." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985). For this reason, the Supreme Court has equated donating money to a political or charitable organization with actually joining that group as a member, and its cases treat "contributors and members . . . interchangeably." *Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (per curiam); *accord Am. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021).

Like donating money, donating one's time to serve as a mentor implicates First Amendment interests—specifically, the rights of expressive and intimate association. *See Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987). Thus, the Supreme Court held in *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), that Scout leaders participated in expressive activity when they "spen[t] time" "instructing and engaging" the "youth members" in order to instill a set of values, *id.* at 649-50.

Under these precedents, the Fearless Strivers contest readily qualifies as expressive activity shielded by the First Amendment. The

18

Foundation is a noncommercial enterprise that "provides capital, community, mentorship, and education to women of color entrepreneurs." Fearless Foundation, *Our Mission*.[2]   Awarding the grants is the mechanism "by which the Foundation . . . promote[s] its values of advancing access to capital for women of color-led businesses." Dkt. 59-3 at 7.  The grants convey the Foundation's conviction that "Black women-owned businesses are vital to our economy." Dkt. 2-2 at 2.  And both the financial support and the provision of one-on-one mentorship serve the Foundation's associational interest in "deepen[ing]" its "relationships with the community of women-of-color entrepreneurs." Dkt. 59-2 at 6-8.

The Alliance contends that the First Amendment does not protect the Foundation's program because "[a]n observer who saw Fearless give $20,000 to a business" wouldn't "know that Fearless was sending a message about the importance of black women in the economy." Br. 16, 20.  But the Alliance reaches that conclusion only by stripping out all context and focusing myopically on the moment of cash handoff—exactly what this Court has said *not* to do.

---

[2]   The statement is available at https://www.fearlessfund.foundation/.

For an activity to rank as "expressive," the ordinary observer need only "interpret it as *some* sort of message." *Coral Ridge*, 6 F.4th at 1254. A "narrow, succinctly articulable message" is not required. *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 569 (1995). And "context . . . matters," which means the Court must consider the "factual context and environment" in which the activity occurs. *Fort Lauderdale Food Not Bombs v. Fort Lauderdale*, 901 F.3d 1235, 1240-41, 1244 (11th Cir. 2018). Here, that factual context includes that the $20,000 is not a loan or payment for services, but a grant. And a donation of money virtually always communicates "*some* sort of message," *Coral Ridge*, 6 F.4th at 1254, because it serves as "a general expression of support for the recipient and its views," *Cornelius*, 473 U.S. at 799; *see also Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 400 (2000) (Breyer, J., concurring) ("Through contributions the contributor associates himself with the candidate's cause"). Here, then, an ordinary observer would at least discern the Foundation's general support for the persons eligible to receive a grant: Black women entrepreneurs. That is true even when one considers the grant alone, apart from the speech

20

accompanying it, as the Alliance protests.   Br. 16 (citing *Rumsfeld v. FAIR*, 547 U.S. 47, 65 (2006)).

While that surrounding speech is not "necessary for the reasonable observer to perceive" that the grant and mentorship program conveys a message, it is certainly relevant, *Food Not Bombs*, 901 F.3d at 1244, and it leaves no doubt about the Foundation's message.   To apply for the Fearless Strivers program, an applicant must visit the Foundation's website, which informs her that the Foundation is "a 501c-3 non-profit" that believes "women of color are the unrecognized economic powerhouses of our world." *Our Mission*, *supra*.   When that applicant clicks through to the application for the Fearless Strivers contest, the first line she reads is:  "Black women-owned businesses are vital to our economy," and "Fearless Fund is deepening its commitment to this community with the launch of the 2023 Fearless Strivers Grant Contest." Dkt. 2-2 at 2.   For an observer to miss that "Fearless was sending a message about the importance of black women in the economy," as the Alliance contends (at 16), she would need to cover her eyes.

The Alliance attempts to escape First Amendment scrutiny by reframing the Foundation's grant and mentorship program as "racial

21

discrimination in contracting," which it says is "conduct, not speech." Br. 13, 16. This argument rests on the Alliance's blatant distortion of the record: namely, its claim that the Foundation is a "venture capital fund" rather than a charitable endeavor. Br. 3, 19 (quoting Dkt. 59-2 at 6). The Alliance inaccurately quotes from a portion of Ms. Simone's declaration that describes the Fearless *Fund*, not the Fearless *Foundation*—a distinction the Alliance tries to elide by referring to these separate corporate entities together as "Fearless." Br. 3-6 & n.1. But the Alliance challenges only the Fearless Strivers Grant Contest, which is operated solely by the nonprofit Foundation—not by any of the Funds named here as defendants. Dkt. 59-3 at 5-6.

The Alliance's legal arguments that the grant program involves "conduct" rather than "speech" are equally "unprincipled." *Otto v. Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020). The Fearless Strivers program doesn't lose its First Amendment protection simply because the Foundation chose a contest with terms and conditions—what the Alliance describes as a "contract"—rather than some other means to give its money away. Br. 13-15. That argument is at war with *Coral Ridge*, 6 F.4th at 1255-56, where this Court upheld Amazon's First Amendment

22

defense to a claim that it impermissibly excluded a charity from a grant program on the basis of its religion. The Alliance argues (at 18-19) that *Coral Ridge* "didn't involve discrimination in contracting" because "no contract" existed between Amazon and participating charities. But that's simply not true: Amazon required charities to sign a "Participation Agreement" that excluded entities, like the plaintiff, that promoted "intolerance" or "hate." *Coral Ridge*, 6 F.4th at 1250. The fact that Amazon limited its program via contract did not convert its expressive choices into "conduct" or preclude application of the First Amendment— as the Alliance contends should happen here. *See also Riley*, 487 U.S. at 788-90 (applying First Amendment scrutiny to law regulating "contracts between charities and professional fundraisers" and rejecting argument that this law was merely "economic").

The Alliance's argument that the alleged "contract" terms somehow immunize it from First Amendment scrutiny is especially meritless because those terms (when still in effect) protected the Foundation's *speech interests*. For example, the Foundation required applicants to authorize the use of their name, likeness, and contest entry—what the Alliance describes (at 12) as "assign[ing] away their intellectual-property

23

rights"—so that the Foundation could "publish" and "post" about the grant program without fear of liability. Dkt. 2-3 at 7-8. These alleged terms thus enabled the "communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes" that always attend giving and fundraising. *Schaumburg*, 444 U.S. at 632. Despite the Alliance's suggestion to the contrary (at 14-15), nonprofits like the Foundation aren't required to drop $20,000 into the collections plate, no questions asked, for their grant program to qualify for First Amendment protection.

### B. Applying § 1981 as the Alliance Requests Would Violate the First Amendment.

Because the Foundation's charitable grant program is expressive, the Alliance cannot force the Foundation to open the program to non-Black women under § 1981. The Alliance is not the first plaintiff to try using antidiscrimination laws to suppress opposing viewpoints on topics of public concern—here, whether charities may focus their funding on racial minorities who have long experienced discrimination. But the law is clear: § 1981 and other antidiscrimination statutes are not a license to "interfere with" a speaker's "desired message" or compel it "to include

other ideas with [its] own speech that [it] would prefer not to include." *303 Creative*, 600 U.S. at 586, 596.

