# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

AMERICAN ALLIANCE FOR EQUAL RIGHTS,

*Plaintiff-Appellant*,

v.

FEARLESS FUND MANAGEMENT, LLC, *et al.*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of Georgia
No. 1:23-cv-03424-TWT (Hon. Thomas W. Thrash, Jr.)

## BRIEF OF AMICUS CURIAE JAPANESE AMERICAN CITIZENS LEAGUE IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

Carmen Lo
ARNOLD & PORTER
  KAYE SCHOLER LLP
3000 El Camino Real
Five Palo Alto Square, Suite 5000
Palo Alto, CA 94306-3807
Telephone: (650) 319-4500
Fax: (650) 319-4700
carmen.lo@arnoldporter.com

Arthur Luk
Andre Geverola
Tommy La Voy
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 942-5000
Fax: (202) 942-5999
arthur.luk@arnoldporter.com
andre.geverola@arnoldporter.com
tommy.lavoy@arnoldporter.com

## CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(1), *Amicus Curiae* Japanese American Citizens League, through undersigned counsel, hereby submit this Certificate of Interested Persons and Corporate Disclosure Statement.

*Amicus Curiae* state that they have no parent corporation, nor have they issued shares or debt securities to the public. The organization is not a subsidiary or affiliate of any publicly owned corporation, and no publicly held corporation holds ten percent of its stock.

I hereby certify that the disclosures of interested parties submitted by Plaintiff-Appellant, Defendants-Appellees, and other *Amicus Curiae* are complete and correct to the best of my knowledge except for the following additional interested persons:

1. Japanese American Citizens League, *Amicus Curiae*

2. Geverola, Andre, *Attorney for Amicus Curiae Japanese American Citizens League*

3. La Voy, Tommy, *Attorney for Amicus Curiae Japanese American Citizens League*

4. Lo, Carmen, *Attorney for Amicus Curiae Japanese American Citizens League*

5. Luk, Arthur, *Attorney for Amicus Curiae Japanese American Citizens League*

Dated: December 13, 2023

/s/ Arthur Luk

Arthur Luk

*Counsel for Amicus Curiae Japanese American Citizens League*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES AND CORPORATE
DISCLOSURE STATEMENT....................................................................C-1

TABLE OF CONTENTS........................................................................................i

TABLE OF CITATIONS ..................................................................................... ii

INTEREST OF *AMICUS CURIAE*......................................................................1

STATEMENT OF THE ISSUES...........................................................................2

SUMMARY OF ARGUMENT .............................................................................2

ARGUMENT .........................................................................................................4

I.      SYSTEMIC RACISM AGAINST JAPANESE AMERICANS
        ILLUSTRATES THE NEED FOR PROGRAMMING THAT
        ADDRESSES THE ENDURING EFFECTS OF DISCRIMINATION .........4

        A.      Persistent Discrimination Limited Access to Capital and
                Entrepreneurial Opportunities ................................................................4

        B.      The U.S. Government's Incarceration of Japanese Americans
                Stripped the Community's Few Remaining Economic Gains ..............7

II.     PROVIDING RESOURCES TO ADDRESS THE ENDURING
        EFFECTS OF SYSTEMIC INEQUITIES IS CRITICAL ..............................9

        A.      After the End of Incarceration, JACL Advocated for Race-
                Conscious Policies Addressing Racism That Targeted Japanese
                Americans........................................................................................9

        B.      Race-Conscious Programs Continue to be Critical ...........................14

III.    ORGANIZATIONS AND PROGRAMS LIKE FEARLESS
        FOUNDATION HAVE A FIRST AMENDMENT RIGHT TO
        REDRESS ENDURING HARMS OF HISTORIC INJUSTICE.................16

CONCLUSION ....................................................................................................19

CERTIFICATE OF COMPLIANCE.....................................................................20

CERTIFICATE OF SERVICE ............................................................................21

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Fujii v. State,*
    38 Cal.2d 718, 242 P.2d 617 (Cal. 1952) ........................................................11

*Haruye Masaoka v. California,*
    39 Cal.2d 883, 245 P.2d 1062 (Cal. 1952) .....................................................11

*Korematsu v. United States,*
    323 U.S. 214 (1944).........................................................................................9

*Oyama v. California,*
    332 U.S. 633 (1948).......................................................................................11

*Ozawa v. United States,*
    260 U.S. 178 (1922).........................................................................................6

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018).....................................................................................9

## Statutes

42 U.S.C. § 1981 ....................................................................................1, 3, 18

50 U.S.C. § 4202 .............................................................................................13

1952 McCarran-Walter Act ...............................................................................12

Alien Land Law of 1913 .................................................................................2, 5

Immigration Act of 1924 ..................................................................................6

Naturalization Act of 1790................................................................................6

