No. 23-13138

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

AMERICAN ALLIANCE FOR EQUAL RIGHTS,

Plaintiff-Appellant,

v.

FEARLESS FUND MANAGEMENT, LLC; FEARLESS FUND II, GP, LLC;
FEARLESS FUND II, LP; and FEARLESS FOUNDATION, INC.,

Defendants-Appellees.

On Appeal from the United States District Court
for the Northern District of Georgia, In No. 1:23-cv-
03424-TWT (Honorable Thomas W. Thrash, Senior
U.S. District Court Judge)

**BRIEF OF LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER
LAW AND FIFTEEN ORGANIZATIONS AS *AMICI CURIAE* IN
SUPPORT OF APPELLEES AND AFFIRMANCE**

Jon Greenbaum
Dariely Rodriguez
Kathryn J. Youker
**LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW**
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857
jgreenbaum@lawyerscommittee.org

Keith Harrison
Laurel Pyke Malson
Amy M. Pauli
Kevin C. Cacabelos
Mary Marston
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, NW
Washington, DC 20004
O +1.202.624.2500
F +1.202.628.5116
E KHarrison@crowell.com

*American Alliance for Equal Rights v. Fearless Fund Mgmt., LLC, et al.*,
No. 23-13138

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 29(c), and Eleventh Circuit Rules 26.1-1(a)(3), 26.1-2(b), and 26.1-3, counsel for *Amici Curiae* Lawyers' Committee for Civil Rights Under Law and thirteen other organizations hereby certify the following:

Lawyers' Committee for Civil Rights Under Law is a nonprofit organization with no parent corporation and that no publicly-held corporation owns 10% or more of its stock.

Advancement Project is a nonprofit organization with no parent corporation and that no publicly-held corporation owns 10% or more of its stock.

American Civil Liberties Union is a nonprofit organization with no parent corporation and that no publicly-held corporation owns 10% or more of its stock.

Appleseed Foundation Inc. is a nonprofit organization with no parent corporation and that no publicly-held corporation owns 10% or more of its stock.

Asian Americans Advancing Justice-AAJC is a nonprofit organization with no parent corporation and that no publicly-held corporation owns 10% or more of its stock.

LatinoJustice PRLDEF is a nonprofit organization with no parent corporation and that no publicly-held corporation owns 10% or more of its stock.

National Association for the Advancement of Colored People ("NAACP") is a nonprofit organization with no parent corporation and that no publicly-held corporation owns 10% or more of its stock.

NAACP Legal Defense and Educational Fund, Inc. ("LDF") is a nonprofit organization with no parent corporation and that no publicly-held corporation owns 10% or more of its stock.

National Action Network is a nonprofit organization with no parent corporation and that no publicly-held corporation owns 10% or more of its stock.

National Coalition on Black Civic Participation is a nonprofit organization with no parent corporation and that no publicly-held corporation owns 10% or more of its stock.

National Council of Negro Women is a nonprofit organization with no parent corporation and that no publicly-held corporation owns 10% or more of its stock.

National Fair Housing Alliance is a nonprofit organization with no parent corporation and that no publicly-held corporation owns 10% or more of its stock.

National Partnership for Women & Families is a nonprofit organization with no parent corporation and that no publicly-held corporation owns 10% or more of its stock.

National Urban League is a nonprofit organization with no parent corporation and that no publicly-held corporation owns 10% or more of its stock.

National Women's Law Center is a nonprofit organization with no parent corporation and that no publicly-held corporation owns 10% or more of its stock.

The Leadership Conference on Civil and Human Rights is a nonprofit organization with no parent corporation and that no publicly-held corporation owns 10% or more of its stock.

*Amici Curiae* are not aware of any publicly owned corporation that has a financial interest in the outcome of this litigation and has not cooperated with any such corporation.

In addition to those identified in the Certificates of Interested Persons and Corporate Disclosure Statements filed by Plaintiff-Appellant, Defendants-Appellees, and any other *Amici Curiae*, the following is a complete list of persons and entities known by the undersigned counsel certifies to have an interest in the outcome of this case or appeal:

1. Advancement Project, *Amicus Curiae*

2. American Alliance for Equal Rights, *Plaintiff-Appellant*

3. American Civil Liberties Union, *Amicus Curiae*

4. American Civil Rights Project, *Amicus Curiae*

5. America First Legal Foundation, *Amicus Curiae*

6. Anderson, R. Gabriel, *Attorney for Plaintiff-Appellant*

7. Appleseed Foundation, Inc., *Amicus Curiae*

8. Asian Americans Advancing Justice-AAJC, *Amicus Curiae*

9. Barnett, Alexandra Garrison, *Attorney for Defendants-Appellees*

10. Branch, Aria, *Attorney for Amicus Curiae Black Economic Alliance Foundation*

11. Brewerton-Palmer, Sarah, *Attorney for Amici Curiae National Venture Capital Association and Venture Forward*

12. Bruhn, Alex, *Attorney for Defendants-Appellees*

13. Buckeye Institute, *Amicus Curiae*

14. Cacabelos, Kevin, *Attorney for Amici Curiae Lawyers' Committee for Civil Rights Under Law, Advancement Project, American Civil Liberties Union, Appleseed Foundation, Inc., Asian Americans Advancing Justice-AAJC, LatinoJustice PRLDEF, National Association for the Advancement of Colored People ("NAACP"), NAACP Legal Defense and Educational Fund, Inc. ("LDF"), National Action Network, National Coalition on Black Civic Participation, National Council of Negro Women, National Fair Housing Alliance, National Partnership for Women & Families, National Urban League, National Women's Law Center, and The Leadership Conference on Civil and Human Rights*