A line of opinions stretching from *Hurley* to *303 Creative* rejects efforts to use antidiscrimination laws to force private parties "to speak in ways that align with" the plaintiff's view but "defy" their own. *303 Creative*, 600 U.S. at 602-03. In *Hurley*, the Supreme Court held that Massachusetts could not require parade organizers to include an organization representing gay Irish-Americans because its participation would "alter the expressive content of the[] parade" and deprive organizers of "autonomy to choose the . . . message." 515 U.S. at 572-73. And in *303 Creative*, the Court held that the First Amendment precluded Colorado from applying a similar law to "compel speech" the defendant "does not wish to provide" in a commercial setting—websites celebrating same-sex weddings. 600 U.S. at 588. A state cannot "use its public accommodations statute to deny speakers the right 'to choose the content of their own messages.'" *Id.* at 592.

This Court applied the same principle in *Coral Ridge*—a case that dictates the result here. *Coral Ridge* involved a challenge to a grant program in which Amazon would donate a percentage of sales to eligible

25

charities that did not promote ideologies of "intolerance" or "hate."  6 F.4th at 1250.  When Amazon excluded a Christian ministry on the basis of its "anti-LGBTQ" views, the ministry claimed religious discrimination under Title II of the Civil Rights Act.  *Id.* at 1251.  Rejecting that argument, this Court held that the ministry's "interpretation of Title II would violate the First Amendment by essentially forcing Amazon to donate to organizations it does not support."  *Id.* at 1254.  The Court recognized that "Amazon's choice of what charities are eligible to receive donations" qualified as "expressive conduct."  *Id.* at 1255.  Applying Title II as the plaintiff proposed "would not further the statute's purpose" but would "instead 'modify the content of [Amazon's] expression'—and thus modify Amazon's 'speech itself'—by forcing it to donate to an organization it does not wish to promote." *Id.* at 1255-56 (quoting *Hurley*, 515 U.S. at 573, 578).

This case is no different.  The Foundation created the Fearless Strivers program to express a message of support for Black women entrepreneurs and raise awareness about inequities in access to capital. The Foundation's choice to exclude non-Black women from its grant and mentorship program is inherently "expressive."  *Coral Ridge*, 6 F.4th at

1255. And applying an antidiscrimination law to alter the program's eligibility criteria would "'modify the content of [the Foundation's] expression'—and thus modify [the] 'speech itself.'" *Id.* at 1256. Indeed, it would upend the program's raison d'être: to "provide[] capital, community, mentorship, and education" to Black women. *Our Mission*, *supra*.

The Alliance's attempts to distinguish *303 Creative*, *Hurley*, and *Coral Ridge* lack merit. The Alliance argues (at 17) that *303 Creative* involved "pure speech," *Hurley* a "form of expression," and *Coral Ridge* "expressive conduct." But that's no distinction at all, as the grants and mentorship at issue here are at least as expressive as Amazon's charitable donations in *Coral Ridge*. *See also Citizens United v. FEC*, 558 U.S. 310, 339 (2010) (equating a ban on corporate independent campaign expenditures with "a ban on speech").

In a similar vein, the Alliance argues that *303 Creative* and *Hurley* involved discrimination "based on message," while the Foundation supposedly asserts a "right to refuse to serve members of a protected class." Br. 17-18. But the Foundation's "message cannot be divorced from [its] selection and evaluation of contestants" for the Fearless

27

Strivers program.  *Green v. Miss U.S.A., LLC*, 52 F.4th 773, 780 (9th Cir. 2022).  The Foundation created the program for the purpose of supporting Black women and raising awareness about disparities in access to capital.  Forcing the Foundation to adopt race-neutral criteria would disable the Foundation from conveying its message on the precise topic it seeks to address:  economic disadvantages faced by *Black women*.

The importance of race to the Foundation's message distinguishes this case from *Runyon v. McCrary*, 427 U.S. 160 (1976), where the Supreme Court held that the First Amendment's free association clause did not bar a § 1981 claim against private schools that denied admission to Black children based on their race.  *Id.* at 175-76.  As the Court observed, the First Amendment protects a right to associate "for the advancement of beliefs and ideas."  *Id.* at 175; *see also Rotary Int'l*, 481 U.S. at 544 (recognizing "the freedom of individuals to associate for the purpose of engaging in protected speech").  In *Runyon*, however, the exclusion of Black children was a naked act of discrimination, unrelated "in any way" to "the teaching in these schools of any ideas."  427 U.S. at

176.   The Court thus declined the schools' attempt to reframe their exclusionary policies "as a form of exercising freedom of association." *Id.*[3]

This case parallels not *Runyon*, but *Green*, 52 F.4th at 781-82, where the Ninth Circuit recognized that use of race-conscious selection criteria is protected where it is integral to the defendant's message.  The court observed that the "popularity" of the musical *Hamilton* stemmed in part "from its casting choices, namely the decision to cast the predominately white Founding Fathers with actors of color."  *Id.* at 781.  The show's "expressive message" was thus "inescapably interwoven" with "whom the musical decided to cast and whom the musical decided to exclude."  *Id.* at 782.  "Had some anti-discrimination statute been applied to *Hamilton* forcibly to include white actors, the show simply would not be able to express the message it desired."  *Id.*; *see also Claybrooks v. ABC, Inc.*, 898 F. Supp. 2d 986, 999 (M.D. Tenn. 2012) (rejecting § 1981 claim that sought to force television network to make race-neutral

---

[3] Even assuming the schools had any protected First Amendment associational interest, the government would have a compelling interest in prohibiting invidious private discrimination in education sufficient to overcome that interest.  The same is not true here for the reasons outlined at pp. 30-33, *infra*.

casting decisions for *The Bachelor*).  That is the case here, where forcing the Foundation to adopt race-blind criteria would silence its message of support for Black women entrepreneurs.

### C.  The Alliance Does Not Even Try to Satisfy Strict Scrutiny.

The Alliance argues in the alternative that, even if the Foundation's program is expressive, the district court erroneously failed to undertake an intermediate scrutiny analysis—that is, to evaluate whether the government has a "substantial" interest in applying § 1981 "unrelated to the suppression of free speech" sufficient to overcome the burden on the Foundation's speech.  Br. 21.  But the Alliance can hardly fault the district court's analysis as "incomplete," *id.*, much less an abuse of discretion, when it failed to raise this argument below—even though it bears the burden of satisfying intermediate scrutiny, *Otto*, 981 F.3d at 868.  The Alliance has forfeited any such argument here.  *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

The Alliance is wrong, in any event, that intermediate scrutiny governs.  The Alliance asks this Court to apply § 1981 to suppress the speech activity of a party that stands on the opposite side of the ideological divide on an issue of substantial public concern.  Its attempt

30

"to 'excise certain ideas or viewpoints from the public dialogue'" and force the Foundation to mouth the Alliance's own race-blind views is classic viewpoint discrimination that violates the First Amendment *per se* or, at a minimum, triggers strict scrutiny. *303 Creative*, 600 U.S. at 588, 592; *see Hurley*, 515 U.S. at 578; *Coral Ridge*, 6 F.4th at 1255-56.