## Other Authorities

61 Fed. Reg. 26042 (May 23, 1996) .................................................................15

About Us, JA Health Insurance Services, https://jahealth.org/about-us/ ................14

About Us, National JACL Credit Union,
https://www.jaclcu.com/about-us/ ......................................................14

*Alien Land Laws in California (1913 & 1920)*, Immigr. Hist.,
https://immigrationhistory.org/item/alien-land-laws-in-california-
1913-1920/ ...............................................................................6

Buck Gee & Denise Peck, *Asian Americans Are the Least Likely
Group in the U.S. to Be Promoted to Management*, Harvard
Business Review (May 31, 2018), https://hbr.org/2018/05/asian-
americans-are-the-least-likely-group-in-the-u-s-to-be-promoted-to-
management ...........................................................................18

*California Law Prohibits Asian Immigrants from Owning Land*, EJI,
https://calendar.eji.org/racial-injustice/may/3 ................................. 5-6

Comm'n on Wartime Relocation and Internment of Civilians,
Personal Justice Denied (Part 2: Recommendations) (1983),
available at https://www.archives.gov/research/japanese-
americans/justice-denied.................................................7-8, 13-14

Ellen Wu, *Asian Americans Helped Build Affirmative Action. What
Happened?*, Slate (Nov. 2, 2022, 12:30 PM),
https://slate.com/human-interest/2022/11/affirmative-action-
proportionality-history-activism.html.................................................12

Executive Order 589 ........................................................................5

Executive Order 9066 .................................................................7, 12

Kimmy Yam, *Anti-Asian hate crimes increased 339 percent
nationwide last year, report says*, NBC News (Feb. 14, 2022),
https://www.nbcnews.com/news/asian-america/anti-asian-hate-
crimes-increased-339-percent-nationwide-last-year-repo-
rcna14282...............................................................................17

Letter from Mike M. Masaoka, Nat'l Legislative Dir., Japanese Am.
Citizens League Anti-Discrimination Comm., Inc., to Robert K.
Carr, Exec. Sec'y of the President's Comm. on Civil Rights (Nov.
13, 1947), available at
https://www.trumanlibrary.gov/library/research-files/mike-m-
masaoka-robert-k-carr..................................................................10

Matthew Weisbly & Sarah Baker, *One Year Later: The JACL Reflects on the Metro Atlanta Spa Shootings*, JACL (Mar. 16, 2022), https://jacl.org/statements/one-year-later-the-jacl-reflects-on-the-metro-atlanta-spa-shootings ...............................................................17

Monique W. Morris et al., *Free to Compete? Measuring the Impact of Proposition 209 on Minority Business Enterprises*, Discrimination Research Center 17 (Aug. 2006), https://www.law.berkeley.edu/files/thcsj/Free_to_Compete.pdf .......................16

Natasha Varner, *Sold, Damaged, Stolen, Gone: Japanese American Property Loss During WWII*, Densho (Apr. 4, 2017), https://densho.org/catalyst/sold-damaged-stolen-gone-japanese-american-property-loss-wwii/ .................................................................8

Neil G. Ruiz, Carolyne Im, and Ziyao Tian, *Discrimination Experiences Shape Most Asian Americans' Lives*, Pew Research Center (Nov. 30, 2023), https://www.pewresearch.org/race-ethnicity/2023/11/30/discrimination-experiences-shape-most-asian-americans-lives/ .........................................................................17

Press Release, U.S. Dep't of Justice, Ten Year Program to Compensate Japanese Americans Interned During World War II Closes Its Doors (Feb. 19, 1999), available at https://www.justice.gov/archive/opa/pr/1999/February/059cr.htm....................13

*Records of the President's Committee on Civil Rights, Record Group 220*, Harry S. Truman Libr., https://www.trumanlibrary.gov/library/federal-record/records-presidents-committee-civil-rights-record-group-220 ..........................................9

Robert S. Chang, *Whitewashing Precedent: From the* Chinese Exclusion Case *to* Korematsu *to the Muslim Travel Ban Cases*, 68 Case W. Res. L. Rev. 1183 (2018) ......................................................5

Ronald Takaki, *Strangers from a Different Shore: A History of Asian Americans* (2d ed. 1998)....................................................4-5, 10-12

Sharon Yamato, *Civil Liberties Public Education Fund*, Densho Encyclopedia, https://encyclopedia.densho.org/Civil_Liberties_Public_Education_Fund/ ...............................................................................13

iv

Shiho Imai, *Immigration Act of 1924*, Densho Encyclopedia, https://encyclopedia.densho.org/Immigration_Act_of_1924 (last updated Mar. 19, 2013)......................................................................6

Shiho Imai, *Naturalization Act of 1790*, Densho Encyclopedia, https://encyclopedia.densho.org/Naturalization_Act_of_1790/ (last updated Mar. 19, 2013)......................................................................6