15. Cherry, Mark, *Attorney for Defendants-Appellees*

16. Cluse, Brooke, *Attorney for Defendants-Appellees*

17. Cohen, David, *Attorney for Amici Curiae National Venture Capital Association and Venture Forward*

18. Costa, Gregg, *Attorney for Defendants-Appellees*

19. Crain, Lee, *Attorney for Defendants-Appellees*

20. Crawford, Bruce, *Attorney for Amici Curiae National Venture Capital Association and Venture Forward*

21. Crump, Benjamin, *Attorney for Defendants-Appellees*

22. David, Alphonso, *Attorney for Defendants-Appellees*

23. Denerstein, Mylan, *Attorney for Defendants-Appellees*

24. Dickey, Gilbert, *Attorney for Plaintiff-Appellant*

25. Ellis, Dennis S., *Attorney for Defendants-Appellees*

26. Equal Protection Project, *Amicus Curiae*

27. Fawcett, J. William, *Attorney for Plaintiff-Appellant*

28. Farrell, Naima, *Attorney for Defendants-Appellees*

29. Fuster, Patrick, *Attorney for Defendants-Appellees*

30. Fearless Foundation, Inc., *Defendant-Appellee*

31. Fearless Fund II, GP, LLC, *Defendant-Appellee*

32. Fearless Fund II, LP, *Defendant-Appellee*

33. Fearless Fund Management, LLC, *Defendant-Appellee*

34. Gonsalves, Terance, *Attorney for Defendant-Appellees*

35. Gonzales, Amber, *Attorney for Amici Curiae Lawyers' Committee for Civil Rights Under Law, Advancement Project, American Civil Liberties Union, Appleseed Foundation, Inc., Asian Americans Advancing Justice-AAJC, LatinoJustice PRLDEF, National Association for the Advancement of Colored People ("NAACP"), NAACP Legal Defense and Educational Fund, Inc. ("LDF"), National Action Network, National Coalition on Black Civic Participation, National Council of Negro Women, National Fair Housing Alliance, National Partnership for Women & Families, National Urban League, National Women's Law Center, and The Leadership Conference on Civil and Human Rights*

36. Greenbaum, Jon, *Attorney for Amici Curiae Lawyers' Committee for Civil Rights Under Law, Advancement Project, American Civil Liberties Union, Appleseed Foundation, Inc., Asian Americans Advancing Justice-AAJC, LatinoJustice PRLDEF, National Association for the Advancement of Colored People ("NAACP"), NAACP Legal Defense and Educational Fund, Inc. ("LDF"), National Action Network, National Coalition on Black Civic Participation, National Council of Negro Women, National Fair Housing Alliance, National Partnership for Women & Families, National Urban League, National Women's Law Center, and The Leadership Conference on Civil and Human Rights*

37. Hamilton, Gene, *Attorney for Amicus Curiae America First Legal Foundation*

38. Harrison, Keith, *Attorney for Amici Curiae Lawyers' Committee for Civil Rights Under Law, Advancement Project, American Civil Liberties Union, Appleseed Foundation, Inc., Asian Americans Advancing Justice-AAJC, LatinoJustice PRLDEF, National Association for the Advancement of Colored People ("NAACP"), NAACP Legal Defense and Educational Fund, Inc. ("LDF"), National Action Network, National Coalition on Black Civic Participation, National Council of Negro Women, National Fair Housing Alliance, National Partnership for Women & Families, National Urban League, National Women's Law Center, and The Leadership Conference on Civil and Human Rights*

39. Hawley, Jonathan, *Attorney for Amicus Curiae Black Economic Alliance Foundation*

40. Hylton, Ellie, *Attorney for Amici Curiae National Venture Capital Association and Venture Forward*

41. Jackson, Gabrielle, *Attorney for Amici Curiae National Venture Capital Association and Venture Forward*

42. Jacobson, William, *Attorney for Amicus Curiae Equal Protection Project*

43. Kastorf, Kurt, *Attorney for Amicus Curiae Lawyers Committee for Civil Rights Under Law*

44. Knox, Leila, *Attorney for Defendants-Appellees*

45. LatinoJustice PRLDEF, *Amicus Curiae*

46. Lawyers Committee for Civil Rights, *Amicus Curiae*

47. Leadership Conference on Civil and Human Rights, *Amicus Curiae*

48. Lewis, Joyce, *Attorney for Amicus Curiae Black Economic Alliance Foundation*

49. Lifland, Charles, *Attorney for Amici Curiae National Venture Capital Association and Venture Forward*

50. Malson, Laurel, *Attorney for Amici Curiae Lawyers' Committee for Civil Rights Under Law, Advancement Project, American Civil Liberties Union, Appleseed Foundation, Inc., Asian Americans Advancing Justice-AAJC, LatinoJustice PRLDEF, National Association for the Advancement of Colored People ("NAACP"), NAACP Legal Defense and Educational Fund, Inc. ("LDF"), National Action Network, National Coalition on Black Civic Participation, National Council of Negro Women, National Fair Housing Alliance, National Partnership for Women & Families, National Urban League, National Women's Law Center, and The Leadership Conference on Civil and Human Rights*

51. Manhattan Institute, *Amicus Curiae*

52. Marston, Mary, *Attorney for Amici Curiae Lawyers' Committee for Civil Rights Under Law, Advancement Project, American Civil Liberties Union, Appleseed Foundation, Inc., Asian Americans Advancing Justice-AAJC, LatinoJustice PRLDEF, National Association for the Advancement of Colored People ("NAACP"), NAACP Legal Defense and Educational Fund, Inc. ("LDF"), National Action Network, National Coalition on Black Civic Participation, National Council of Negro Women, National Fair Housing Alliance, National Partnership for Women & Families,*

*National Urban League, National Women's Law Center, and The
Leadership Conference on Civil and Human Rights*

53. Marquart, Katherine, *Attorney for Defendants-Appellees*

54. McCarthy, Thomas, *Attorney for Plaintiff-Appellant*

55. Meeks, Katherine Moran, *Attorney for Defendants-Appellees*

56. Mitchell, Jonathan, *Attorney for Amicus Curiae America First Legal
Foundation*

57. Mixon, Meaghan, *Attorney for Amicus Curiae Black Economic
Alliance Foundation*

58. Morales, Tristan, *Attorney for Amici Curiae National Venture Capital
Association and Venture Forward*

59. National Action Network, *Amicus Curiae*

60. National Association for the Advancement of Colored People, *Amicus
Curiae*

61. NAACP Legal Defense and Educational Fund, Inc., *Amicus Curiae*

62. National Coalition on Black Civic Participation, *Amicus Curiae*

63. National Council of Negro Women, *Amicus Curiae*

64. National Fair Housing Alliance, *Amicus Curiae*

65. National Partnership for Women & Families, *Amicus Curiae*

66. National Urban League, *Amicus Curiae*

67. National Venture Capital Association, *Amicus Curiae*

68. National Women's Law Center, *Amicus Curiae*

69. Nault, James, *Attorney for Amicus Curiae Equal Protection Project*

70. Norris, Cameron, *Attorney for Plaintiffs-Appellant*

71. Pak, Byung, *Attorney for Defendants-Appellees*

72. Pauli, Amy, *Attorney for Amici Curiae Lawyers' Committee for Civil Rights Under Law, Advancement Project, American Civil Liberties Union, Appleseed Foundation, Inc., Asian Americans Advancing Justice-AAJC, LatinoJustice PRLDEF, National Association for the Advancement of Colored People ("NAACP"), NAACP Legal Defense and Educational Fund, Inc. ("LDF"), National Action Network, National Coalition on Black Civic Participation, National Council of Negro Women, National Fair Housing Alliance, National Partnership for Women & Families, National Urban League, National Women's Law Center, and The Leadership Conference on Civil and Human Rights*