To the extent any form of scrutiny is even required, *but see Coral Ridge*, 6 F.4th at 1255-56, the Alliance can't show the government has a compelling or substantial interest in applying § 1981 to prohibit the Foundation from running a grant and mentorship program solely for Black women. To start, the Alliance hasn't shown a likelihood that § 1981 even applies to a private party's expressive decisions about how to award charitable grants or mentorship. *See* pp. 49-51, *infra*. Our country's history and tradition further confirm that self-help programs by and for Black women do not violate the statute, but instead serve the same remedial ends § 1981 was designed to promote.

Congress enacted § 1981 after the Civil War to ensure economic freedom for Black Americans. *See* pp. 56-60, *infra*. Black mutual-aid societies proliferated during the same era, when "[w]hites received more public aid, despite the relatively greater needs of the black community."

31

Elna C. Green, *This Business of Relief* 101 (2003). Black women, in particular, emerged as leaders of "a widespread movement in nineteenth and twentieth century America . . . [to] bond[] together for 'self-help.'" Mary Margaret Schley, *The United Order of Tents and 73 Cannon Street: A Study of Identity and Place* 7 (2013); *see also* Jessica Gordon Nembhard, *Collective Courage* 23 (2014). For instance, two formerly enslaved women founded the United Order of Tents in 1867 to provide financial assistance, burial insurance, elder care, and scholarships to other Black women. Schley, *supra*, at 14-18. The Daughters of Africa formed during the same era to distribute aid for "black women to feed their children, assist the sick, and bury the dead." Erica Armstrong Dunbar, *A Fragile Freedom* 60-61 (2008). Other examples abound. *See generally* W.E.B. DuBois, *Economic Co-Operation Among Negro Americans* (1907) (describing schools, orphanages, insurance societies, and banks designed to aid Black Americans).

Such initiatives by and for Black Americans fit within a venerable American tradition of self-help by racial minorities and immigrant groups. From the colonial period until today, groups as diverse as the

Charitable Irish Society,[4] the Sons of Italy,[5] the Hebrew Free Burial Association,[6] and the Gran Círculo de Obreros Mexicanos[7] have provided financial aid or insurance within specific communities. *See* 26 C.F.R. § 53.4945-4(b)(2), (5) (IRS regulation permitting grants to minority groups based on criteria "related to the purposes of the grant"). Shutting off such avenues of support to racial and ethnic minorities, including Black women, would undermine rather than support the government interests embodied in § 1981. *See Fulton v. Philadelphia*, 141 S. Ct. 1868, 1881-82 (2021).

## II.    The Alliance's Claim Is Unlikely to Succeed for Additional Reasons.

Even apart from the Foundation's First Amendment defense, the Alliance is unlikely to succeed on its claim. The Alliance hasn't surmounted the first hurdle for injunctive relief: proof of an Article III injury. And the Alliance is unlikely to succeed on the merits of its § 1981

---

[4]    https://www.charitableirishsociety.org/.

[5]    https://nyheritage.org/exhibits/immigration/mutual-aid-societies.

[6]    https://www.hebrewfreeburial.org/.

[7]    https://www.tshaonline.org/handbook/entries/mexican-american-or-ganizations.

claim for two additional reasons:  the contest confers no enforceable rights, as is necessary to state a claim, and the Foundation's race-conscious program aims to remedy traditional patterns of unequal access to funding for Black women.

### A.    The Alliance Lacks Standing Under Article III.

Article III standing is a prerequisite to any preliminary injunction. *E.g.*, *Fla. Ass'n of Med. Equip. Dealers v. Apfel*, 194 F.3d 1227, 1231 (11th Cir. 1999).  The Alliance does not assert its own Article III standing and instead invokes organizational standing on behalf of its members.  Br. 25.  To do so, the Alliance must establish "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).

Article III has three bedrock requirements: an injury-in-fact that (1) "is concrete, particularized, and actual or imminent," (2) "was likely caused by the defendant," and (3) "would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).  The

Alliance has the burden to prove each element for its members "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Because this appeal arises from the district court's denial of a preliminary injunction, the Alliance can no longer rest on mere allegations but must put forward evidence establishing "'a substantial likelihood of standing.'" *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 n.3 (6th Cir. 2018) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)); *accord, e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020).

The Alliance hasn't shown a substantial likelihood of establishing (at least) the first requirement. The record doesn't "clearly establish" that the Alliance's members are substantially likely to have standing in their own right. *Wreal*, 840 F.3d at 1247. The Alliance has neither identified its members by name nor substantiated that Owners A, B, and C are able and ready to apply for the Fearless Strivers program in the imminent future—both of which Article III requires.

35

### 1. The Alliance has not named any members who have standing to sue in their own right.

Naming at least one member who meets all three elements of Article III standing is a prerequisite for organizational standing. In *Summers*, an organization challenged the U.S. Forest Service's regulations for salvaging burnt timber and defended its standing on the theory that "some (unidentified) members" planned to visit affected forest areas. 555 U.S. at 497-98. The Supreme Court rejected this theory, holding that organizations must "make specific allegations establishing that at least *one identified member* had suffered or would suffer harm." *Id.* at 498 (emphasis added). The only exception to "[t]his requirement of naming the affected members" is a case "where *all* the members of the organization are affected by the challenged activity." *Id.* at 498-99. As the Court explained, the naming requirement is an important check that ensures federal courts don't forgo their "independent obligation to assure that standing exists" based on "organizations' self-descriptions of their membership." *Id.* at 499.

The Supreme Court in *Summers* relied on *FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990), where several petitioners asked the Court to review the constitutionality of a Dallas ordinance that prohibited people

convicted of certain crimes from obtaining a license to run an adult bookstore or similar businesses. *See id.* at 221-23. The Court held that evidence showing "one or two of the Petitioners" had licenses denied or revoked under the ordinance did not satisfy Article III. *Id.* at 235. As the Court described *FW/PBS* in *Summers*, "the affidavit provided by the city to establish standing would be insufficient because it did not name the individuals who were harmed by the challenged license-revocation program." 555 U.S. at 498.

This Court applied the *Summers* rule in *Georgia Republican Party v. SEC*, 888 F.3d 1198 (11th Cir. 2018). There, this Court recognized that an earlier decision had suggested that organizations "need not 'name names' to establish standing based on prospective harm." *Id.* at 1204 (quoting *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008)). But that was no longer true after *Summers*, which required "that an organization proffer 'at least one *identified* member [who] had suffered or would suffer harm.'" *Id.* (quoting 555 U.S. at 498). This Court has since adhered to that rule. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1249 (11th Cir. 2020). Other circuits have as well. *E.g.*, *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 601-02 (8th Cir. 2022);

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1011 (7th Cir. 2021). Only the D.C. Circuit has broken ranks. *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022).