*The U.S. Mainland: Growth and Resistance*, Libr. of Cong., https://www.loc.gov/classroom-materials/immigration/japanese/the-us-mainland-growth-and-resistance/............................................................................ 4-5

Theodore Hsien Wang, *Swallowing Bitterness: The Impact of the California Civil Rights Initiative on Asian Pacific Americans*, Ann. Surv. Am. L. 463 (1995)...................................................................15

*To Secure These Rights*, Harry S. Truman Libr., https://www.trumanlibrary.gov/library/to-secure-these-rights................. 7, 10-11

Tyler Dang, Katherine Fang, Benji Lu, Michael Tayag, & Goodwin Liu, *A Portrait of Asian Americans in the Law 2.0*, American Bar Foundation & National Asian Pacific American Bar Association (2022), https://www.apaportraitproject.org/s/ABF_Portrait123_pp3.pdf......................18

U.S. Const. 1st amend ............................................................................1

U.S. Const. 14th amend ........................................................................11

Victoria Tran, *Asian Americans are falling through the cracks in data representation and social services*, Urban Institute (June 19, 2018), available at https://www.urban.org/urban-wire/asian-americans-are-falling-through-cracks-data-representation-and-social-services .................17

*Amicus curiae* the Japanese American Citizens League ("JACL") is a national nonprofit organization that exists to advance the mission of securing and safeguarding the civil and human rights of Asian Americans and Pacific Islanders ("AAPIs") and all communities who are affected by injustice and bigotry, while also promoting cultural, educational, and social values and preserving the heritage and legacy of the Japanese American community.

Since its founding in 1929, JACL has fought prejudice and bigotry against Japanese Americans and other marginalized communities.  During World War II, Japanese Americans were denied constitutional rights, stripped of their property and sources of livelihood, and incarcerated by the United States for no reason other than their ethnicity.  Through JACL and other groups, those who were wrongfully forced into American concentration camps obtained redress, but the enduring legacy of discrimination against Japanese Americans remains an issue.  JACL knows the lasting harm caused by discrimination and the importance of race-conscious programs that remedy that harm. Thus, JACL has an important interest in supporting programs like Fearless Foundation, which similarly exercises its First Amendment

---

[1] All parties have consented to the filing of this brief.  No party's counsel authored this brief in whole or in part, and no person, other than *Amicus* or their counsel, contributed money intended to fund the preparation or submission of this brief.

right to redress historical discrimination by providing mentoring and funding to Black women.

## STATEMENT OF THE ISSUES

1.  Whether the First Amendment bars the Alliance's attempt to transform the purpose and message of the Foundation's charitable grant program.

2.  Whether the Alliance lacks Article III standing because it did not name its allegedly affected members or prove they likely are able and ready to apply for a grant.

3.  Whether the Alliance's claim likely fails on the merits because the Foundation's charitable grant program is not covered by 42 U.S.C. § 1981 or is a valid remedial program to address racial disparities in access to funding.

4.  Whether the Alliance has failed to prove an irreparable injury, a favorable balance of equities, or public interest supporting a preliminary injunction.

Appellees' statement of the issues presents these four issues. This *amicus* brief mainly bears on the first, third, and fourth of those issues.

## SUMMARY OF ARGUMENT

From the Alien Land Law of 1913, which prohibited Asian immigrants from owning land, to President Roosevelt's 1942 executive order to incarcerate thousands of Japanese Americans in concentration camps, Asian Americans in general and Japanese Americans in particular have suffered the abhorrent effects of racial

discrimination. The enduring effects of that discrimination have not disappeared just because those laws have been overturned.

Race-conscious programs are necessary and permissible to redress the present-day effects of historical discrimination. For example, the United States government has provided redress payments to survivors of the World War II concentration camps, specifically recognizing the lasting effects of racial discrimination on Japanese American economic advancement. Likewise, from the 1970s through the present, federal, state, and local governments implemented race-conscious contracting programs to remedy historical discrimination. Under Appellant's interpretation of § 1981, none of these programs would be possible. But Appellant is wrong.

Just as these programs, along with JACL's work supporting the Japanese American community, permissibly address the lasting effects of historical discrimination against Japanese and Asian Americans, the Fearless Foundation grant program is an exercise of its First Amendment right to address the persistent effects of historical (and often continuing) discrimination against Black women entrepreneurs. Indeed, only when the present effects of past racial discrimination are fully addressed can "all persons" in the United States enjoy "the full and equal benefit of all laws. . . as is enjoyed by white citizens" as provided in § 1981.

**ARGUMENT**

## I. SYSTEMIC RACISM AGAINST JAPANESE AMERICANS ILLUSTRATES THE NEED FOR PROGRAMMING THAT ADDRESSES THE ENDURING EFFECTS OF DISCRIMINATION

Since shortly after their arrival to the United States, Asian Americans and Pacific Islanders ("AAPIs") have been targets of racial discrimination. Race-conscious measures, and organizations like JACL which advocate for and administer these programs, are necessary to address the lasting and continuing effects of this discrimination.