73. Pettig, Bruce, *Attorney for Amici Curiae National Venture Capital Association and Venture Forward*

74. Rhoades, Meshach, *Attorney for Amici Curiae Lawyers' Committee for Civil Rights Under Law, Advancement Project, American Civil Liberties Union, Appleseed Foundation, Inc., Asian Americans Advancing Justice-AAJC, LatinoJustice PRLDEF, National Association for the Advancement of Colored People ("NAACP"), NAACP Legal Defense and Educational Fund, Inc. ("LDF"), National Action Network, National Coalition on Black Civic Participation, National Council of Negro Women, National Fair Housing Alliance, National Partnership for Women & Families, National Urban League, National Women's Law Center, and The Leadership Conference on Civil and Human Rights*

75. Rodriguez, Dariely, *Attorney for Amici Curiae Lawyers' Committee for Civil Rights Under Law, Advancement Project, American Civil Liberties Union, Appleseed Foundation, Inc., Asian Americans Advancing Justice-AAJC, LatinoJustice PRLDEF, National Association for the Advancement of Colored People ("NAACP"), NAACP Legal Defense and Educational Fund, Inc. ("LDF"), National Action Network, National Coalition on Black Civic Participation, National Council of Negro Women, National Fair*

Housing Alliance, National Partnership for Women & Families,
National Urban League, National Women's Law Center, and The
Leadership Conference on Civil and Human Rights

76. Rights, National Action Network, National Association for the
Advancement of Colored People, National Urban League, National
Coalition on Black Civic Participation, and LatinoJustice PRLDEF

77. Salim-Williams, Zakiyyah, *Attorney for Defendants-Appellees*

78. Santos, Marlee, *Attorney for Amici Curiae Lawyers' Committee for
Civil Rights Under Law, Advancement Project, American Civil
Liberties Union, Appleseed Foundation, Inc., Asian Americans
Advancing Justice-AAJC, LatinoJustice PRLDEF, National
Association for the Advancement of Colored People ("NAACP"),
NAACP Legal Defense and Educational Fund, Inc. ("LDF"),
National Action Network, National Coalition on Black Civic
Participation, National Council of Negro Women, National Fair
Housing Alliance, National Partnership for Women & Families,
National Urban League, National Women's Law Center, and The
Leadership Conference on Civil and Human Rights*

79. Schwartz, Jason, *Attorney for Defendants-Appellees*

80. Senger, Molly, *Attorney for Defendants-Appellees*

81. Shapiro, Ilya, *Attorney for Amici Curiae American Civil Rights
Project, Manhattan Institute, and Buckeye Institute*

82. Thurman, Ashley, *Attorney for Amici Curiae National Venture
Capital Association and Venture Forward*

83. Venture Forward, *Amicus Curiae*

84. Waddell, T. Brandon, *Attorney for Amici Curiae National Venture
Capital Association and Venture Forward*

85. Youker, Kathryn, *Attorney for Amici Curiae Lawyers' Committee for
Civil Rights Under Law, Advancement Project, American Civil
Liberties Union, Appleseed Foundation, Inc., Asian Americans*

*American Alliance for Equal Rights v. Fearless Fund Mgmt., LLC, et al.,*
No. 23-13138

> *Advancing Justice-AAJC, LatinoJustice PRLDEF, National Association for the Advancement of Colored People ("NAACP"), NAACP Legal Defense and Educational Fund, Inc. ("LDF"), National Action Network, National Coalition on Black Civic Participation, National Council of Negro Women, National Fair Housing Alliance, National Partnership for Women & Families, National Urban League, National Women's Law Center, and The Leadership Conference on Civil and Human Rights*

Per Circuit Rule 26.1-2(c), *Amici Curiae* certify that the CIP contained in this

brief, and in any other brief that has been filed, including this brief, is complete.

Dated: December 13, 2023              /s *Keith Harrison*
                                           Keith Harrison

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................. C-1

INTEREST OF THE *AMICI CURIAE* ................................................ 1

INTRODUCTION ......................................................................... 2

ARGUMENT ............................................................................... 3

I.  Section 1981 Actualized the 13th Amendment's Abolition of Slavery. ........................................................................... 3

    A.  Congress Enacted Section 1981 in the Aftermath of Black Codes that, Despite Ratification of the 13th Amendment, Obstructed Black Citizens' Freedom of Contract. ................................................................... 4

    B.  Congress Intended Section 1981 To Be A Remedial Measure To Grant Formerly Enslaved Black People Access To the Economic Marketplace. ............................. 7

    C.  Congress Intended Section 1981 to Redress Discriminatory Contracting in Employment, Consumer Transactions, and Property, Not Prohibit Remedial Practices or Policies. ........................................................ 11

II.  Thwarting Remedial Philanthropic Programs is Contrary to Section 1981's Congressional Intent. ......................................... 14

III.  Prohibiting Remedial Philanthropy Would Diminish Black Women's Economic Freedom. .................................................. 16

CONCLUSION ........................................................................... 19

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

CERTIFICATE OF SERVICE

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
  No. 23-13138, 2023 WL 6520763 (11th Cir. Sept. 30, 2023)............................11

*CBOCS W., Inc. v. Humphries*,
  553 U.S. 442 (2008)......................................................................................9, 13

*City of Memphis v. Greene*,
  451 U.S. 100 (1981)........................................................................................6, 14

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
  140 S. Ct. 1009 (2020)....................................................................................2, 7