*Summers* forecloses standing here. To date, the Alliance has refused to comply with the "requirement of naming the affected members." 555 U.S. at 498-99. The Alliance also hasn't invoked the *Summers* exception for cases "where *all* the members of the organization are affected by the challenged activity." *Id.* at 499. Nor could it: Its own president, Edward Blum, stated that "some" (not all) of its members were excluded from the Fearless Strivers program "because of their race." Dkt. 2-9 at 2.

The district court refused to apply *Summers*, relying on *American College of Emergency Physicians v. Blue Cross & Blue Shield of Georgia*, 833 F. App'x 235 (11th Cir. 2020), which stated that "organizational plaintiffs need not 'name names' to establish standing." *Id.* at 240 n.8; *see* Dkt. 115 at 6. Of course, that unpublished decision is not binding. 11th Cir. R. 36-2. It's also wrong: The panel there mistakenly quoted the party's argument in *Georgia Republican Party*—rather than the

portion of the opinion *rejecting* that argument. *Compare* 888 F.3d at 1204, *with id.* at 1204-05. Plus, *Emergency Physicians* stated only that "requiring specific names at the *motion to dismiss* stage is inappropriate." 833 F. App'x at 240 n.8 (emphasis added). The Alliance must make a higher evidentiary showing to establish standing for a preliminary injunction. *See* p. 35, *supra*.

Nor do the Alliance's cases justify an end-run around *Summers*. *Doe v. Stincer*, 175 F.3d 879 (11th Cir. 1999), where this Court held that an association need not "name the members on whose behalf suit is brought," *id.* at 882, predates *Summers*. *See Prairie Rivers*, 2 F.4th at 1011. Not surprisingly, this Court hasn't applied *Stincer* in the organizational-standing context since *Summers*. *See Ga. Republican Party*, 888 F.3d at 1204. The Alliance also admits (at 29) that many of its cited decisions didn't even address the naming requirement, which makes them proverbial "drive-by jurisdictional rulings" that merit no weight. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998).

The Alliance argues that the Foundation has confused Federal Rule 10's restrictions on pseudonymous plaintiffs with Article III standing. Br. 29-31. But allowing an *individual* plaintiff to proceed via

pseudonym in court is fundamentally different from allowing an *organization* to sue based on "self-descriptions of their membership." *Summers*, 555 U.S. at 499. Here, no one—not even the Court—can truly assess whether the Alliance's pseudonymous members have Article III standing.

The Alliance's attempt to use pseudonyms to circumvent *Summers* flouts the principle that "'[t]he Constitution deals with substance, not shadows.'" *Students for Fair Admissions*, 600 U.S. at 230. The Alliance seems to think that *Summers* would have turned out differently if the environmental group had stated that Members A, B, and C (rather than "some" members) plan to visit the forest areas, 555 U.S. at 497, and that the result in *FW/PBS* would have flipped if the challengers had used the labels Petitioners 1 and 2 (rather than saying "two of the Petitioners"), 493 U.S. at 235. The Alliance's approach would make a mockery of the limitation "that federal courts decide only 'the rights of individuals'"— not mere legal questions submitted by ideological organizations that use pseudonymous members as a smokescreen to transform federal courts into "roving commission[s]" that evaluate race-conscious programs across the country. *TransUnion*, 141 S. Ct. at 2203.

2.    **The Alliance has not proved that any member is able and ready to apply for a grant in the imminent future.**

The Alliance fails to prove standing for another reason. The record does not show that Owners A, B, and C likely are "'able and ready'" to participate in the Foundation's grant program and will suffer an imminent injury if they cannot apply "'on an equal basis.'" *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (quoting *Northeastern Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993)).

The clearest way for a potential applicant to make this showing is to have applied and been rejected, as the Alliance's own cases illustrate. Br. 25-26. That description covers the *Gratz* plaintiff who was rejected by the University of Michigan, 539 U.S. at 262; the association in *Northeastern Florida* whose members "regularly bid on contracts," 508 U.S. at 668; and the "rejected applicants" to Harvard, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 261 F. Supp. 3d 99, 109-10 (D. Mass. 2017). But Owners A, B, and C never applied to the Foundation's grant program—perhaps because they sought to

41

circumvent the then-applicable rule requiring entrants to agree to arbitration to resolve any disputes.  Dkt. 2-3 at 16-18.

A plaintiff who hasn't applied must corroborate that she is "'able and ready' to apply in the *imminent future*."  *Carney*, 141 S. Ct. at 503 (emphasis added).  In *Carney*, a political independent challenged the political-balance requirements that divided the Delaware judiciary between Democrats and Republicans, excluding all those not registered with one of the two major parties.  *Id.* at 497.  The plaintiff testified that he "would apply for any judicial position that [he] thought [he] was qualified for" and that he was "qualified for any position that would come up."  *Id.* at 500.  The Court held that this evidence was insufficient to prove that the plaintiff was "'able and ready' to apply for a judgeship in the reasonably foreseeable future."  *Id.* at 501.  The plaintiff had recently changed his party affiliation to set up the lawsuit, and his bare statement of an intent to apply was made "without reference to an anticipated timeframe, without prior judgeship applications, . . . and without any other supporting evidence."  *Id.* at 501-02.

This Court and others have likewise rejected assertions of standing as too speculative when the plaintiffs never applied to the challenged

42

program and did not detail concrete plans to apply in the imminent future.  In *Aaron Private Clinic Management LLC v. Berry*, 912 F.3d 1330 (11th Cir. 2019), for example, a plaintiff lacked standing to challenge statutes restricting licensing of methadone clinics because he hadn't shown "*any* concrete steps—such as selecting a clinic location, securing a lease option, consulting with relevant government officials, applying for the necessary permits or certifications, or associating with potential clients—that suggest such an immediate intention or plan" to open a clinic.  *Id.* at 1337.  And in *Women's Emergency Network v. Bush*, 323 F.3d 937 (11th Cir. 2003), this Court ordered the dismissal of a First Amendment challenge to an allegedly discriminatory process for approving specialty license plates because the plaintiffs had not yet "appl[ied] for a license plate bearing a message concerning their political views."  *Id.* at 946-47; *see also, e.g.*, *Faculty v. N.Y. Univ.*, 11 F.4th 68, 77 (2d Cir. 2021); *Carroll v. Nakatani*, 342 F.3d 934, 942-43 (9th Cir. 2003).

As in those cases, the Alliance hasn't carried its burden to substantiate that Owners A, B, and C are able and ready to apply to the Foundation's grant program in the imminent future.  The Alliance grounds its members' standing on three anonymous declarations.  Br. 25.