### A. Persistent Discrimination Limited Access to Capital and Entrepreneurial Opportunities

Anti-Asian racism and xenophobia has been abundant and enduring since before the first immigrants from Japan entered the mainland United States in the latter half of the 1800s.[2] At their arrival, Japanese immigrants faced shocking and intense anti-Japanese hostility.[3] The predominantly white settlers waged hostile and violent campaigns to keep Japanese immigrants out of the labor market.[4] A large proportion of the Japanese immigrants of the late 19th and early 20th centuries were denied access to traditional labor markets and were pushed into small-scale

---

[2]     *The U.S. Mainland: Growth and Resistance*, Libr. of Cong., https://www.loc.gov/classroom-materials/immigration/japanese/the-us-mainland-growth-and-resistance/ (last visited Dec. 12, 2023).

[3]     *See, e.g.,* Ronald Takaki, *Strangers from a Different Shore: A History of Asian Americans* 179 (2d ed. 1998).

[4]     *Id.* at 180.

entrepreneurial activity and agriculture,[5] eventually buying farms and controlling a considerable share of the crop output in California.[6]  As a result of the widespread hostility against Americans of Asian descent, President Theodore Roosevelt issued Executive Order 589 in 1907 which restricted Japanese and Korean migrants from entering the United States.[7]

The state of California reacted to these developments by passing the Alien Land Law in 1913, which prohibited Asian immigrants from owning land; as amended in 1920 and 1923, the law also prohibited the owning or long-term leasing of land by the American-born children of Asian immigrants or by Asian immigrant-controlled corporations.[8]  The laws were enacted with overt racial animus and with the intent to limit Japanese settlement and their alleged competition against white farmers.[9]  Similar laws were enacted in fifteen other states, and upheld in 1923 by the Supreme Court.[10]  Many farmers of Japanese descent, both immigrants and

---

[5]     *Id*.

[6]     *The U.S. Mainland: Growth and Resistance, supra.*

[7]     *See* Robert S. Chang, *Whitewashing Precedent: From the* Chinese Exclusion Case *to* Korematsu *to the Muslim Travel Ban Cases*, 68 Case W. Res. L. Rev. 1183, 1203 (2018).

[8]     *California Law Prohibits Asian Immigrants from Owning Land*, EJI, https://calendar.eji.org/racial-injustice/may/3 (last visited Dec. 12, 2023).

[9]     *Id.* (noting supporters of the laws included the "Anti-Jap Laundry League"); Takaki, *supra*, at 204 (explaining that, in describing support for the alien land laws, the State Attorney General Ulysses S. Webb justified the legislative restriction targeting the Japanese as a concern for "race undesirability," and that Senator James Phelan campaigned at the time on the slogan "Keep California White").

[10]    *California Law Prohibits Asian Immigrants from Owning Land*, *supra*, at 8.

American-born descendants, were forced to give up their farms, losing their property and livelihoods.[11]

During the same era, the federal government restricted both immigration from Japan and the possibility of naturalization among those who had already arrived. The Naturalization Act of 1790 restricted citizenship to "'any alien, being a free white person,' who had been in the U.S. for two years."[12] In *Ozawa v. United States*, 260 U.S. 178 (1922), the Supreme Court unanimously held that Takao Ozawa was racially ineligible for citizenship, that the term "white" in the Naturalization Act was "synonymous with the words 'a person of the Caucasian race,'" and that the Japanese race is "clearly of a race which is not Caucasian." *Id.* at 198.

Two years later, Congress passed the Immigration Act of 1924, which targeted many minority groups but specifically barred immigration for those "aliens ineligible for citizenship," echoing the language and discrimination of *Ozawa*.[13]

---

[11] *Alien Land Laws in California (1913 & 1920)*, Immigr. Hist., https://immigrationhistory.org/item/alien-land-laws-in-california-1913-1920/ (last visited Dec. 12, 2023).

[12] Shiho Imai, *Naturalization Act of 1790*, Densho Encyclopedia, https://encyclopedia.densho.org/Naturalization_Act_of_1790/ (last updated Mar. 19, 2013).

[13] Shiho Imai, *Immigration Act of 1924*, Densho Encyclopedia, https://encyclopedia.densho.org/Immigration_Act_of_1924 (last updated Mar. 19, 2013).