*Doe v. Kamehameha Schs./Bernice Pauahi Bishop Est.*,
  470 F.3d 827 (9th Cir. 2006.) ......................................................................15, 16

*Gen. Bldg. Contractors Ass'n, Inc. v. Pa.*,
  458 U.S. 375 (1982).................................................................................9, 10, 12

*Jones v. Alfred H. Mayer Co.*,
  392 U.S. 409 (1968).......................................................................6, 7, 9, 10, 11

*Kyles v. J.K. Guardian Sec. Servs., Inc.*,
  222 F.3d 289 (7th Cir. 2000) ............................................................................13

*McDonald v. Santa Fe Trail Transp. Co.*,
  427 U.S. 273 (1976).............................................................................................14

*Runyon v. McCrary*,
  427 U.S. 160 (1976).....................................................................................11, 13

*Setser v. Novack Inv. Co.*,
  657 F.2d 962 (8th Cir. 1981) ............................................................................15

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard
  Coll.*,
  143 S. Ct. 2141 (2023)........................................................................................2

ii

*In re Turner*,
    24 F. Cas. 337 (C.C.D. Md. 1867).....................................................................12

*United Steelworkers v. Weber*,
    443 U.S. 193 (1979)........................................................................................15

**Statutes**

42 U.S.C. § 1981(a) ....................................................................................................2

Act of Apr. 9, 1866, ch. 31, 14 Stat. 27 (1866) ......................................................10

**U.S. Constitution**

U.S. Const., amend. XIII.................................................... 3, 4, 5, 6, 7, 9, 10, 13, 19

**Rules**

Fed. R. App. P. 26.1 ....................................................................................................1

Fed. R. App. P. 29 .......................................................................................................1

Local Rule 26.1-1 ........................................................................................................1

Local Rule 26.1-2.....................................................................................................1, 14

Local Rule 26.1-3 ........................................................................................................1

**Other Authorities**

Alicia Robb, *Financing Patterns and Credit Market Experiences: A*
    *Comparison by Race and Ethnicity for U.S. Employer Firms 12*
    *Off. of Advocacy*, U.S. Small Bus. Assoc. (Feb. 2018) ................................16, 17

Andrew Johnson, "*Veto of the Civil Rights Bill*," March 27, 1866 ........................10

Barry Sullivan, *Historical Reconstruction, Reconstruction History,*
    *and the Proper Scope of Section 1981,* 98 YALE L.J. 541 (1989) ......................7

Christine J. Back, *42 U.S.C. § 1981's Contract Clause: Racial*
    *Equality in Contractual Relationships*, Congressional Research
    Service (2023) .................................................... 12, 13, 14, 15, 16, 19

Cong. Globe, 39th Cong., 1st Sess.............................................................5, 6, 8, 9

Danielle Tarantolo, *From Employment to Contract: Section 1981 and Antidiscrimination Law for the Independent Contractor Workforce,* 116 YALE L.J. 170 (2006) ...........................................................4, 11

Elana Dure, *Black women are the fastest growing group of entrepreneurs. But the job isn't easy* (Oct. 12, 2021) .........................................17

Gizelle George-Joseph and Daniel Milo, *The Bigger Picture Blackwomenomics—Equalizing Entrepreneurship* (Feb. 9, 2022)....................18

John H. Franklin, *The Civil Rights Act of 1866 Revisited*, 41 Hastings L.J. 1135 (1990)...............................................................................12

Majority Staff Report, *Women's Small Business Ownership and Entrepreneurship Report*, U.S. Senate Comm. on Small Bus. and Entrep. 6 (July 2023) .....................................................................17

Mehrsa Baradaran, *The Color of Money, Black Banks and the Racial Wealth Gap* 9–11 (2017).............................................................4, 5

NABA Inc., *Investing in The Future: How Supporting Black Women-Owned Businesses and Entrepreneurs Benefits Us All*, FORBES (Apr. 27, 2023)...................................................................................18

Rebecca E. Zietlow, *Slavery, Liberty and the Right to Contract*, 19 NEV. L.J. 447, 448 (2018).............................................................4, 9

Richard Rothstein, *The Color of Law: A Forgotten History of How Our Government Segregated America* 154 (2017)..............................................5

Schurz's Report on the Conditions in the South. Report of C. Schurz, S. Exec. Doc. No. 2, 39th Cong., 1st Sess. 2 (1865) .......................................8, 9

## INTEREST OF THE *AMICI CURIAE*[1]

Amici are the Lawyers' Committee for Civil Rights Under Law joined by fifteen additional national civil rights organizations: Advancement Project, American Civil Liberties Union, Appleseed Foundation, Inc., Asian Americans Advancing Justice-AAJC, LatinoJustice PRLDEF, National Association for the Advancement of Colored People ("NAACP"), NAACP Legal Defense and Educational Fund, Inc. ("LDF"), National Action Network, National Coalition on Black Civic Participation, National Council of Negro Women, National Fair Housing Alliance, National Partnership for Women & Families, National Urban League, National Women's Law Center, and The Leadership Conference on Civil and Human Rights. These organizations all have different missions, but each is committed to furthering the goal of preventing and eradicating systemic discrimination, including in the marketplace. *Amici* fully appreciate the serious harm that would result to Black communities and other communities of color if charitable efforts to advance equity were undermined.

---

[1] All parties have consented to the filing of this brief. No counsel to a party in this case authored this brief in whole or in part. No party or party's counsel made any monetary contribution that was intended to or did fund the preparation or submission of this brief. No person or entity other than the *amici* and their counsel made any monetary contribution that was intended to or did fund the preparation or submission of this brief.

1

Formed in 1963, the Lawyers' Committee is a nonpartisan, nonprofit organization that uses legal advocacy to achieve racial justice, fighting inside and outside the courts to ensure that Black people and other people of color have the voice, opportunity, and power to make the promises of our democracy real. To this end, the Lawyers' Committee has participated in hundreds of cases involving issues related to voting rights, housing, employment, education, and public accommodations. *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023); *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009 (2020).

## INTRODUCTION

Congress enacted § 1981 as a remedial measure during the Reconstruction era to secure the rights of newly emancipated Black citizens who historically had been deprived of the ability to make and enforce economic contracts. The freedom to contract and participate in the economy on equal terms "as is enjoyed by white citizens" was central to overcoming the legacy of slavery and economic oppression targeting Black communities. 42 U.S.C. § 1981(a). The Act's remedial purpose squarely aimed to benefit Black people. It is that remedial purpose, which is at the very heart of § 1981, that is under attack in this case.