43

But these declarations are not competent evidence because they do not comply with 28 U.S.C. § 1746. *Roy v. Ivy*, 53 F.4th 1338, 1348-49 (11th Cir. 2022). Owners A, B, and C didn't sign with their own legal names, but with fake names that don't bind them under penalty of perjury:



Owner C

Dkt. 2-11 at 4; *see* Dkt. 2-10 at 4; Dkt. 11-1 at 4. Courts routinely refuse to consider such anonymous declarations. *E.g.*, *Williams v. D'Argent Franchising, LLC*, 2023 WL 3059192, at *13-14 (W.D. La. Apr. 24, 2023); *Do No Harm v. Pfizer Inc.*, 646 F. Supp. 3d 490, 503 n.4 (S.D.N.Y. 2022). So even if one assumes that *Summers* doesn't require the Alliance to divulge "its members' legal names," Br. 13, the declarations are faux evidence that do not substantiate the Alliance's standing, *e.g.*, *KeyView Labs, Inc. v. Barger*, 2020 WL 8224618, at *6 (M.D. Fla. Dec. 22, 2020).

At any rate, the anonymous declarations are too threadbare to meet the Alliance's burden at the preliminary-injunction stage to prove Owners A, B, and C are able and ready to apply for the Foundation's grant in the imminent future. Each member filed a virtually identical

44

declaration that parroted the legal standard: "I am ready and able to apply for a grant for Business A [or B or C] through the Fearless Strivers Grant Contest in the fourth promotion period, but I am ineligible because I am not a black woman." Dkt. 2-10 at 2; Dkt. 11-1 at 2; Dkt. 2-11 at 2. The declarations are otherwise as generic as possible, asserting only that Owners A, B, and C meet the baseline eligibility requirements of gender, U.S. residence, age, and ownership of a small business. Dkt. 2-10 at 2-3; Dkt. 11-1 at 2-3; Dkt. 2-11 at 2-3; *see* Dkt. 2-3 at 3.

These declarations are nothing more than "a bare statement of intent" that regurgitates the able-and-ready standard. *Carney*, 141 S. Ct. at 502. Such "[t]hreadbare recitals" are insufficient at the pleading stage, let alone at the preliminary-injunction stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The declarations don't share any "specific and concrete facts"—such as past applications, a present need for and inability to secure funding from capital markets, and ongoing preparations to apply—that "would suggest [a] readiness" to apply for a grant in the "imminent" future. *Aaron*, 912 F.3d at 1337-38. And the litigation backdrop hints at "a desire to vindicate [the Alliance's] view of the law." *Carney*, 141 S. Ct. at 501. Just as the *Carney* plaintiff registered as a

45

political independent to engineer a lawsuit, Owners A, B, and C "became members" of the Alliance to facilitate "this lawsuit."  Dkt. 2-10 at 3; Dkt. 11-1 at 3; Dkt. 2-11 at 3.

Bare statements of intent and ideological affinity do "essentially nothing to demonstrate that" Owners A, B, and C are "in a position to compete equally" with other grant applicants and instead describe only the same "generalized grievance" about the Foundation's grant program that any non-Black woman who owns a small business could raise. *Carroll*, 342 F.3d at 942-43.  As the Alliance acknowledges, the Foundation runs a "'skill-based contest.'"  Br. 4.  But the declarations never describe how Owners A, B, and C would attempt to satisfy such criteria as the "[v]iability and strength" of their businesses, their need for funding, and their "[p]otential for business growth."  Dkt. 2-3 at 10. Nor do the declarations explain how the Owners could survive contest rules that permit the Foundation to disqualify applications based on their political message or views inconsistent with the Foundation's objectives. *Id.* at 6-7.  Their purported harm therefore is not "concrete and particularized," as required by Article III.  *TransUnion*, 141 S. Ct. at 2203.

46

Mr. Blum's declaration only reinforces the absence of concrete evidence demonstrating standing. Although the Alliance asserts that Owners A, B, and C all have standing, Mr. Blum attested that "*at least two*" of the Alliance's members "are ready and able to apply to the Fearless Strivers Grant Contest, but cannot because they are the wrong race." Dkt. 2-9 at 2 (emphasis added). His failure to identify (by real name *or* pseudonym) which two members are purportedly able and ready to apply creates a standing problem even under the Alliance's reading of *Summers*. Br. 27. Mr. Blum's declaration further undercuts the credibility of the anonymous declarations because he stated that he had "discussed" Businesses A, B, and C with their respective owners, yet he mysteriously concluded that only two Alliance members are able and ready to apply. Dkt. 2-9 at 3. This declaration leaves this Court no way to tell which of Owners A, B, or C has "an intent that is concrete" to apply in the imminent future. *Carney*, 141 S. Ct. at 502.

In the end, the Alliance's generalized desire to prevent the Foundation from considering race when administering its charitable program reflects "'the sort of proactive enforcement discretion properly reserved to the Executive Branch,' with none of the corresponding

accountability." *Acheson Hotels, LLC v. Laufer*, 601 U.S. ___, 2023 WL 8378965, at *6 (Dec. 5, 2023) (Thomas, J., concurring in the judgment) (quoting *Laufer v. Arpan, LLC*, 29 F.4th 1268, 1291 (11th Cir. 2022) (Newsom, J., concurring)).   Mr. Blum and Owners A, B, and C even declared that the owners "joined the Alliance because they support its mission and this lawsuit"—in other words, for ideological reasons. Dkt. 91-4 at 3; Dkt. 2-10 at 3; Dkt. 2-11 at 3; Dkt. 11-1 at 3.   But a plaintiff must "sufficiently differentiate[] himself from a general population of individuals affected in the abstract by" the Foundation's grant program. *Carney*, 141 S. Ct. at 502.   A desire to live in a colorblind country is not a concrete injury under Article III, just as the Black plaintiffs in *Allen v. Wright*, 468 U.S. 737 (1984), lacked standing based on generalized objections to federal tax breaks for schools engaged in discrimination.   *Id.* at 754-55.   This Court should not approve a preliminary injunction that serves only the Alliance's abstract, ideological cause.

### B.    The Alliance's § 1981 Claim Likely Fails on the Merits.

Section 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and

Territory to make and enforce contracts . . . as is enjoyed by white citizens." The Alliance is unlikely to prove a violation of this provision for at least two reasons. First, the Foundation's grant program does not involve contracting within the meaning of § 1981. Second, this statute does not prohibit private, race-conscious efforts, such as the Foundation's grant program, that seek to remedy manifest racial imbalances without unfairly trammeling the rights of others.

### 1. Section 1981 does not cover the Foundation's grant program.

Section 1981 doesn't govern the Foundation's grants at all because they are discretionary gifts that confer no enforceable rights on contest entrants—a prerequisite to suit under § 1981. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476, 479-80 (2006). The program's rules set forth criteria under which individuals can apply for a grant, but they impose no reciprocal "obligation[s]" on the Foundation, which may unilaterally disqualify entries for any number of reasons. Dkt. 59-3 at 18 (providing that a contest entry is "gratuitous"); Dkt. 2-3 at 6-8 (same under old rules). Contrary to the district court's conclusion, the grant rules are not a "unilateral offer to contestants that they may accept by completing their entry," Dkt. 115 at 12, because the Foundation has no

49

"duty of performance . . . on completion or tender of the invited performance," Restatement (Second) of Contracts § 45(2) (1981).