Without citizenship, Japanese Americans were ineligible for numerous professions, and unable to prosper from property ownership and its related financial benefits.[14]

B.     **The U.S. Government's Incarceration of Japanese Americans Stripped the Community's Few Remaining Economic Gains**

In 1942, President Franklin Roosevelt issued Executive Order 9066, allowing the Secretary of War and the U.S. military to "exclude any and all persons, citizens and aliens, from designated areas in order to provide security against sabotage, espionage and fifth column activity."[15] Despite the lack of any evidence that Japanese Americans committed any such acts,[16] this alleged security rationale served as justification for the forced removal and incarceration of over 120,000 U.S. citizens of Japanese ancestry and Japanese immigrants at incarceration centers bordered by barbed wire fencing and guarded by military police.[17] This policy was solely based on Japanese ethnicity; in comparison, "[n]o mass exclusion or

---

[14]     *To Secure These Rights*, Harry S. Truman Libr., https://www.trumanlibrary.gov/library/to-secure-these-rights (last visited Dec. 12, 2023).
[15]     Comm'n on Wartime Relocation and Internment of Civilians, Personal Justice Denied (Part 2: Recommendations) 2 (1983), available at https://www.archives.gov/research/japanese-americans/justice-denied.
[16]     *Id.* at 3.
[17]     *Id.* at 2-3.

detention, in any part of the country, was ordered against American citizens of German or Italian descent."[18]

Beyond the immense psychological trauma, physical injury, death, stigma and dehumanization resulting from the forced removal and incarceration, Japanese Americans suffered severe economic damage and losses. The Japanese-owned small businesses and professions that had survived alien land laws and other restrictions had to be abandoned or sold for a small amount of their value through a "removal sale."[19] White competitors would offer to buy inventory for five to ten cents on the dollar.[20] Other businesses were simply looted after their owners were removed from the West Coast.[21] Farmers' crops were harvested and sold without compensation, their land was then left untended for years, and their homes were ransacked and animals stolen and sold.[22] The economic devastation on the Japanese American community was felt for years to come.[23]

The victims of the mass incarceration attempted to appeal the law, but did not receive justice. The Supreme Court upheld the constitutionality of the order that

---

[18]   *Id.* at 3.
[19]   Natasha Varner, *Sold, Damaged, Stolen, Gone: Japanese American Property Loss During WWII*, Densho (Apr. 4, 2017), https://densho.org/catalyst/sold-damaged-stolen-gone-japanese-american-property-loss-wwii/.
[20]   *Id.*
[21]   *Id.*
[22]   *Id.*
[23]   Personal Justice Denied (Part 2: Recommendations), *supra*, at 5.

caused the forced removal, the mass incarceration, and all of the associated harms

in *Korematsu v. United States*, 323 U.S. 214 (1944).[24]

## II. PROVIDING RESOURCES TO ADDRESS THE ENDURING EFFECTS OF SYSTEMIC INEQUITIES IS CRITICAL

### A. After the End of Incarceration, JACL Advocated for Race-Conscious Policies Addressing Racism That Targeted Japanese Americans

The Japanese American experience highlights the need for race-conscious programs, and the right of organizations like JACL to advocate for and administer these programs, that redress the persistent effects of historical racism. Following World War II and the surrender of Nazi Germany, President Truman established the Committee on Civil Rights to "propose measures to strengthen and protect the civil rights of the American people."[25]

Organizations like JACL and others in the Japanese American community cited the heroism of their military service, and lobbied the Committee to support reparations for incarceration, repayment for the resulting property losses, and

---

[24] Almost seventy-five years later, Chief Justice Roberts acknowledged that *Korematsu* "was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—'has no place in law under the Constitution.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) (citation omitted).

[25] *Records of the President's Committee on Civil Rights, Record Group 220*, Harry S. Truman Libr., https://www.trumanlibrary.gov/library/federal-record/records-presidents-committee-civil-rights-record-group-220 (last visited Dec. 12, 2023).

changes to discriminatory statutes and naturalization laws.[26]  In its final report, the Committee "noted that hundreds of evacuees *suffered serious property and business losses because of governmental action* and through no fault of their own."[27]

By the end of 1946, the California Justice Department had been actively enforcing the state's overtly discriminatory alien land laws, making more than sixty claims to confiscate property from Japanese landowners.[28]  The Committee emphasized that these actions prevented Japanese communities from supporting their families with money derived from beneficial use of the land.[29]  Concerning naturalization, the Committee noted that the "status of citizenship is basic to the enjoyment of many of the rights" and that "*those barred from citizenship are thereby barred from many avenues of economic and social advancement* open to American citizens."[30]  The report further recognized that "some of the standards of eligibility in our naturalization laws have nothing to do with a person's fitness to become a citizen," but rather penalize residents based on race or national origin, and that the

---

[26]   Letter from Mike M. Masaoka, Nat'l Legislative Dir., Japanese Am. Citizens League Anti-Discrimination Comm., Inc., to Robert K. Carr, Exec. Sec'y of the President's Comm. on Civil Rights (Nov. 13, 1947), available at https://www.trumanlibrary.gov/library/research-files/mike-m-masaoka-robert-k-carr.
[27]   *To Secure These Rights, supra.*
[28]   Takaki, *supra*, at 411.
[29]   *To Secure These Rights, supra.*
[30]   *Id.* (emphasis added).