In the face of our country's history of racism, its pervasive structural discrimination, and the pernicious effects of both, Plaintiff attempts to upend the

spirit and the purpose of § 1981 to further entrench the status quo of inequitable market access. Plaintiff's challenge to the Fearless Foundation's Fearless Strivers Grant program, a remedial philanthropic program that awards grants to Black women-owned small businesses that have been historically disadvantaged in their ability to obtain funding, is contrary to § 1981's congressional purpose and intent and should not succeed.

## ARGUMENT

### I.  Section 1981 Actualized the 13th Amendment's Abolition of Slavery.

Following the close of the Civil War, Congress ratified the 13th Amendment to the United States Constitution. It provides, "[n]either slavery nor involuntary servitude, … shall exist within the United States[.]" U.S. Const. Amend. XIII. Despite the Amendment's clear command, American society did not welcome newly emancipated Black people and instead denied them participation in society and the marketplace. Congress responded forcefully, enacting § 1981 as a remedy for past systemic discrimination and private actors' current and future denial of access to social life, economic participation, and economic parity. Central to the fulfillment of the 13th Amendment in resistant Southern states and elsewhere, § 1981 mandated newly emancipated Black citizens' freedom of contract.

**A. Congress Enacted Section 1981 in the Aftermath of Black Codes that, Despite Ratification of the 13th Amendment, Obstructed Black Citizens' Freedom of Contract.**

Though Southern states ratified the 13th Amendment, they quickly circumvented its freedoms. Rebecca E. Zietlow, *Slavery, Liberty and the Right to Contract*, 19 NEV. L.J. 447, 448 (2018) (Zietlow). In 1865, while the 13th Amendment was in the process of ratification by the States, Southern states implemented the Black Codes—laws that forced Black people to work in a labor economy based on debt or low wages. *Id.* at 462-63. Despite the 13th Amendment's promise, under the Black Codes, newly freed Black people thus remained trapped in conditions similar to chattel slavery.

White southerners refused to contract with formerly enslaved Black people. And when they did, "many used the labor contract itself to restore conditions as onerous as those under slavery[,]" fixing wages, forbidding work outside the contract, and using physical violence to coerce work. Danielle Tarantolo*, From Employment to Contract: Section 1981 and Antidiscrimination Law for the Independent Contractor Workforce,* 116 YALE L.J. 170, 186–87 (2006) ("Tarantolo"). White southerners also often "simply refused to sell land to" Black people, even when not selling was economically foolish. Mehrsa Baradaran, *The Color of Money, Black Banks and the Racial Wealth Gap* 9–11, 18 (2017) ("Baradaran"). To bolster this exclusion of Black people from the market by private

parties, some states went so far as to forbid such sales. *Id*. at 18. The inability to build wealth or own property forced Black people into sharecropping, where landowners subjected them to debt when the growing season closed, with no hope of recourse against the ever-present manipulation of the ledger. Richard Rothstein, *The Color of Law: A Forgotten History of How Our Government Segregated America* 154 (2017); Baradaran, *supra*, at 33–34.

By the time the Secretary of State officially certified the ratification of the 13th Amendment on December 18, 1865, the Black Codes were already in full force and effect in the South. As a result, the day after the certification of the 13th Amendment, Senator Lyman Trumbull (IL), the Chairman of the Judiciary Committee who brought the 13th Amendment to the Senate floor in 1864, stated that he would soon introduce the bill that eventually became the Civil Rights Act of 1866, later codified as § 1981. In announcing the new bill, Senator Trumbull made clear the Civil Rights Act's foundation was the recent ratification of the 13th Amendment, noting that "[i]n giving this notice I desire to say that it is given in view of the adoption of the constitutional amendment abolishing slavery." Cong. Globe, 39th Cong., 1st Sess., at 77. Senator Trumbull also announced that the legislation was being introduced "for the purpose of quieting apprehensions in the minds of many friends of freedom lest by local legislation or a prevailing public sentiment in some

of the States persons of the African race should continue to be oppressed and in fact deprived of their freedom . . . ." *Id.*

On January 5, 1866, Senator Trumbull formally introduced his bill in the Senate. Commenting on the bill's objective, Senator Trumbull again emphasized its grounding in the 13th Amendment:

> This measure is intended to give effect to that declaration and secure to all persons within the United States *practical freedom*. There is very little importance in the general declaration of abstract truths and principles unless they can be carried into effect, unless the persons who are to be affected by them have some means of availing themselves of their benefits.

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 431–32 (1968) (internal quotations omitted) (emphasis added). The bill aimed to "destroy all (the) discriminations embodied in the Black Codes." *Id*. at 432 (citing Cong. Globe, 39th Cong., 1st Sess. at 474) (internal quotations omitted); *City of Memphis v. Greene*, 451 U.S. 100, 132 (1981) (White. J, concurring) ("The proposed Civil Rights Act was *specifically designed* to stem this tide of oppression[.]") (emphasis added).

The 39th Congress, in short, found that the 13th Amendment fell short of remedying "the plight" of southern Black people. *City of Memphis*, 451 U.S. at 131 (White, J. concurring). To implement the 13th Amendment in all states as a matter of law and fact, and to "vindicate the rights of former slaves," the 39th Congress

thus enacted section 1 of the Civil Rights Act of 1866, later codified as § 1981.[2]

*Comcast Corp.*, 140 S. Ct. at 1015.

**B.    Congress Intended Section 1981 To Be A Remedial Measure To Grant Formerly Enslaved Black People Access To the Economic Marketplace.**

Congress enacted § 1981 as the remedial mechanism for ensuring formerly enslaved Black people equal access to the economic marketplace. "[T]he freedom that Congress is empowered to secure under the Thirteenth Amendment includes the freedom to buy whatever a white man can buy, the right to live wherever a white man can live." *Jones*, 392 U.S. at 443. The 39th Congress identified Black Codes— and all forms of inequitable economic market and social access impacting Black citizens—as badges and incidents of slavery and sought their eradication. *Id.* at 442. (explaining that the Black Codes "were substitutes" for the slave "system").