In any event, the Alliance cites no case, nor has the Foundation located one, that applied § 1981 to a private party's distribution of charitable grants. *See Doe v. Kamehameha Schs.*, 470 F.3d 827, 889 (9th Cir. 2006) (en banc) (Kozinski, J., dissenting) (noting absence of any "case where section 1981 has been applied to a charity"). Nor does § 1981 necessarily reach personal contracts that serve as "the foundation of a close association," such as between "an employer and a private tutor" or, here, the Foundation and individual mentees. *Runyon*, 427 U.S. at 187-89 (Powell, J., concurring). The complete absence of authority applying § 1981 to private grants or personal mentorship is unsurprising in light of the substantial First Amendment concerns posed by the Alliance's reading of the statute. *See United States v. Hansen*, 599 U.S. 762, 781 (2023). This Court should not become the first to extend § 1981 into this novel context.

Even assuming, as the Alliance argues, that various terms in the grant contest's original rules created a contract subject to § 1981, the Foundation removed those terms and conditions after the filing of this

lawsuit.  *See* p. 8, *supra*.  The Alliance argues (at 5, 33-34) that those revisions did not moot the case for Article III purposes.  But even if the case remains live—and the Court could, for example, issue a declaratory judgment or award nominal damages under the original rules—the Alliance cannot obtain an injunction under § 1981 prohibiting the Foundation from offering a "contract" that no longer exists.  *Domino's Pizza*, 546 U.S. at 479-80.

### 2.    The Foundation's grant program is a valid remedial plan.

Section 1981 traces its roots to the Thirteenth Amendment and Reconstruction legislation designed to secure the economic independence of Black Americans.  *Runyon*, 427 U.S. at 168-71 & n.8.  Although the text on its face confers rights only on non-white persons, the Supreme Court has held that § 1981 protects persons of all races.  *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295-96 (1976).  At the same time, this Court has given effect to both Congress's text and its intent to protect disadvantaged minorities by interpreting § 1981 to permit appropriate private, race-conscious efforts to ameliorate the effects of historical discrimination.  The district court disregarded the statute's text and history by restricting such efforts to the employment context and

51

also applied strict scrutiny while overlooking that Congress made § 1981 applicable to private individuals under its Thirteenth Amendment power to eliminate the badges and incidents of slavery—not its Fourteenth Amendment authority over state actors.

The Supreme Court first created a carveout for race-conscious remedial plans in the Title VII context, holding that the statute's prohibition on racial discrimination by employers does not reach "an affirmative action plan voluntarily adopted by private parties to eliminate traditional patterns of racial segregation." *Steelworkers v. Weber*, 443 U.S. 193, 201 (1979). This Court then extended this defense "to the § 1981 defendant," *Ferrill*, 168 F.3d at 474, as the Fifth Circuit did before it was subdivided to create the Eleventh Circuit, *Edmonson v. U.S. Steel Corp.*, 659 F.2d 582, 584 (5th Cir. Unit B 1981) (per curiam); *see Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982) (adopting Unit B decisions as circuit precedent).

Under this framework, private, race-conscious remedial programs comply with § 1981 if they (1) address "manifest racial imbalances" and (2) do not "unnecessarily trammel" the rights of others. *Johnson v. Transp. Agency, Santa Clara Cnty.*, 480 U.S. 616, 628-30 (1987). The

52

Foundation's remedial program easily meets the first requirement because its grants seek to address the "manifest racial imbalance" in access to capital for Black women-owned businesses. *Weber*, 443 U.S. at 208. Black women face disproportionate barriers—including racial discrimination—in accessing funding to grow their businesses. Dkt. 59-4 at 19-21. The Alliance below never questioned the stark inequalities in access to funding—with only 0.13% of funds going to the 2% of small businesses owned by Black women. *Id.* at 18. These massive disparities far outstrip the minimum necessary for a valid remedial program. *See, e.g.*, *In re Birmingham Reverse Discrimination Emp. Litig.*, 20 F.3d 1525, 1540 (11th Cir. 1994) (manifest racial imbalance shown where 42 of 453 firefighters were Black).

The Foundation also satisfies the second requirement because its grant program does not "unnecessarily trammel" the interests of non-Black women who own small businesses. *Weber*, 443 U.S. at 208. The Foundation selects one grant winner "in its sole discretion" per cycle, Dkt. 2-3 at 12, such that no single applicant has any "absolute entitlement" to the Foundation's money, *Johnson*, 480 U.S. at 638. Nor has the Alliance shown its members face an "absolute bar" to obtaining

53

capital from other sources—99.87% of which goes to people other than Black women. *Id.* at 630; *see* Dkt. 59-4 at 17-18. The Foundation's modest grants don't limit the Alliance members' access to funding in any meaningful way and are instead "designed to break down old patterns of racial segregation and hierarchy" in a capital market that has "'been traditionally closed'" to Black women. *Weber*, 443 U.S. at 208. And if the Alliance were to succeed in enjoining the Foundation's grants, the likely result is that the program would end—a contraction, rather than an expansion, of available funds.

The *Weber-Johnson* safe harbor for private remedial programs is necessary to prevent § 1981 from creating perverse results. As the Supreme Court has said of Title VII, "[i]t would be ironic indeed if a law triggered by a Nation's concern over centuries of racial injustice and intended to improve the lot of those who had been excluded from the American dream for so long constituted the first legislative prohibition of all voluntary, private, race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy." *Johnson*, 480 U.S. at 628-29 (cleaned up). Such a result would be even "*more ironic*" under § 1981, given its roots in Reconstruction-era legislation designed to help Black

54

Americans.  *Setser v. Novack Inv. Co.*, 657 F.2d 962, 966-67 (8th Cir. 1981) (en banc) (emphasis added); *see Kamehameha*, 470 F.3d at 838-39.

Despite recognizing that it would be "'ironic'" to apply § 1981 to prevent "'race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy,'" the district court declined to apply the remedial-plan defense in the context of a "grant fund, rather than an employer."  Dkt. 115 at 19-20 (quoting *Johnson*, 480 U.S. at 628-29).  The Alliance's amici defend this conclusion on the theory that courts have "imported" *Weber* and *Johnson* into § 1981 from Title VII but only in the employment context.  ACR Project Br. 8.

The district court's employment-only interpretation conflicts with § 1981, which (unlike Title VII) "is not limited to employment."  *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 304 (1994).  That is why courts have applied the *Weber* defense outside the employment context.  *E.g.*, *Kamehameha*, 470 F.3d at 839-40 (school); *Rabbani v. Gen. Motors Corp.*, 2000 WL 36752977, at *4 (N.D. Fla. July 26, 2000) (auto dealerships).  As the Supreme Court has explained, "*employment*-related" interpretations of § 1981 will apply to "*non*-employment contracts" too.  *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 455 (2008).  And although Title VII and

§ 1981 parallel each other in some respects, the Court has refused to textually "engraft" inapplicable portions of Title VII onto § 1981, noting that the "two statutes" have "two distinct histories." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1017 (2020).