"largest group of American residents presently subject to this discrimination are those born in Japan."[31]

Race-conscious reforms soon followed to redress harms suffered by Japanese Americans. A series of legal challenges led to the repeal of the alien land laws. The Supreme Court ruled in *Oyama v. California*, 332. U.S. 633, 646-50 (1948), that restricting an individual who is ineligible for citizenship from conveying land as a gift to a citizen child was unconstitutional, making clear that the law was "nothing more than outright racial discrimination." *Id.* at 650 (Murphy, J., and Rutledge, J., concurring). Subsequently, the California Supreme Court invalidated the state laws, determining that denying landownership to people ineligible to citizenship was in violation of the 14th Amendment. *Fujii v. State*, 38 Cal.2d 718, 242 P.2d 617 (Cal. 1952); *Haruye Masaoka v. California*, 39 Cal.2d 883, 245 P.2d 1062 (Cal. 1952). A change of public opinion also allowed for the outright repeal of the discriminatory land laws through the passage of California Proposition 13 in 1956.[32] Though not an immediate remedy to decades of discriminatory property ownership policies, the repeal of the alien land laws was a first step toward providing Japanese Americans the opportunity to access economic advancement.

---

[31]    *Id.*
[32]    Takaki, *supra*, at 412-13.

Various racially discriminatory barriers to naturalization were also repealed. JACL leadership illuminated the hardships suffered by the immigrant generation of Japanese Americans who were barred from citizenship, effectively shut out of over 100 occupations due to these restrictions.[33] The passage of the 1952 McCarran-Walter Act nullified the racial restriction of the 1790 naturalization law, allowing the first generation of Japanese immigrants who had been living in the United States for decades to finally be eligible for citizenship.[34] Many were eager to pledge their loyalty to the United States, and by 1965, about 46,000 immigrant Japanese became naturalized.[35]

Despite these reforms, the victims of the incarceration camps did not receive meaningful redress and compensation until more than forty years after they were released. In 1980, Congress created the Commission on Wartime Relocation and Internment of Civilians ("CWRIC"). JACL and its members participated in the CWRIC review of the incarceration of Japanese Americans and their economic losses. In 1983, the CWRIC issued its report, "Personal Justice Denied," which concluded that Executive Order 9066 "was not justified by military necessity, and the decisions which followed from it—detention, ending detention and ending

---

[33] Ellen Wu, *Asian Americans Helped Build Affirmative Action. What Happened?*, Slate (Nov. 2, 2022, 12:30 PM), https://slate.com/human-interest/2022/11/affirmative-action-proportionality-history-activism.html.

[34] Takaki, *supra*, at 413.

[35] *Id.*

exclusion—were not driven by analysis of military conditions. The broad historical causes which shaped these decisions were race prejudice, war hysteria and a failure of political leadership."[36]

As a result of the advocacy of JACL and other organizations, and the findings of the CWRIC, Congress passed The Civil Liberties Act of 1988, acknowledging the "grave injustice" of incarceration of Japanese Americans. *See* 50 U.S.C. § 4202. Along with a formal apology, 82,219 eligible survivors received redress checks of $20,000.[37] The Act also authorized the Civil Liberties Public Education Fund which funded programs to ensure that the forced removal and incarceration of people with Japanese ancestry would be remembered, and that the discrimination causing the events would be understood.[38] The Fund was created as a "critical immunization against infection by the virus of prejudice," and a reminder that "our strengths as a nation is our willing to acknowledge imperfection as well as to struggle for a more just society."[39]

---

[36] Personal Justice Denied (Part 2: Recommendations), *supra,* at 5.

[37] Press Release, U.S. Dep't of Justice, Ten Year Program to Compensate Japanese Americans Interned During World War II Closes Its Doors (Feb. 19, 1999), available at https://www.justice.gov/archive/opa/pr/1999/February/059cr.htm.

[38] Sharon Yamato, *Civil Liberties Public Education Fund*, Densho Encyclopedia, https://encyclopedia.densho.org/Civil_Liberties_Public_Education_Fund/ (last updated Mar. 19, 2013).

[39] Personal Justice Denied (Part 2: Recommendations), *supra,* at 7.