Senator Wilson, after describing the Black Codes as, "[s]o unjust, so wicked, so incompatible. . . [with]. . . the expressed will of the nation" explained why the legislation was necessary notwithstanding the 13th Amendment:

> This measure is called for because these reconstructed
> Legislatures, in defiance of the rights of the freedmen

---

[2] The Civil Rights Act of 1866 was introduced as S. 61 by Sen. Trumbull (R-IL) on Jan. 5, 1866. Barry Sullivan, *Historical Reconstruction, Reconstruction History, and the Proper Scope of Section 1981,* 98 YALE L.J. 541, 550 (1989). S. 61 passed the United States Senate (33-12) on Feb. 12, 1866. Govtrack, https://bit.ly/2lfzg3k (last accessed Dec. 12, 2023). S. 61 passed the United States House of Representatives (111-38) on Mar. 13, 1866. Govtrack, https://bit.ly/2nlDaID (last accessed Dec. 12, 2023). The bill became the law on Apr. 8, 1866. *Jones*, 392 U.S. at 435.

and the will of the nation embodied in the amendment to
the Constitution, have enacted laws nearly as iniquitous
as the old slave codes that darkened the legislation of
other days. The needs of more than four million colored
men imperatively call for its enactment.

Cong. Globe, 39th Cong., 1st Sess., at 603. For example, the well-documented

factual record before Congress included:

> . . . the barbarous vagrant law recently passed by the
> [Mississippi] rebel State Legislature[.] [It] is rigidly
> enforced, and under its provisions the freed slaves are
> rapidly being re-enslaved. No negro is allowed to buy,
> rent, or lease any real estate; all minors of any value are
> taken from their parents and bound out to planters; and
> every freedman who does not contract for a year's labor
> is taken up as a vagrant.

Cong. Globe, 39th Cong., 1st Sess., at 1833. The legislative history

demonstrates that Congress knew all too well that those who wrote and adopted the

Black Codes, as well as the nightriders and members of mobs who violently

suppressed the economic rights of formerly enslaved people, practiced brutal forms

of discrimination against Black people.[3]

---

[3] The best known was a report by General Carl Schurz, who was sent by President
Andrew Johnson to investigate conditions in the South in the summer of 1865.
Splitting with the President, Schurz reported shocking violence against formerly
enslaved people and identified as the primary problem the unwillingness of whites
to grant Black people their rights. Congress printed and distributed Schurz's
Report on the Conditions in the South. Report of C. Schurz, S. Exec. Doc. No. 2,
39th Cong., 1st Sess. 2, 17-25 (1865). *See also* Kenneth Stammp, The Era of
Reconstruction 1865-1877 73- 75 (1965); Eric Foner, The Story of American
Freedom 104 (1998).

If the Black Codes remained in place, Congress knew the 13th Amendment would become "a mere paper guarantee." *Jones*, 392 U.S. at 443 (quoting the statements of Representative Thayer of Pennsylvania, at Cong. Globe, 39th Cong., 1st Sess., at 1151). Recognizing the structural barriers faced by those newly freed from slavery, the goal of the Civil Rights Act of 1866 was clearly remedial in nature and aimed squarely at enabling Black people equal access to the economic marketplace. "Fully aware of this prevailing attitude, the leaders of Congress set about to enact legislation that would ensure to [Black people] the opportunity to participate equally in the free labor system by *providing an instrument by which they could strike down barriers to their participation*, whether those barriers were erected with the conscious intent to exclude or with callous indifference to exclusionary effects." *Gen. Bldg. Contractors Ass'n, Inc. v. Pa.*, 458 U.S. 375, 411-12 (1982) (emphasis added) (Marshall, J., dissenting).

The Reconstruction Congress recognized that "freedom of contract was not an end in itself; it was a means to the end of achieving equal citizenship and fundamental rights for freed slaves…." Zietlow, 19 NEV. L.J. at 448.[4] Thus, § 1981 "represents an immediately post-Civil War legislative effort to guarantee the then newly freed slaves the same legal rights that other citizens enjoy." *CBOCS W., Inc.*

---

[4] *See also id.* ("The Reconstruction Congress regulated contracts to prevent the exploitation of labor . . ." citing the "1868 Eight Hour Act, the 1867 Anti-Peonage Act, and the 1866 Civil Rights Act"); *id.* at 475 (same).

*v. Humphries*, 553 U.S. 442, 448 (2008). By extending § 1981 to private contracting, Congress sought to ensure "a dollar in the hands of a [Black person] will purchase the same thing as a dollar in the hands of a white man." *Jones*, 392 U.S. at 443. Such freedoms were intended to ensure that slavery's exploitation of Black citizens was not reinstated under the Black Codes, or future similar restrictions. Congress passed the sweeping Civil Rights Act of 1866 by overriding a presidential veto, for the first time in American history on any major legislation—further evidence of the intent of Congress to support racially conscious remedial efforts.[5]

The legislative history of the Civil Rights Act of 1866 makes clear that § 1981 is both firmly rooted in the 13th Amendment and squarely aimed at "providing an instrument by which [Black people] could strike down barriers to their participation" in our nation's economic marketplace. *Gen. Bldg. Contractors Ass'n, Inc.*, 458 U.S. at 411-12. Just as the 13th Amendment sought to break the shackles of white ownership over formerly enslaved Black citizens, § 1981 aimed to make Black Americans' economic independence a reality. The statute, in short, was both remedial in nature and purpose, and focused on Black citizens' rights to contract and participate equally in the nation's economic marketplace.

---

[5] Act of Apr. 9, 1866, ch. 31, 14 Stat. 27 (1866). President Andrew Johnson vetoed the Act, questioning whether, "it is sound policy to make our entire colored population, and all other excepted classes, citizens of the United States." Andrew Johnson, "*Veto of the Civil Rights Bill*," March 27, 1866.