Those distinct histories support the Foundation because § 1981, even more so than Title VII, couldn't reasonably be interpreted to forbid private, race-conscious efforts to remedy the ongoing legacy of slavery and Jim Crow—whether inside or outside the employment context. The year before the enactment of § 1981's predecessor, Congress established the Freedman's Saving and Trust Company to provide financial services to "persons heretofore held in slavery in the United States, or their descendants." Act of Mar. 3, 1865, ch. 92, § 5, 13 Stat. 510, 511; *see* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, § 308, 103 Stat. 183, 353 (authorizing similar program for minority depository institutions). Under the Alliance's employment-only interpretation, however, this Reconstruction entity was brazenly violating § 1981 by distributing financial resources to Black people, as have many other racial and ethnic charities. *See* pp. 31-33, *supra*.

56

The district court also held that the Foundation's program was "unlikely to satisfy the narrow tailoring requirement of the strict scrutiny analysis." Dkt. 115 at 20. The court thus appeared to accept the Alliance's argument that strict scrutiny applies to private, race-conscious remedial programs, even though this requirement appeared nowhere in *Weber* or *Johnson*. Dkt. 91 at 16-17. The Alliance instead grounded this argument in *Students for Fair Admissions* and *Gratz*, where the Supreme Court explained that "purposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981." 539 U.S. at 276 n.23.

Stare decisis forecloses the application of strict scrutiny to the Foundation's grant program. Because *Weber* and *Johnson*, which require only a manifest racial imbalance and a lack of unnecessary trammeling of others' rights, have "direct application" on this question, they control even if they "rest on reasons rejected in some other line of decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989). The district court therefore was wrong to "assum[e] strict scrutiny applies" after *Students for Fair Admissions* when the Supreme Court hasn't revisited the remedial-plan exception. Dkt. 115 at 20.

57

Strict scrutiny is also inconsistent with § 1981's constitutional underpinnings. During Reconstruction, Congress enacted § 1981's predecessor statutes to enforce both the Thirteenth and Fourteenth Amendments. *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 383-86 (1982). But the Supreme Court soon held that the Fourteenth Amendment reaches only "State action." *Civil Rights Cases*, 109 U.S. 3, 11 (1883). Section 1981 thus covers private conduct only by virtue of Congress's § 2 "power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968).

The Alliance has completely overlooked that the Thirteenth Amendment is the constitutional basis for applying § 1981 to private conduct. While purporting to recognize that § 1981 "was enacted to 'translate' a constitutional right," the Alliance (at 34-35) and the American Civil Rights Project (at 5) invoke the *Fourteenth* Amendment— the *wrong* constitutional provision, *Runyon*, 427 U.S. at 170-71 & n.9. The Foundation is not a state actor governed by the Fourteenth Amendment, *Gratz*, 539 U.S. at 260, nor a private party that has agreed to follow the Fourteenth Amendment in exchange for federal funds,

*Students for Fair Admissions*, 600 U.S. at 198 n.2.  Supreme Court decisions about the Fourteenth Amendment therefore say nothing about whether strict scrutiny is required for private, race-conscious remedial plans that advance (rather than frustrate) § 1981's constitutional function in eliminating the badges and incidents of slavery.  *Jones*, 392 U.S. at 440; *cf. Birmingham*, 20 F.3d at 1539 (modifying *Weber/Johnson* defense for Fourteenth Amendment claim against "*government* entity") (emphasis added).

If the Alliance were right that § 1981 prohibited the Foundation's remedial grant program, then the statute would have drifted far from its moorings in the Thirteenth Amendment.  Congress couldn't have rationally determined that *prohibiting* private, race-conscious efforts to direct financial resources to Black Americans would serve to alleviate "the badges and the incidents of slavery."  *Jones*, 392 U.S. at 440.  Yet the Alliance's strict-scrutiny-focused approach would require private charities to exacerbate existing racial disparities before they can start to remedy them.  Dkt. 91 at 19.  Such an interpretation, as the Foundation explained below, would "distort the purpose and text of this seminal civil

rights statute to use it against Black people—the same people the Reconstruction Congress sought to protect." Dkt. 59 at 8.

In short, the Foundation's charitable work seeks to eliminate, not perpetuate, the badges and incidents of slavery. The grant program promotes the very goals that § 1981 was enacted to advance: providing Black people with economic freedom—equal access to capital to build businesses, grow communities, and support families. *Runyon*, 427 U.S. at 179. In contrast, the Alliance's strict colorblind theory of § 1981 does just the opposite. This Court should reject the Alliance's invitation to install a Fourteenth Amendment model in place of the test that the Supreme Court has prescribed and the Constitution demands.

## III.  The Other Factors Weigh Against a Preliminary Injunction.

This Court also should affirm because the district court did not abuse its discretion in finding that the Alliance's members failed to show that they would suffer irreparable injury, and because the balance of equities and public interest don't favor injunctive relief. Failure on just one requirement "dooms" the Alliance's appeal. *Wreal*, 840 F.3d at 1248.

## A.    The District Court Did Not Abuse Its Discretion in Finding No Irreparable Injury.

The Alliance argues that race-conscious programs necessarily inflict an irreparable injury on everyone who cannot seek money "on an equal footing." Br. 31-34. But this argument conflicts with this Court's precedents, which have rejected categorical presumptions of irreparable injury not rooted in real-world harms. The Alliance also glosses over its delay in seeking relief and gestures at the possibility of mootness in an attempt to paper over the fact that its ideological objection to race-conscious programs is not an irreparable injury.

At bottom, the Alliance's claim is that its members have lost out on an opportunity to acquire funds from the Foundation. But a "temporary loss" of money is the classic example of a *reparable* injury. *Sampson v. Murray*, 415 U.S. 61, 90 (1974). As the district court correctly observed, the Alliance has made no argument why this is the rare case where damages could not address any harm from the loss of money. Dkt. 115 at 22. Notably, Owners A, B, and C don't say that their businesses will go belly up in the meantime. Dkt. 2-10 at 2-3; Dkt. 2-11 at 2-3; Dkt. 11-1 at 2-3. Nor do they explain how stopping the distribution of funds to Black women business owners could even prevent their injury in the first

place.  *See Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 310 (1999) (disapproving preliminary injunctions that restrain defendant's use of funds in which plaintiff has "no lien or equitable interest").

This Court has already reached the same conclusion for an analogous race-conscious program.  In *Northeastern Florida*, this Court held that a set-aside program for minority contractors didn't irreparably harm the plaintiff-association because it could seek "adequate compensatory or other corrective relief" for contractors "wrongfully denied a contract."  896 F.2d at 1285-86.  This Court also rejected the argument that the allegedly discriminatory nature of the set-aside program alone "constitutes irreparable injury."  *Id.* at 1285.  Although the Supreme Court later held in a separate appeal that the association had *standing*, *Northeastern Fla.*, 508 U.S. at 668-69, this Court has reaffirmed its decision in *Northeastern Florida* on the question of *irreparable injury*, explaining that the "violation of constitutional rights" does not "always constitute[] irreparable harm" outside the context of First Amendment and privacy rights.  *Siegel v. LePore*, 234 F.3d 1163, 1177-78 (11th Cir. 2000) (en banc) (per curiam).  So even if the Alliance

were likely to succeed as to standing, it would *still* lack the irreparable injury required for a preliminary injunction.