B.    **Race-Conscious Programs Continue to be Critical**

Japanese Americans continued to face obstacles to economic advancement despite the dismantling of barriers to property ownership and naturalization.  The forced removal led to "the disastrous loss of farms, businesses and homes," and disrupted years of career and professional development, which delayed Japanese American participation in the post-World War II economic boom. [40]  Many were unable to obtain employment, and financial institutions refused to give Japanese Americans loans or let them deposit money.  In response to this discrimination, JACL formed the National JACL Credit Union with just $2,435 to provide financial assistance to Japanese Americans.[41]  Insurance companies also refused to allow Japanese Americans the ability to buy health insurance.  Likewise, JACL established a Health Benefits Trust to support the health insurance needs of the Japanese American community.[42]

Japanese and Asian Americans also advocated for race-conscious programs to address concrete racial discrimination stemming from historical exclusion across various industries, including in government contracting.  Beginning in the 1970s through the 1980s, federal, state, and local governments acknowledged the issue of

---

[40]    *Id.* at 5.

[41]    *About Us*, National JACL Credit Union, https://www.jaclcu.com/about-us/ (last visited Dec. 12, 2023).

[42]    *About Us*, JA Health Insurance Services, https://jahealth.org/about-us/ (last visited Dec. 12, 2023).

wide racial disparities. Congressional hearings documented the extent of racial discrimination against minority-owned businesses, noting the underutilization of Asian, African American, Latinx, and Native American-owned businesses across all industries.[43]

Disparities existed at the local level as well. In San Francisco, California, in the late 1980s, Asian American contractors made up 20% of the available pool of construction firms in the city, but only received 5% of the total dollars awarded for school district construction contracts.[44] A study conducted by the local school district confirmed the allegations and found that school staff often channeled contracts to entities with whom they were familiar, at the expense of Asian-owned firms.[45] After revamping its contracting process, and setting goals to contract with minority-owned businesses, Asian American participation in school construction contracts tripled.[46]

---

[43] Notice: Proposed Reforms to Affirmative Action in Federal Procurement, 61 Fed. Reg. 26042, 26061-62 (May 23, 1996) (noting that a total of 11% of Asian businesses owners experienced known instances of discrimination in the form of higher quotes from suppliers, and Asian firms earned 60 cents of each dollar of expenditures those firms would be expected to receive).

[44] Theodore Hsien Wang, *Swallowing Bitterness: The Impact of the California Civil Rights Initiative on Asian Pacific Americans*, Ann. Surv. Am. L. 463, 467 (1995).

[45] *Id.* at 467-68.

[46] *Id.* at 468. Other examples also exist. Over a 2 year period in the 1980s, prior to implementing an affirmative action policy, Contra Costa County had no Asian prime contractor receive non-federally-funded construction contract. *Id.* at 469.

The need for organizations like JACL to advocate for and facilitate race-conscious programs continues to exist. Subsequent race-neutral programs have proven ineffective at closing opportunity gaps, and have undermined any gains from race-conscious programs. In San Jose, California, participation by people of color in the city's prime contracts fell by more than 80 percent immediately following the suspension of the city's race-conscious programs.[47] After Caltrans cut its minority-business goals in half, actual participation from such businesses fell from 26% to 12%.[48] Across the board, states and localities that removed race-conscious programming saw a drastic decline in the utilization of minority-owned businesses, leaving a large gap of untapped potential.[49]

## III. ORGANIZATIONS AND PROGRAMS LIKE FEARLESS FOUNDATION HAVE A FIRST AMENDMENT RIGHT TO REDRESS ENDURING HARMS OF HISTORIC INJUSTICE

Aware of its responsibilities as the oldest and largest Asian Pacific American civil rights organization, JACL strives to promote a world that honors diversity by respecting values of fairness, equality, and social justice. JACL monitors and

---

Once the county enacted an affirmative action policy in 1987, about 7% of the county's prime construction dollars were awarded to Asian-owned businesses. *Id.*

[47] Monique W. Morris et al., *Free to Compete? Measuring the Impact of Proposition 209 on Minority Business Enterprises*, Discrimination Research Center 17 (2006), available at https://www.law.berkeley.edu/files/thcsj/Free_to_Compete.pdf.

[48] *Id.* at 16.

[49] *Id.*

responds to issues that affect the civil and human rights of all Americans, and

implements strategies to effect positive social change, particularly to the Asian

Pacific American community.  Today, the issues JACL continues to address include:

- **Combatting ongoing discrimination**.  A November 30, 2023, Pew Research Center report found, for example, that 58% of Asian adults have experienced racial discrimination or have been treated unfairly because of their race or ethnicity.[50]  That discrimination included a staggering 339% surge in anti-Asian hate crime in 2022 compared to 2021.[51]  According to a national report published by Stop AAPI Hate, 10,905 anti-Asian hate incidents took place between March 19, 2020 to December 31, 2021.[52]

- **Remedying socioeconomic status that reflects the enduring effects of discrimination.**  A high percentage of Asian Pacific Americans live in poverty.[53]

- **Overcoming persistent barriers to opportunity.**  Asian Pacific Americans experience barriers in many occupational contexts, including

---

[50]     Neil G. Ruiz, Carolyne Im, and Ziyao Tian, *Discrimination Experiences Shape Most Asian Americans' Lives*, Pew Research Center (Nov. 30, 2023), https://www.pewresearch.org/race-ethnicity/2023/11/30/discrimination-experiences-shape-most-asian-americans-lives/.