The history reflecting the congressional intent of the Civil Rights Act of 1866, embodied in the statute itself, should guide the Court here. The remedial philanthropy of the Fearless Fund grant program promotes the very goals that the Civil Rights Act of 1866 was enacted to advance: providing Black people with economic freedom—equal access to capital to build businesses, grow communities, and support families. *Runyon v. McCrary*, 427 U.S. 160, 179 (1976). The 39th Congress would not have found *prohibiting* remedial philanthropic funding of Black Americans' small businesses to be consistent with its intent to alleviate "the badges and the incidents of slavery." *Jones*, 392 U.S. at 440. In sum, the legislative history of the Civil Rights Act of 1866, like the text itself, makes clear that it would be "a perversion of Congressional intent to use § 1981 against a remedial program whose purpose is to 'bridge the gap in venture capital funding for women of color founders'—a gap that is the result of centuries of intentional racial discrimination." *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, No. 23-13138, 2023 WL 6520763, at *3 (11th Cir. Sept. 30, 2023) (Wilson, J. dissenting).

> **C. Congress Intended Section 1981 to Redress Discriminatory Contracting in Employment, Consumer Transactions, and Property, Not Prohibit Remedial Practices or Policies.**

Congress' "loftier goal" of "guaranteeing to [B]lack[] [people] the fundamental rights of citizenship" was incorporated into the Civil Rights Act of 1866. Taronotolo, 116 YALE L.J. at 187. The early history and application of §

1981 reinforces this "loftier goal" as well as its remedial purpose. This same history also confirms that the statute was never meant to *prevent* Black citizens from achieving equality in the marketplace, much less to prevent remedial philanthropic efforts to promote such equality. Indeed, Congress' revision of the United States Code in 1874 reaffirmed that the Civil Rights Act of 1866 was "an important factor in the protection of the rights of freedmen." John H. Franklin, *The Civil Rights Act of 1866 Revisited*, 41 Hastings L.J. 1135, 1136 (1990) (Franklin).[6]

Early judicial interpretations of the Civil Rights Act focused on employment discrimination and discrimination in retail transactions as warranting scrutiny—not philanthropic giving aimed at redressing historic discrimination in line with § 1981's remedial purpose. *See id.* (discussing *In re Turner*, 24 F. Cas. 337 (C.C.D. Md. 1867) and holding that employment contract for Black apprentice violated the Civil Rights Act of 1866 because it did not include guarantee that apprentice would be taught to read); *id*. at 1137 (court using the Act to "uph[o]ld the right of a [B]lack woman to ride in the first[-]class car as provided for by the ticket she held"). And since its enactment more than a century ago, § 1981 claims have arisen primarily in these same contexts, including employment contracts, consumer and retail contracts, and financing and property contracts. Christine J. Back, *42 U.S.C. § 1981's Contract*

---

[6] The revision of the Code included "principal provisions of the Civil Rights Act of 1866 becom[ing] section 1981 . . ." *Id.*; *Gen. Bldg. Contractors Ass'n, Inc.*, 458 U.S. at 385.

*Clause: Racial Equality in Contractual Relationships*, Congressional Research Service (2023).

*Amici* have not been able to identify instances where, since its enactment in 1866, § 1981 has been successfully used as a sword against targeted remedial philanthropy. Rather, its historical use has been to counter race-based *exclusion* from the marketplace, arising from past race discrimination. The entire reason for § 1981's existence was to empower Black citizens to gain greater economic power and contract rights than they otherwise could achieve or exercise because of the enduring effects of centuries of anti-Black discrimination. The seminal § 1981 cases thus target the wholesale refusal to admit Black students into an educational institution, *e.g.*, *Runyon*, 427 U.S. at 172-73, and the racist discharge of Black employees, *e.g.*, *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 450–51 (2008). As these cases reflect, the statute's principal concern was ensuring that Black citizens were not denied the same ability to access economic markets as "white citizens," not thwarting remedial philanthropic policies or practices. *See Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 301 (7th Cir. 2000) ("[T]he statute … reflects the exercise of congressional authority under the Thirteenth Amendment to relieve African Americans of the 'badges and incidents' of slavery.").

**II.    Thwarting Remedial Philanthropic Programs is Contrary to Section 1981's Congressional Intent.**

Plaintiff's theory is as novel as it is wrong. Congress never could have envisioned that § 1981 would be used to deny Black citizens access to philanthropic programs that—like the statute—aim to remedy historic economic discrimination against Black people in the marketplace. Because the Black Codes targeted and limited the economic opportunities of Black people on the basis of their race, § 1981 necessarily was race conscious. It recognized that, in slavery's aftermath, "white citizens" enjoyed rights that non-white citizens did not. By using "white citizens'" rights as a benchmark against which to measure equal access to the market, § 1981 thus classified by race and took account of the privileges reserved for white people.[7] Plaintiffs' distorted application of § 1981 thus is contrary to Congress' express intent.

If a plaintiff's claim is inconsistent with § 1981's history and purpose, no § 1981 claim should lie. To permit such claims would preclude effectuation of the provision's clear remedial intent. Indeed, one Circuit has dismissed such challenges,

---

[7] To be sure, §1981 has been interpreted to protect the right to contract for other groups, *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976), but it still remains focused on the kinds of major deprivations of "basic civil rights" that animated the 39th Congress to act, *City of Memphis*, 451 U.S. at 134 (White, J., concurring). And nothing about the fact that white people can bring suits under § 1981 means that the statute prohibits race-conscious remedial efforts.

under § 1981, to a race-conscious remedial program, noting that the program responded to "manifest imbalance[s]." *Doe v. Kamehameha Schs./Bernice Pauahi Bishop Est.*, 470 F.3d 827, 836, 843 (9th Cir. 2006.) Any other interpretation would render § 1981's remedial purpose null. In *Setser v. Novack Inv. Co.*, the court held, "[i]t would indeed be . . . ironic if the Civil Rights Act of 1866 was used now to prohibit" § 1981, "the only effective remedy for past discriminatory employment practices against [Black people] and other minorities[.]" 657 F.2d 962, 966–67 (8th Cir. 1981); *cf. United Steelworkers v. Weber*, 443 U.S. 193, 204 (1979) (explaining, in the context of Title VII, "[i]t would be ironic indeed if a law triggered by a Nation's concern over centuries of racial injustice and intended to improve the lot … constituted the first legislative prohibition of all voluntary, private, race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy.").

*Doe* illustrates that race-conscious policies, when remedial in nature and purpose, can effectuate § 1981, consistent with its history and purpose. There, a white student brought a § 1981 claim against private schools in Hawaii for giving admissions preference to students of Native Hawaiian ancestry. 470 F.3d at 829. The Ninth Circuit held that the program did not offend § 1981. *Id.* at 849. It found that Kamehameha Schools' program was not a "straightforward case of discrimination," but a "remedial policy" that considered students' race to address manifest

15

imbalances between educational outcomes for Native Hawaiian students and their counterparts. *Id.* at 837.