The Alliance relies on *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417 (11th Cir. 1984), to support its argument that its members will be irreparably harmed absent injunctive relief.  Br. 31-34.  But *Gresham* does not establish any legal error in the decision below, much less an abuse of discretion.  As the district court noted, an important part of *Gresham*'s reasoning was that, when "'an injunction is authorized by statute and the statutory conditions are satisfied . . . the usual prerequisite of irreparable injury need not be established.'"  730 F.2d at 1423.  Section 1981, unlike the housing-discrimination statutes in *Gresham*, does not itself authorize injunctive relief or even create a cause of action, which the Supreme Court implied only in 1975.  *See Comcast*, 140 S. Ct. at 1015.

Although this Court also reasoned that discrimination can give rise to a presumption of irreparable injury, the question remains "whether the presumption of irreparable injury logically follows from a showing of a substantial likelihood that illegal discrimination has occurred." *Gresham*, 730 F.2d at 1423-24.  The plaintiffs made that showing for

housing discrimination in *Gresham* because their housing was "in limbo while a court resolves the matter," "corrective relief" was "nearly impossible to enter" without vacating white tenants, and white and Black tenants alike would lose out on "the benefits of living in an integrated community" during the lawsuit. *Id.* at 1424; *accord Rogers v. Windmill Pointe Vill. Club Ass'n, Inc.*, 967 F.2d 525, 528-29 (11th Cir. 1992) (per curiam). In other words, this Court rested the presumption on the tangible harms of housing discrimination—not on the Alliance's abstract proposal that race-conscious measures create *per se* irreparable injury. Br. 33.

Not one of the tangible harms identified in *Gresham* carries over to the Foundation's race-conscious grant program, which is much more like the set-aside program in *Northeastern Florida*. Here, the Alliance hasn't proved the loss of an apartment, only the loss of a chance to compete for charitable grant money, which is not an irreparable injury and does not "warrant the extraordinary remedy of preliminary injunction." *Northeastern Fla.*, 896 F.2d at 1286.

*Northeastern Florida* and *Siegel* likewise foreclose the Alliance's argument that the purported dignitary harms of race-conscious programs

64

establish irreparable injury in the abstract.  Br. 33-34.  To begin, Owners A, B, and C never claim to have experienced any dignitary harm. Dkts. 2-10, 2-11, 11-1.  The case the Alliance principally cites, *Students for Fair Admissions*, also didn't involve a preliminary injunction and couldn't have abrogated this Court's holding in *Northeastern Florida* that exclusion from a race-conscious program does not amount to irreparable injury.  The Alliance also cites *Free the Nipple-Fort Collins v. Fort Collins*, 916 F.3d 792 (10th Cir. 2019), for the proposition that "[a]ny deprivation of any constitutional right fits that bill."  *Id.* at 806.  That case is doubly irrelevant, both because this case involves a statutory claim and because this Court in *Siegel* decisively rejected the argument that constitutional violations cause *per se* irreparable injury.

The Alliance's delay in bringing this action further confirms the absence of irreparable injury.  *See* Mot. Dissent 5-6.  "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal*, 840 F.3d at 1248.  Here, the Alliance delayed for *years*.  The Foundation launched its grant program in 2021 and publicized this year's iteration as early as February 2023.  Dkt. 59-3 at 5-6.  But the Alliance

65

did not move for a preliminary injunction until August 2023.  Dkt. 1 at 13; Dkt. 2-1 at 11.  This "failure to act with speed or urgency in moving for a preliminary injunction" reinforces that the district court did not abuse its discretion in finding no irreparable injury.  *Wreal*, 840 F.3d at 1248.

Finally, the Alliance argues that a preliminary injunction is appropriate to prevent the possibility that the Foundation would finish the program and argue that the case is moot.  Br. 34.  This argument is wrong because the program's close couldn't moot the Alliance's request for nominal damages.  Dkt. 1 at 12; *see Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801-02 (2021).  In any event, the Alliance cannot gesture at the possibility of mootness to bootstrap itself into a preliminary injunction where no irreparable injury otherwise exists.

## B.    The Balance of Equities and Public Interest Also Disfavor Injunctive Relief.

The Alliance also can't carry its burden on the final two requirements for a preliminary injunction.  To start, the balance of the equities favors the Foundation.  The Alliance must clearly establish that its "threatened injury" "outweighs the potential harm" to the Foundation.  *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018).  But the Alliance

fails to substantiate any injury, let alone one that would override the Foundation's own First Amendment interest in donating its money as it sees fit. Instead, the Alliance seeks to hijack the Fearless Strivers program to express a different message in favor of colorblindness. *Hurley*, 515 U.S. at 573.

An injunction also disserves the public interest. The public interest lies in encouraging private entities to make charitable donations according to their own preferences, *see Coral Ridge, Inc.*, 6 F.4th at 1254, and in addressing manifest racial imbalances. Congress has specifically recognized that "it is in the national interest to expeditiously ameliorate the conditions of socially and economically disadvantaged groups," including "Black Americans." 15 U.S.C. § 631(f)(1)(C)-(D). The Foundation's grant program advances these goals, which are entirely consistent with § 1981's original purpose. An injunction halting the program would undermine the public interest.

## CONCLUSION

This Court should affirm the denial of the Alliance's motion for a preliminary injunction.

67

Dated:  December 6, 2023

Respectfully submitted,

/s/ *Mylan L. Denerstein*

Alphonso David
GLOBAL BLACK ECONOMIC FORUM
34 35th Street, Suite 5A
Brooklyn, NY  11232
(212) 287-5864

Mylan L. Denerstein
Mark J. Cherry
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
(212) 351-4000

Gregg J. Costa
GIBSON, DUNN & CRUTCHER LLP
811 Main Street, Suite 3000
Houston, TX  77002
(346) 718-6600

Jason C. Schwartz
Molly T. Senger
Zakiyyah Salim-Williams
Katherine Moran Meeks
Alex Bruhn
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC  20036
(202) 955-8500

Patrick J. Fuster
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000

Benjamin L. Crump
BEN CRUMP LAW, PLLC
122 S. Calhoun Street
Tallahassee, FL  32301
(850) 224-2020

Dennis S. Ellis
ELLIS GEORGE CIPOLLONE
2121 Avenue of the Stars
Suite 3000
Los Angeles, CA  90067
(310) 274-7100

*Counsel for Appellees*

68

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

**1.    Type Volume**

  **X**      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, including two words manually counted in the visual image and excluding parts of the document exempted by Federal Rules of Appellate Procedure 32(f), this document contains 12,997 words.

**2.    Typeface and Type Style**

  **X**      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared using Microsoft Word 2019 in 14-point, New Century Schoolbook font.


Dated:  December 6, 2023          /s/ *Mylan L. Denerstein*

                                    Mylan L. Denerstein

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 6th day of December 2023, a true and correct copy of the foregoing was filed electronically and served on all counsel through this Court's CM/ECF system.

/s/ *Mylan L. Denerstein*
Mylan L. Denerstein