[51]     Kimmy Yam, *Anti-Asian hate crimes increased 339 percent nationwide last year, report says*, NBC News (Feb. 14, 2022), https://www.nbcnews.com/news/asian-america/anti-asian-hate-crimes-increased-339-percent-nationwide-last-year-repo-rcna14282.

[52]     Matthew Weisbly & Sarah Baker, *One Year Later: The JACL Reflects on the Metro Atlanta Spa Shootings* (Mar. 16, 2022), https://jacl.org/statements/one-year-later-the-jacl-reflects-on-the-metro-atlanta-spa-shootings.

[53]     *See* Victoria Tran, *Asian Americans are falling through the cracks in data representation and social services*, Urban Institute (June 19, 2018), available at https://www.urban.org/urban-wire/asian-americans-are-falling-through-cracks-data-representation-and-social-services ("Despite assumptions that all Asian Americans are high earners, 12.3 percent of Asian Americans live below the federal poverty level, ranging from 6.8 percent of Filipino Americans to 39.4 percent of Burmese Americans, according to the American Community Survey (ACS). Almost 20 percent of Native Hawaiians and Pacific Islanders live in poverty.").

the corporate sector, the federal government, science and engineering, and academia.[54]

As the Japanese American experience has shown, organizations like JACL and its advocacy and funding of race-conscious remedial programs are vital tools to combat the ongoing effects of discrimination and to overcome persistent barriers to opportunity. The Fearless Foundation's mentoring and financial support initiatives are a prime example, as they increase access to capital for small businesses owned by Black women and redresses a specific enduring effect of historic discrimination—limited access to capital and business mentoring. Accordingly, § 1981—which was enacted to combat economic-based discrimination resulting from America's history of slavery—should not be interpreted to restrict these

---

[54] *See generally* Tyler Dang, Katherine Fang, Benji Lu, Michael Tayag, & Goodwin Liu, *A Portrait of Asian Americans in the Law 2.0*, American Bar Foundation & National Asian Pacific American Bar Association (2023), available at https://www.apaportraitproject.org/s/ABF_Portrait123_pp3.pdf (finding, for example, Asian Americans entered government (7.5%), public interest (6.4%), and clerkships (7.2%) at the lowest rate of any racial group; that in 2020 only 45 general counsel of Fortune 1000 companies were Asian American; and in 2019, only 8 of the 2,396 elected in prosecutors in the United States and only one Senate-confirmed U.S. Attorney identified as Asian American); Buck Gee & Denise Peck, *Asian Americans Are the Least Likely Group in the U.S. to Be Promoted to Management*, Harv. Bus. Rev. Online (May 31, 2018), https://hbr.org/2018/05/asian-americans-are-the-least-likely-group-in-the-u-s-to-be-promoted-to-management ("Our analysis of national EEOC workforce data found that Asian American white-collar professionals are the least likely group to be promoted from individual contributor roles into management … And this is not just a problem in private industry: While Asian Americans were 9.8% of the federal professional workforce in 2016, they are only 4.4% of the workforce at the highest federal level.").

organizations' First Amendment right to direct funding to support race-conscious remedial measures consistent with their missions.

## CONCLUSION

This Court should affirm the denial of the Appellant's motion for a preliminary injunction.


Dated: December 13, 2023                Respectfully submitted,

Carmen Lo                               */s/ Arthur Luk*
ARNOLD & PORTER                         Arthur Luk
  KAYE SCHOLER LLP            Andre Geverola
3000 El Camino Real                     Tommy La Voy
Five Palo Alto Square, Suite 5000       ARNOLD & PORTER
Palo Alto, CA 94306-3807                  KAYE SCHOLER LLP
Telephone: (650) 319-4500               601 Massachusetts Avenue, NW
Fax: (650) 319-4700                     Washington, DC 20001
carmen.lo@arnoldporter.com              Telephone: (202) 942-5000
                                        Fax: (202) 942-5999
                                        arthur.luk@arnoldporter.com
                                        andre.geverola@arnoldporter.com
                                        tommy.lavoy@arnoldporter.com

*Counsel for Amicus Curiae Japanese American Citizens League*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and 32(g)(1), the undersigned counsel for amicus curiae certifies the following:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,018 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared using Microsoft Office Word 365 and set in Times New Roman font in a size equivalent to 14 points or larger.

*/s/ Arthur Luk*
Arthur Luk

*Counsel for Amicus Curiae Japanese American Citizens League*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing brief was filed electronically on December 13, 2023 and will therefore be served electronically upon all counsel.

*/s/ Arthur Luk*
Arthur Luk

*Counsel for Amicus Curiae Japanese American Citizens League*