As in *Doe*, philanthropy that addresses "manifest imbalance[s]" in the availability of funding such as exist here for Black small businesswomen is a "remedial policy"—not discrimination—and provides opportunity to Black small businesswomen where it does not otherwise exist. To read § 1981 to prohibit such remedial programs would be inconsistent with and undermine the 39th Congress' purpose in enacting § 1981.

## III. Prohibiting Remedial Philanthropy Would Diminish Black Women's Economic Freedom.

Congress' intent to abolish "all badges and incidents of slavery" under § 1981 is just as important today as it was during the height of the Black Codes. And expanding, not contracting, market access to historically and currently excluded groups is as central to § 1981's design today as when it was first passed.

Market access is not equal among racial groups in today's America. Venture capital provides a stark example. In recent research studies, the Small Business Administration ("SBA") has found continued disparities in racial minorities' ability to access capital. Alicia Robb, *Financing Patterns and Credit Market Experiences: A Comparison by Race and Ethnicity for U.S. Employer Firms 12 Off. of Advocacy*,

U.S. Small Bus. Assoc. (Feb. 2018).[8] For example, the SBA found that although Black Americans are 14.2% of the population, only 2.1% own businesses. *Id.* at 8. It also noted that 70.6% of Black Americans commonly relied on personal or family savings for start-up capital, and only 15.7% depended on business loans. *Id*. at 15-16. The Black community's dependence on personal or family savings is due, in part, to the fact that Black businesses face a funding rejection rate *three times higher* than their white counterparts. Elana Dure, *Black women are the fastest growing group of entrepreneurs. But the job isn't easy* (Oct. 12, 2021)[9]; *see* Majority Staff Report, *Women's Small Business Ownership and Entrepreneurship Report*, U.S. Senate Comm. on Small Bus. and Entrep. 6 (July 2023) (affirming same).[10] Similarly, a research study by Goldman Sachs founds that, in comparison to a quarter of white business owners, more than half of Black business owners who sought credit reported receiving less than the amount they requested from financial

---

[8] Available at https://advocacy.sba.gov/wp-content/uploads/2019/04/Financing_Patterns_and_Credit_Market_Experiences_report.pdf.

[10] Available at https://www.jpmorgan.com/insights/business/business-planning/black-women-are-the-fastest-growing-group-of-entrepreneurs-but-the-job-isnt-easy.

institutions. Gizelle George-Joseph and Daniel Milo, *The Bigger Picture Blackwomenomics—Equalizing Entrepreneurship* at 3 (Feb. 9, 2022).[11]

Black women businessowners' lack of market access is even worse. Black women comprise approximately 6% of the population of the United States, but own only 2% of employer businesses. George-Joseph et. al, *supra*, at 3. Single Black women own only 0.5% of employer businesses, a rate "24 times lower than for single white men." *Id.* And overall, Black women receive less than 0.35% of all venture capital funding. NABA Inc., *Investing in The Future: How Supporting Black Women-Owned Businesses and Entrepreneurs Benefits Us All*, FORBES (Apr. 27, 2023).[12] This inequality in access to capital is particularly astounding, considering 42% of newly-created women-owned businesses are started by Black women. Majority Staff Report, *supra* at 6.

Applying § 1981 to prohibit remedial philanthropic programs that increase Black women's access to venture capital is inconsistent with its purpose and history. Black women currently have access to a mere sliver of venture capital compared to other demographic groups. Finding a program that *increases* Black women's access

---

[11] Available at https://www.goldmansachs.com/intelligence/pages/gs-research/black-womenomics-equalizing-entrepreneurship/report.pdf.

[12] Available at https://www.forbes.com/sites/forbeseq/2023/04/27/investing-in-the-future-how-supporting-black-women-owned-businesses-and-entrepreneurs-benefits-us-all/?sh=24a7707e4ac2.

to funding unlawful under § 1981 would exacerbate inequitable economic access currently faced by Black communities.

## CONCLUSION

Section 1981's history and purpose demonstrate that it is a remedial statute meant to ensure and equalize Black citizens' economic market access. The long history of remedial philanthropy is consistent with this purpose and necessary to rid the United States of the vestiges of "badges and incidents" of slavery that the 13th Amendment meant to purge from the market.

Plaintiff's efforts to weaponize the very provision that was enacted to address the economic inequities that persist from slavery and the Black Codes, and more modern-day discrimination, is contrary to the Act's congressional intent and turns the nation's first civil rights act on its head. The effects of years of systemic anti-Black discrimination persist across many sectors of American society. Philanthropic efforts to remediate such "manifest imbalances," such as the philanthropic grantmaking here, should be upheld because they are consistent with congressional intent and are lawful under § 1981. This Court should affirm the district court's denial of preliminary injunctive relief.

Dated:     December 13, 2023                    Respectfully submitted,

                                                /s/ *Keith Harrison*
Jon Greenbaum                                   Keith Harrison
Dariely Rodriguez                               Laurel Pyke Malson
Kathryn J. Youker                               Amy M. Pauli
**LAWYERS' COMMITTEE FOR**                       Kevin C. Cacabelos
**CIVIL RIGHTS UNDER LAW**                       Mary Marston
1500 K Street NW, Suite 900                     **CROWELL & MORING LLP**
Washington, D.C. 20005                          1001 Pennsylvania Avenue, NW
Telephone: (202) 662-8600                       Washington, DC 20004
Facsimile: (202) 783-0857                       O +1.202.624.2500
jgreenbaum@lawyerscommittee.org                 F +1.202.628.5116
                                                E KHarrison@crowell.com

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

**1. Type Volume**

  _X_  This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding parts of the document exempted by Federal Rules of Appellate Procedure 32(f), this document contains 4,448 words.

**2. Typeface and Type Style**

  _X_  This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared using Microsoft Word in 14-point, Times New Roman font.


Dated: December 13, 2023

                                                          /s/ *Keith Harrison*
                                                          Keith Harrison

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing brief through the CM/ECF system, which will send a notice of filing to all registered CM/ECF users.


/s/ *Keith Harrison*
Keith Harrison

DATED:  December 13, 2023