Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
gibsondunn.com

Mylan L. Denerstein
Direct: +1 212.351.3850
Fax: +1 212.351.6350
MDenerstein@gibsondunn.com

March 6, 2024

David J. Smith
Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, GA 30303

> Re: *American Alliance for Equal Rights v. Fearless Fund Management, LLC*, No. 23-13138—Argued January 31, 2024 (Rosenbaum, Newsom, and Luck, Circuit Judges)

Dear Mr. Smith:

We write to provide *Do No Harm v. Pfizer Inc.*, — F.4th —, 2024 WL 949506 (2d Cir. Mar. 6, 2024), as supplemental authority under Fed. R. App. P. 28(j). Both the majority and concurring opinions in *Do No Harm* underscore that the Alliance has not carried its burden to prove Article III standing for a preliminary injunction.

The question in *Do No Harm*, as here, was whether an organization can establish Article III standing under the "more rigorous standard applicable at the preliminary injunction stage," as compared to "the pleading stage," while withholding the identities of its supposedly injured members from the district court. 2024 WL 949506, at *5-6. The Second Circuit held that an organization must name an affected member under the "clear language" of *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009), and *FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990). 2024 WL 949506, at *8; *see also id.* at *10 (citing *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016)). The Second Circuit explained that such a "naming requirement makes sense as an element of associational standing" to ensure that the members are "genuinely" injured and not mere pawns for "the organization to lodge a hypothetical legal challenge." *Id.* at *8.

Judge Wesley's concurring opinion in *Do No Harm* offers a second path to affirmance in this case. Although Judge Wesley disagreed with the majority as to whether *Summers* requires organizations to disclose their injured members' names to the court, he agreed that the organization had not proved Article III standing. 2024 WL 949506, at *18. The organization there, like the Alliance here, had submitted "virtually identical declarations" from anonymous members that were "vague and conclusory" and did not substantiate "a concrete readiness to

**GIBSON DUNN**

apply" to the challenged program. *Id.* at *18-20 (citing *Carney v. Adams*, 592 U.S. 53 (2020)).

Whether cast in terms of the Alliance's failure to identify its affected members or its failure to corroborate boilerplate statements that the anonymous members actually are ready to apply for a charitable grant, the lesson is the same: The Alliance lacks Article III standing.

Respectfully submitted,

*/s/ Mylan L. Denerstein*

Mylan L. Denerstein
GIBSON, DUNN & CRUTCHER LLP
*Counsel for Defendants-Appellees*

cc:    All counsel of record (via ECF)

𝕴𝖓 𝖙𝖍𝖊
**𝖀𝖓𝖎𝖙𝖊𝖉 𝖘𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘**
𝖋𝖔𝖗 𝖙𝖍𝖊 𝖘𝖊𝖈𝖔𝖓𝖉 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

———————

August Term, 2023

(Argued: October 3, 2023     Decided: March 6, 2024)

Docket No. 23-15

———————

DO NO HARM,

*Plaintiff-Appellant,*

–v.–

PFIZER INC.,

*Defendant-Appellee.*

———————

Before:     JACOBS, WESLEY, and ROBINSON, *Circuit Judges.*

———————

Plaintiff-Appellant Do No Harm challenges a December 16, 2022 order of the United States District Court for the Southern District of New York (Rochon, *J.*) denying its request for a preliminary injunction and dismissing the case without prejudice because Do No Harm lacked Article III standing.

Do No Harm alleges that a Pfizer fellowship program unlawfully excludes white and Asian-American applicants on the basis of race in violation of federal and state laws. As a membership organization, it bases its standing on injuries to two pseudonymous white or Asian-American members who indicated they would

apply for the fellowship if they were not excluded from eligibility. The district court concluded that Do No Harm lacked standing because, among other reasons, it failed to identify a single injured member by name.

Two conclusions drive our decision to affirm: First, for purposes of establishing Article III standing under the summary judgment standard applicable to a motion for a preliminary injunction, *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011), an association that relies on injuries to individual members to establish its standing must name at least one injured member. This does not prevent the association from seeking to protect the identities of its named members from public disclosure using existing legal frameworks. Second, if a plaintiff fails to establish Article III standing in the context of a motion for a preliminary injunction, the district court must dismiss their claims without prejudice for lack of standing, rather than allow the case to proceed in the ordinary course if the plaintiff alleged sufficient facts to establish standing under the less onerous standard applicable at the pleading stage. Because Do No Harm moved for a preliminary injunction and failed to name at least one injured member, we **AFFIRM**.

Judge Wesley concurs in part, and in the judgment, in a separate opinion.

———————

CAMERON T. NORRIS (Thomas R. McCarthy, Frank H. Chang, C'Zar Bernstein, *on the brief*), Consovoy McCarthy PLLC, Arlington, VA, *for Plaintiff-Appellant*.

SAMANTHA LEE CHAIFETZ, DLA Piper LLC, Washington, DC (Loretta E. Lynch, Liza M. Velazquez, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY; Jeannie S. Rhee, Martha L. Goodman, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC, *on the brief*), *for Defendant-Appellee*.

———————

Robinson, *Circuit Judge*:

Defendant-Appellee Pfizer Inc. ("Pfizer") sponsors a Breakthrough Fellowship Program (the "Fellowship") that seeks "to advance students and early career colleagues of Black/African American, Latino/Hispanic, and Native American descent." J. App'x 45. Do No Harm, a nationwide membership organization, filed suit against Pfizer on behalf of its members, alleging that Pfizer unlawfully excludes white and Asian-American applicants from the Fellowship in violation of federal and state laws.

When Do No Harm moved for a preliminary injunction, the district court dismissed the suit for lack of subject matter jurisdiction. *Do No Harm v. Pfizer Inc.*, 646 F. Supp. 3d 490, 517–18 (S.D.N.Y. 2022).[1] In particular, the district court concluded that Do No Harm lacked Article III standing because, among other reasons, it failed to identify a single injured member by name. *Id.* at 504–05.

---

[1] The district court did not enter judgment on a separate document as required by Federal Rule of Civil Procedure 58(a). Nevertheless, pursuant to Rule 58(c)(2)(B), the judgment became final 150 days after the order was entered on the docket, and we deem Do No Harm's notice of appeal to have been timely filed as of that date. *See* Fed. R. App. P. 4(a)(2). Moreover, we note that "failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58(a) does not affect the validity of an appeal from that judgment or order." Fed. R. App. P. 4(a)(7)(B). We also note that "[w]here an order appealed from clearly represents a final decision and the appellees do not object to the taking of an appeal, the separate document rule is deemed to have been waived and the assumption of appellate jurisdiction is proper." *Selletti v. Carey*, 173 F.3d 104, 109–10 (2d Cir. 1999). Pfizer has not objected to the taking of this appeal; it has waived the separate document requirement. We therefore exercise jurisdiction pursuant to 28 U.S.C. § 1291.

The decisive issues in this appeal are (1) whether, for purposes of establishing Article III standing under the summary judgment standard applicable to a motion for a preliminary injunction, *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011), an association that relies on injuries to individual members to establish its standing must name at least one injured member; and (2) whether, if a plaintiff fails to establish Article III standing in the context of a motion for a preliminary injunction, the district court must dismiss their claims without prejudice for lack of standing, or whether the court should simply deny the preliminary injunction and allow the case to proceed in the ordinary course if the plaintiff alleged sufficient facts to establish standing under the less onerous standard applicable at the pleading stage.

We conclude that the district court did not err in determining that Do No Harm lacked Article III standing because it did not identify by name a single member injured by Pfizer's alleged discrimination, and that the district court properly dismissed Do No Harm's claims after reaching that conclusion. We therefore **AFFIRM**.

# BACKGROUND

## I.      Facts[2]

Pfizer is a corporation headquartered in New York City that researches, manufactures, and sells biopharmaceutical products.  In 2021, Pfizer launched the Breakthrough Fellowship Program: a nine-year, "first-of-its-kind" opportunity designed "to increase minority representation at Pfizer" and "enhance [its] pipeline of diverse leaders."  J. App'x 45.

The Fellowship consists of five parts: a ten-week summer internship for rising college seniors; two years of full-time employment after graduation; a fully paid scholarship to a full-time, two-year MBA, MPH, or MS Statistics program; summer internships between the first and second years of the fellow's master's program; and, finally, a return to Pfizer for postgraduate employment.

Individuals are only eligible to apply for the Fellowship during their junior year of college.  At the time this suit was filed in September 2022, the Fellowship webpage listed the following "Requirements" for potential applicants:

- Be a U.S. citizen or a U.S. Permanent Resident

---

[2] Our account of the facts is drawn from Do No Harm's Complaint and accompanying attachments.  For the purpose of reviewing the district court's order dismissing Do No Harm's claims, we credit Do No Harm's allegations.  *Novak v. Kasaks*, 216 F.3d 300, 305 (2d Cir. 2000).

- Be an undergraduate student enrolled in a full-time university program (an accredited college / university degree program at the time of award) and graduate December '23 or Spring 2024

- Committed interest & intent to pursue an MBA, MPH or MS Statistics program

- Apply to a Breakthrough Fellowship Intern opportunity via Pfizer.com/Careers search 'Breakthrough' [hyperlink omitted]

- Have a 3.0 GPA or above

- Meet the program's goals of increasing the pipeline for Black/African American, Latino/Hispanic and Native Americans.

- Demonstrate exceptional leadership potential

- Willingness to work in NYC or other Pfizer location as indicated by the job posting

*Id.* at 48–49.

The webpage also contained an "FAQs" section that directed potential applicants to a separate PDF document. One frequently asked question read: "I'm not from a minority group identified for the Breakthrough Fellowship Program; what opportunities are available to me?" *Id.* at 51. Pfizer answered:

> Pfizer is an equal opportunity employer. We have multiple programs and opportunities throughout the year for undergraduate and graduate students and for Pfizer colleagues generally. For example, any colleague can pursue an MBA or MPH through Pfizer Benefits' Education Assistance Program. We also host MBA students each summer, more information on this program can be found here [hyperlink omitted]. Undergraduates and graduate students who are not eligible or interested in the Breakthrough Fellows Program but would like to pursue a career at Pfizer can apply to the Summer Growth Experience Program and/or create a job alert on our

Pfizer.com/Careers page to receive email or text notifications when positions are opened.

*Id.* at 51.  The webpage further stated that "[a]pplications for the 2023 Breakthrough Fellowship Program will open shortly end [sic] of Summer 2022/beginning Fall 2022." *Id.* at 48.

Do No Harm is a Virginia-based, nationwide membership organization whose stated mission is "to protect healthcare from radical, divisive, and discriminatory ideologies, including the recent rise in explicit racial discrimination in graduate and postgraduate medical programs." *Id.* at 9.  Its members include "physicians, healthcare professionals, medical students, patients, and policymakers." *Id.*  Do No Harm pursues its mission through education and advocacy, including litigation.

## II.    District Court Proceedings

On September 15, 2022, Do No Harm filed suit against Pfizer, alleging violations of 42 U.S.C. § 1981, Title VI of the Civil Rights Act, Section 1557 of the Affordable Care Act (the "ACA"), and the New York State and New York City Human Rights Laws.  Do No Harm asserts that Pfizer's Fellowship unlawfully "excludes white and Asian-American" applicants, as evidenced by the Fellowship's FAQs page, advertising materials, and requirement that applicants

"[m]eet the program's goals of increasing the pipeline for Black/African American, Latino/Hispanic and Native Americans." J. App'x 8, 11–14 (alteration in original). Do No Harm alleged it had "at least two members" who were "ready and able to apply for the 2023 class" if Pfizer eliminated its allegedly discriminatory criteria. *Id.* at 9.

Concurrent with its complaint, Do No Harm filed a motion for a temporary restraining order and preliminary injunction barring Pfizer from selecting the 2023 Fellowship class until further order of the district court. In support of its motion, Do No Harm submitted anonymous declarations from two of its members identified by the pseudonyms "Member A" and "Member B."[3] In their respective declarations, Members A and B affirmed that they "[met] all the eligibility requirements set by Pfizer," including that they were undergraduate juniors,

---

[3] In the context of cases in which parties who are identified by name *to the court* seek to keep their names confidential from the public or other parties, this Court routinely uses the terms "anonymous" and "pseudonymous" interchangeably. *See, e.g., Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189 (2d Cir. 2008) ("[W]hen determining whether a plaintiff may be allowed to maintain an action under a pseudonym, the plaintiff's interest in anonymity must be balanced against both the public interest in disclosure and any prejudice to the defendant."); *United States v. Pilcher*, 950 F.3d 39, 41–42 (2d Cir. 2020) (referring to defendant's motion as both a "motion to proceed anonymously" and a "motion to file a habeas petition under a pseudonym"); *Doe v. Delta Airlines Inc.*, 672 Fed. Appx. 48, 52 (2d Cir. 2016) (referring to plaintiff's motion as both "an application to litigate under a pseudonym" and an "application to proceed to trial anonymously"). We use the two terms interchangeably here and emphasize that in contrast to the above cases, the names of the anonymous members have not been disclosed to the court, even *in camera*.

maintained GPAs of 3.0 or higher, and were "involved in campus life and [held] leadership positions" in various campus activities. *Id.* at 36–41. Members A and B, who self-identified as white and Asian-American, respectively, averred that Pfizer "categorically exclud[ed]" white and Asian-Americans like them from the Fellowship. *Id.* at 37, 40. Both Members swore they were "able and ready to apply to the 2023 class of the Fellowship" if Pfizer eliminated its allegedly discriminatory criteria. *Id.*

Do No Harm also submitted a declaration from Kristina Rasmussen, Do No Harm's Executive Director. Rasmussen asserted that "Do No Harm has at least two members who are white and Asian American and in their junior year of college who are ready and able to apply to the Pfizer Breakthrough Fellowship Program if Pfizer stops discriminating against white and Asian-American applicants." *Id.* at 34. She further declared that "Do No Harm also has at least one member who is a sophomore who will be ready and able to apply to the Pfizer Breakthrough Fellowship next year if Pfizer stops discriminating against white and Asian-American applicants." *Id.* at 34–35.

During a conference held on September 21, 2022, Do No Harm withdrew its request for a temporary restraining order based on Pfizer's representation that the application window for the 2023 class would not open before January 2023. At the

same conference, the district court observed that Do No Harm had not identified Members A or B by name, and asked that it address this issue in its further submissions. Briefing on the preliminary injunction motion was completed in November 2022. Both parties addressed the naming issue in their filings.

On December 16, 2022, the district court issued an opinion and order denying Do No Harm's motion for a preliminary injunction and dismissing the case without prejudice for lack of subject matter jurisdiction. *Do No Harm*, 646 F. Supp. 3d at 517–18.

As a preliminary matter, the court noted that a plaintiff's burden to show Article III standing on a motion for a preliminary injunction "will normally be no less than that required on a motion for summary judgment." *Id.* at 500 (quoting *Cacchillo*, 638 F.3d at 404). Applying that standard, the court held that Do No Harm lacked standing because it failed to identify any of its injured members by name. *Id.* at 504–05 (citing *Summers v. Earth Island Institute*, 555 U.S. 488, 498–99 (2009)). Even if it had identified its members by name, the court concluded that Do No Harm failed to establish that any of its members suffered a cognizable injury because they did not "provide any information, facts or prior experience that show a committed interest and intent to pursue [the opportunity]." *Id.* at 507 (internal quotation marks omitted).

In an alternative analysis, the court considered Do No Harm's "claim-specific" standing to pursue its federal claims.[4]  *Id.* at 508.  The court concluded that Do No Harm could not pursue its § 1981 claim for the additional reason that associations such as Do No Harm lack standing to assert claims on behalf of their members under § 1981.  *Id.* at 508–09.  The court further concluded that Pfizer is not subject to the prohibitions of Title VI or Section 1557 of the ACA.  *Id.* at 509–17.  Having rejected Do No Harm's federal claims for claim-specific reasons, the court declined to exercise supplemental jurisdiction over the remaining state law claims and dismissed the case without prejudice.  *Id.* at 518.

## III.    Motion to Supplement the Record on Appeal

Do No Harm filed a timely notice of appeal on January 3, 2023.  Pfizer represents that it opened its application window for the 2023 Fellowship class on February 15, 2023, and closed it on March 1, 2023.

_____

[4] The district court's discussion of "claim-specific" standing appears to focus on Article III standing with respect to the § 1981 claim, and "statutory standing" with respect to the Title VI and ACA claims.  "Statutory standing," as distinct from Article III standing, relates to the merits, that is whether a particular plaintiff "has a cause of action under the statute."  *American Psychiatric Association v. Anthem Health*, 821 F.3d 352, 359 (2d Cir. 2016) (quoting *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014)).  Because so-called statutory standing does not implicate "the court's statutory or constitutional *power* to adjudicate the case," this term is "misleading."  *Id.* (quoting *Lexmark*, 573 U.S. at 128 n.4).

When it filed its brief and joint appendix, Do No Harm moved to supplement the record on appeal with another declaration of Kristina Rasmussen and a declaration of a third anonymous member identified by the pseudonym "Member C." Member C, then a college sophomore, states, "I meet all the eligibility requirements [for the Fellowship] set by Pfizer, except I am Asian," and declares, "I am able and ready to apply for the 2024 class of the Fellowship if Pfizer" eliminates its allegedly discriminatory criteria. App. Ct. Dkt. 38 at 11. Rasmussen swears, among other things, that Member C is a member of Do No Harm. *Id.* at 13. Pfizer opposes the motion. App. Ct. Dkt. 50. The motion was referred to this panel for consideration alongside the merits.

## DISCUSSION

An association may have standing to sue as the representative of its members, "[e]ven in the absence of injury to itself." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). To establish associational standing, an association must show: (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977).

At issue here is the first of these requirements—that at least one association member must have standing to sue in their own right. To establish individual standing, a plaintiff must show: (1) they suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or hypothetical; (2) there is a "causal connection between the injury and the conduct complained of"; and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted).

Ordinarily, to establish standing to challenge an allegedly discriminatory program, a plaintiff must apply to that program. *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997). But a plaintiff need not go through the motions of formally applying when that would be a "futile gesture." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 365–66 (1977) ("If an employer should announce [its] policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, [its] victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs."). In such circumstances, a plaintiff need only demonstrate that they are able and ready to apply, but a discriminatory policy prevents them from doing so on equal footing. *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003).

On appeal, Do No Harm argues that, after the district court concluded that Do No Harm lacked standing for purposes of its preliminary injunction motion, the district court should not have dismissed the claims altogether unless Do No Harm failed to establish standing under the less onerous standard applicable at the pleading stage. Applying that standard, Do No Harm contends that it sufficiently alleged facts to establish its standing. In particular, it argues that, at the pleading stage, it is not required to name its members to establish Article III standing, and it sufficiently alleged that its pseudonymous members were ready and able to apply to the Fellowship. Even applying the more rigorous standard applicable at the preliminary injunction stage, Do No Harm argues it presented sufficient evidence to establish its members' standing.

Finally, Do No Harm asserts the district court erred by dismissing its federal claims pursuant to its "claim-specific" analyses without first giving Do No Harm notice or an opportunity to be heard. It disputes the district court's conclusion that associations like Do No Harm lack standing to sue on behalf of their members under § 1981, and it challenges the court's assessment of the merits of its Title VI and ACA claims.

"We review the dismissal of claims for lack of standing *de novo*," meaning without deference to the district court. *Ross v. Bank of America, N.A. (USA)*, 524

F.3d 217, 222 (2d Cir. 2008).  Applying that standard, we conclude that (1) the district court did not err in concluding that Do No Harm lacked Article III standing to seek a preliminary injunction because it did not identify by name a single member injured by Pfizer's alleged discrimination, and (2) the district court properly dismissed Do No Harm's claims after reaching that conclusion.  We therefore **AFFIRM**.

## I.     Identifying Do No Harm Members

We require plaintiffs claiming associational standing "to identify members who have suffered the requisite harm."  *Summers*, 555 U.S. at 499.  The Supreme Court explored what it means to "identify" members in *Summers*.  There, environmental organizations challenged US Forest Service regulations exempting certain timber sales from notice and comment procedures.  *Id.* at 490–92.  The parties settled their claim insofar as it related to a specific identified project in which the Forest Service applied those regulations, leaving the organizational plaintiffs with no specific actual or threatened application of the regulations that would impact the recreational or aesthetic interests of at least one identified member.  *Id.* at 491–92.  The Court accordingly concluded that the plaintiff organizations lacked Article III standing.  *Id.* at 495–96.

In announcing its holding, the Court rejected the suggestion that an organization may premise its standing on the "statistical probability" that some of its members are threatened with concrete injury. *Id.* at 497–98. Such an approach would, in the majority's view, "make a mockery of our prior cases, which have required plaintiff-organizations to make specific allegations establishing that at least one *identified member* had suffered or would suffer harm." *Id.* at 498 (emphasis added). This aspect of the Court's opinion was central to the district court's conclusion that Do No Harm failed to adequately identify a harmed member because it didn't *name names*. *See Do No Harm*, 646 F. Supp. 3d at 501–02.

Do No Harm argues that *Summers* is irrelevant to this case. It contends that the standard set in *Summers* is inapplicable at the pleading stage, and that *Summers* does not, in any event, require associations to identify specific injured members *by name*.

We disagree on both points. Whether *Summers* requires naming names at the *pleading stage* is irrelevant; the district court made its standing determination here in the context of a motion for a *preliminary injunction*, not at the pleading stage. And a requirement that a plaintiff association seeking to establish standing on the basis of injuries to its members identify at least one injured member by name best aligns with Supreme Court precedent, including *Summers*, is most consistent with

the principles underlying organizational standing, and is bolstered by the conclusions of numerous other courts.

### A. Standing and Preliminary Injunctions

It is well settled that "[a] plaintiff's burden to demonstrate standing increases over the course of litigation." *Cacchillo*, 638 F.3d at 404. As with any other matter on which the plaintiff bears the burden of proof, each element of standing must be supported "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

In *Cacchillo*, we held that "[w]hen a preliminary injunction is sought, a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment." 638 F.3d at 404 (internal quotation marks omitted). Consequently, to establish standing on a motion for a preliminary injunction, "a plaintiff cannot rest on such mere allegations as would be appropriate at the pleading stage but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (cleaned up).

The district court made its standing determination in the context of addressing Do No Harm's preliminary injunction motion. Do No Harm bore the

burden of demonstrating standing subject to at least a summary judgment standard. That's the frame in which we review the district court's standing determination. To determine whether Do No Harm met its burden, we need not and do not decide whether, at the *pleading* stage, Do No Harm was required to name names. *Cf. Building & Construction Trades Council of Buffalo, New York & Vicinity v. Downtown Development, Inc.*, 448 F.3d 138, 145 (2d Cir. 2006) (concluding that an organizational plaintiff need not identify specific injured members by name at the pleading stage, but recognizing that a naming requirement "might have some validity . . . at the summary judgment stage").[5]

## B. Naming Names

*Summers*, and the precedent upon which it relies, support the view that an association cannot just *describe* the characteristics of specific members with

---

[5] The concurrence suggests there is tension between requiring names at summary judgment and leaving open the possibility that names may not be required at the pleading stage. Concurrence at 9. As mentioned above, "[a] plaintiff's burden to demonstrate standing increases over the course of litigation," such that each element of standing "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). In other words, what is enough to establish standing at the pleading stage will not necessarily be enough to establish standing at summary judgment. *See* I.A., above. For that reason, there is nothing incongruous about suggesting that allegations that may be sufficient to survive a motion to dismiss are not enough to defeat a motion for summary judgment. *See, e.g., Ball v Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 199 (2d Cir. 1990) (in personal jurisdiction context, "bare legal allegations may be sufficient to withstand a 12(b)(6) motion, but, without factual support, fail to make a *prima facie* showing at the summary judgment stage, once discovery has occurred").

cognizable injuries; it must identify at least one by name. That makes sense where an association's standing rests on alleged injuries to its members, and is consistent with persuasive decisions from a number of courts.

In rejecting the suggestion that a plaintiff organization could rely on a statistical likelihood that its members are injured by the challenged regulation, the *Summers* Court noted that "this requirement of naming the affected members has never been dispensed with in light of statistical probabilities, but only where *all* the members of the organization are affected by the challenged activity." *Summers*, 555 U.S. at 498–99. Thus, plaintiffs claiming associational standing must "identify members who have suffered the requisite harm." *Id.* at 499.

Do No Harm is right that *Summers* does not squarely address the specific issue here. The core holding of *Summers* is that an association relying on injuries to its members to establish its standing must identify *specific* members injured by the challenged conduct. *Id.* at 498–99. It does not directly address whether those members must be identified *by name*.

Nevertheless, a rule requiring an associational plaintiff to name at least one injured member, at least at the summary judgment stage, best aligns with the Court's guidance in *Summers* and the caselaw on which *Summers* relies—specifically, *FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990).

In *FW/PBS*—a case arising in a summary judgment posture—groups of individuals and businesses challenged the constitutionality of a city ordinance. *Id.* at 221. Plaintiffs premised their standing on, among other things, the affidavit of a named police officer who claimed that "two licenses" were revoked because of the challenged ordinance. *Id.* at 235. Although the Court would not rely on the affidavit because it was introduced for the first time on appeal, it said:

> Even if we could take into account the facts as alleged in the city's affidavit, it fails to identify the individuals whose licenses were revoked and, therefore, falls short of establishing that any petitioner before this Court has had a license revoked under the [challenged ordinance].

*Id.* We do not read the Court's statement as suggesting that the affidavit was insufficient because it failed to describe the circumstances of the harmed individuals in sufficient detail. Rather, we read it as stating that the affidavit was insufficient because it did not include the individuals' *names*.

The Court's subsequent treatment of *FW/PBS* in *Summers* confirms our view. The *Summers* Court explained that the affidavit in *FW/PBS* was insufficient "because it did not *name* individuals who were harmed" by the challenged program. 555 U.S. at 498 (emphasis added). It stated: "This requirement of *naming* the affected members has never been dispensed with in light of statistical

probabilities." *Id.* at 498–99 (emphasis added). Although *Summers* focused on the necessity of identifying members with greater specificity than mere statistical probabilities, it also recognized the necessity of *naming* members actually harmed by a challenged program. A contrary interpretation would ignore the decision's clear language and undermine the Supreme Court precedent upon which it relied. We are not, as the concurrence implies, merely "pluck[ing]" the word "name" from *Summers* to craft a naming requirement. Concurrence at 6. Rather, we assume the Supreme Court said what it meant and meant what it said.

A naming requirement makes sense as an element of associational standing. An association that premises its standing on harm to its members must demonstrate that those members suffered an injury in fact that is concrete and particularized and actual or imminent, as opposed to conjectural or hypothetical. *Lujan*, 504 U.S. at 560. In this case, it requires proof that members are ready and able to apply to the challenged program but for its allegedly discriminatory criteria. *Gratz*, 539 U.S. at 262. Although a name on its own is insufficient to confer standing, disclosure to the court of harmed members' real names is relevant to standing because it shows that identified members are genuinely ready and able to apply, and are not merely enabling the organization to lodge a hypothetical legal challenge. A member's name does not merely check a box; it is a

demonstration of the sincerity of the member's interest in applying for a fellowship. These are quintessential Article III standing concerns. *See Carney v. Adams*, 592 U.S. 53, 64 (2020) (noting "longstanding legal doctrine preventing this Court from providing advisory opinions at the request of one who, without other concrete injury, believes that the government is not following the law").

Plus, in order to actually *apply* for the Fellowship, an applicant has to disclose their *name*, in addition to the other listed requirements. It thus makes sense that a would-be applicant's willingness to disclose their name—at least to the court—is an essential component of the ready-and-able showing.

Moreover, a naming requirement flows from the rationale underlying associational standing. We allow an association to sue on behalf of its members only when those individuals "would otherwise have standing to sue in their own right." *Hunt*, 432 U.S. at 343. While procedures exist to allow parties to proceed anonymously to the *public* when certain conditions are met, *see, e.g., United States v. Pilcher*, 950 F.3d 39, 42 (2d Cir. 2020), we do not allow parties to remain anonymous *to the court*, *Publicola v. Lomenzo*, 54 F.4th 108, 111–12 (2d Cir. 2022) (citing Fed. R. App. P. 32(d), Fed. R. Civ. P. 10(a), and Fed. R. Civ. P. 11(a)). *See also Doe v. Federal Republic of Germany*, 2023 WL 6785813, at *11 (S.D.N.Y. Oct. 13, 2023) (collecting cases) ("In this District . . . parties proceeding anonymously must

reveal their names (and other identifying information) under seal to the court."). Although the caselaw requiring plaintiffs to identify themselves to the court typically turns on an analysis of federal procedural rules rather than Article III, it would nevertheless be incongruous, especially at the summary judgment stage, to allow an association to rest its standing on anonymous member declarations when we would not allow those members, as individual parties, to proceed anonymously to the court in their own right.[6]

---

[6] The concurrence suggests that, had Members A and B filed suit themselves and refused to provide their real names to the court, their complaint would be dismissed "on *pleading grounds*, not jurisdictional ones." Concurrence at 10. We agree with the concurrence that the unidentified members' complaint would face immediate dismissal pursuant to Fed. R. Civ. P. 10(a), but do not adopt the concurrence's position that those unnamed would-be plaintiffs would have Article III standing to get past summary judgment but for the Federal Rules of Civil Procedure. That a court may dismiss a party's complaint on procedural grounds if they refuse to provide their name to the court at the pleading stage does not mean the unnamed party would otherwise have Article III standing to secure a judgment. *Cf. Fund Liquidation Holdings LLC v. Bank of America Corporation*, 991 F.3d 370, 383 n.7 (2d Cir. 2021) (even though Federal Rules of Civil Procedure do not require the legal existence of a corporate entity to be pleaded affirmatively in every case, "the non-existence of the supposed claimant is a problem of constitutional magnitude"). We can't test the concurrence's hypothesis that unnamed plaintiffs who are precluded by the Federal Rules of Civil Procedure from proceeding with their claims would have constitutional standing at the judgment stage because as far as we can tell, cases in which a party has been allowed to proceed to judgment without disclosing their identity to the court don't exist.

In suggesting otherwise, the concurrence relies on cases in which individuals are allowed to proceed pseudonymously *to the public or other parties*. Those cases are entirely beside the point. Concurrence at 10–11. As noted above, even when parties proceed anonymously to the public or the opposing party, their names and other identifying information must still be disclosed *to the*

Finally, the only sister circuit to squarely address the question agrees that an association must name its injured members to establish Article III standing. *See Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, *J.*) ("[T]he Supreme Court has said that an affidavit provided by an association to establish standing is insufficient unless it names an injured individual." (citing *Summers*, 555 U.S. at 498)).[7] District courts in this Circuit have held similarly. *See, e.g., Pen American*

_____

court. *See, e.g., Doe v. Federal Republic of Germany*, 2023 WL 6785813, at *11 (S.D.N.Y. Oct. 13, 2023) ("In this District, too, parties proceeding anonymously must reveal their names (and other identifying information) under seal to the court.") (collecting cases); *One Standard of Justice, Inc. v. City of Bristol*, 2022 WL 17688053, at *7 (D. Conn. Dec. 9, 2022) (granting plaintiff's motion to proceed under a pseudonym but still requiring all documents containing plaintiff's name to be filed under seal with the court); *Publicola v. Lomenzo*, 54 F.4th 108, 112 (2d Cir. 2022) (dismissing appeal where anonymous plaintiff refused to refile his briefs under his real name or to seek permission from the Court to file copies of his briefs under seal in order to preserve his anonymity). This requirement serves logistical purposes, such as allowing the court to check for conflicts of interest, but, whether viewed through the lens of constitutional injury (who is injured?) or redressability (whose name would be on a judgment favorable to the plaintiff?), the requirement of a named (to the court) plaintiff at the judgment stage is one of constitutional dimension.

[7] The Ninth Circuit has held that an association lacked standing where it failed to "identify any affected members by name [or submit] declarations by any of its members attesting to harm they have suffered or will suffer." *Associated General Contractors of America, San Diego Chapter, Inc. v. California Department of Transportation*, 713 F.3d 1187, 1194 (9th Cir. 2013). The concurrence relies on discussion from a later Ninth Circuit case that was decided at the *pleading stage*, and in which the organization's primary basis for standing rested on *its own diversion-of-resources injury*, rather than injury to its members, to support the contention that the Ninth Circuit would not require Do No Harm to name names. Concurrence at 6–7 (citing *National Council of La Raza v. Cegavske*, 800 F.3d 1032, 1038 (9th Cir. 2015)). Given the different postures of the *Associated General Contractors* and *National Council of La Raza* cases, we cannot ascribe to the Ninth Circuit a clear position as to

*Center, Inc. v. Trump*, 448 F. Supp. 3d 309, 320–321 (S.D.N.Y. 2020) ("Plaintiff is required to identify at least one affected member by name."); *Equal Vote American Corp. v. Congress*, 397 F. Supp. 3d 503, 509 (S.D.N.Y. 2019) ("[I]n order to bring claims on behalf of its members under the 'associational standing' doctrine, an organizational plaintiff . . . must identify, by name, at least one member with standing.").

The cases cited by Do No Harm do not convince us otherwise.  In *Forum for Academic and Institutional Rights, Inc. v. Rumsfeld*, a district court permitted an association to keep its membership list secret from the public *after* it submitted the list for *in camera* review.  291 F. Supp. 2d 269, 286 n.6 (D.N.J. 2003).  While the district court in *NAACP v. Trump* allowed the NAACP's members to proceed anonymously, it ultimately declined to decide the naming issue because the government failed to renew the argument in its reply to the NAACP's motion for

whether an organization relying on injuries to its members to support its standing must "name names" at the summary judgment stage to establish a cognizable injury.  *See also California Restaurant Association v. City of Berkeley*, 89 F.4th 1094, 1116 n.5 (9th Cir. 2024) (Baker, *J.*, concurring) (recognizing circuit split as to whether plaintiff associations must "name names" at pleading stage, but asserting that "under *Lujan*, *Summers*, and [*Associated General Contractors*], at summary judgment or trial an organizational plaintiff is undoubtedly obligated to identify one or more of its injured members—among other 'specific facts' detailing the nature of their asserted injury.").  The concurrence also relies on a Tenth Circuit case to support its position that *Summers* did not create a naming requirement.  Concurrence at 6 (citing *Speech First, Inc. v. Shrum*, 92 F.4th 947, 948–52 (10th Cir. 2024)).  But that case, like *National Council of La Raza*, was decided at the pleading stage.  *Shrum*, 92 F.4th at 947.

summary judgment. 298 F. Supp. 3d 209, 225 n.10 (D.D.C. 2018). And neither *Speech First v. Sands* nor *SFFA v. Harvard* contain any reasoning as to whether an association must name its members in order to establish standing. *See Speech First, Inc. v. Sands*, 69 F.4th 184, 188 (4th Cir. 2023); *Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181, 198–201 (2023).

For the above reasons, we hold that an association must identify by name at least one injured member for purposes of establishing Article III standing under a summary judgment standard. Our holding in no way precludes an organization from seeking to protect its members' identities—either from the public or the opposing party—pursuant to existing legal procedures and standards. *See Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 190 (2d Cir. 2008); *Pilcher*, 950 F.3d at 42. An organization's ability to shield from disclosure the identities of members upon whom it relies to establish its standing is a separate matter. At issue here is whether an organization can proceed without even disclosing *to the court* the names of the members whose Article III injuries support the organization's standing. We hold that, because Do No Harm did not disclose the names of

Members A or B to the district court, it failed to demonstrate that it has at least one member with Article III standing.[8]

## II. The Dismissal Order

Do No Harm argues that even if it failed to establish standing in connection with its motion for a preliminary injunction, the district court should have simply denied the preliminary injunction motion rather than dismiss its claims altogether. It argues that it successfully alleged standing under a motion-to-dismiss standard, and that's the standard that applies to the question of dismissal.

---

[8] The concurrence would sidestep the naming issue by ruling instead that Do No Harm produced insufficient evidence to support readiness and ability to apply for the Fellowship. But apart from their failure to disclose their names, the showing made by Members A and B is at least arguably sufficient. *See Carney v. Adams*, 592 U.S. 53, 64 (2020) (limiting holding to the particular record, and stating, "[w]e do not decide whether a statement of intent alone under other circumstances could be enough to show standing"). The record contains sworn affidavits that Do No Harm's members satisfy each of Pfizer's stated application requirements—that is, they are enrolled as juniors in college, maintain above a 3.0 GPA, hold leadership positions, etc. The concurrence would require more information about how the members have prepared themselves to apply for the Fellowship, but it is unclear what concrete preparatory steps would be required to amplify on very broad application requirements that require no particular academic background or work experience. And because the record reflects that at the time Do No Harm filed this suit Pfizer had not yet described or provided any application materials, it is unclear what materials Members A and B might be expected to have prepared.

We don't purport to decide these questions here. Because we agree with the district court that Do No Harm lacks standing because it did not identify any injured member by name, we need not review the court's alternate holding that the affidavits of Member A and Member B were insufficiently detailed to show that either member was ready and able to apply to the Fellowship for purposes of establishing Do No Harm's standing. *Do No Harm v. Pfizer Inc.*, 646 F. Supp. 3d 490, 505–07 (S.D.N.Y. 2022).

A splintered D.C. Circuit decision from 2015, *Obama v. Klayman*, effectively illustrates the divergent approaches to this question. 800 F.3d 559 (D.C. Cir. 2015). All three panelists in *Klayman* agreed that the district court erred in granting plaintiffs a preliminary injunction because they concluded the plaintiffs lacked standing; but they disagreed as to whether the case should be dismissed. Judge Williams reasoned that a party seeking a preliminary injunction must show "a likelihood of success on the merits," which includes a likelihood of success in establishing jurisdiction. *Id.* at 565 (opinion of Williams, J.). On his view, a determination that the plaintiff cannot show a likelihood of establishing standing defeats its request for a preliminary injunction, but does not require dismissal of the case. *Id.* at 568. Rather, on remand, the plaintiff might be able to collect sufficient evidence to establish standing. *Id.* Judge Brown likewise would have remanded for the possibility of "limited discovery to explore jurisdictional facts." *Id.* at 564 (opinion of Brown, J.).

The third panelist, Judge Sentelle, took a different view. He explained:

> I agree with the conclusion of my colleagues that plaintiffs have not shown themselves entitled to the preliminary injunction granted by the district court. However, we should not make that our judicial pronouncement, since we do not have jurisdiction to make *any determination* in the cause. I therefore would vacate the preliminary injunction as having been granted without jurisdiction by the district

court, and I would remand the case, not for further proceedings, but for dismissal.

*Id.* at 570 (opinion of Sentelle, J.) (emphasis added).  Judge Sentelle emphasized: "Without standing there is no jurisdiction.  Without jurisdiction, we cannot act." *Id.*

The D.C. Circuit subsequently endorsed the majority view from *Klayman*, holding that "an inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction, not dismissal of the case." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

In our view, Judge Sentelle captured the correct order of operations for a case like ours: as a general matter, when a court determines it lacks subject matter jurisdiction, it *cannot* consider the merits of the preliminary injunction motion and should dismiss the action in its entirety.

Our conclusion relies heavily on our description in *Cacchillo* about the nature of the standing determination in the context of a preliminary injunction motion:  it is a determination of whether the plaintiff *has standing*, not whether the plaintiff has demonstrated a "substantial likelihood" of showing standing.  638 F.3d at 404.  Given that understanding, it follows that, upon determining in the

context of a preliminary injunction motion that a plaintiff lacks standing, a court should generally dismiss the plaintiff's claims.

In *Cacchillo*, this Court considered a plaintiff's appeal from the district court's denial of her motion for a preliminary injunction for lack of standing. *Id.* at 403. In assessing the standing question, we recited the established rules that "[a] plaintiff's burden to demonstrate standing increases over the course of litigation," and that each element of standing "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 404. We held that a plaintiff's burden when seeking a preliminary injunction is normally "no less than that required on a motion for summary judgment." *Id.* Thus, we held that "to establish standing for a preliminary injunction, a plaintiff cannot rest on such mere allegations as would be appropriate at the pleading stage but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (cleaned up).

We repeat the *Cacchillo* analysis to emphasize what it did *not* say. We did not suggest that the operative question is whether the plaintiff mustered sufficient evidence to *show a substantial likelihood* of establishing standing; we framed the question in *Cacchillo* as whether the plaintiff *had standing* under the standard applicable at that stage of the litigation. That's a different approach from the D.C.

Circuit's, and it may explain in part our divergent conclusions. *Cf. Klayman*, 800 F.3d at 565 (opinion of Williams, *J.*) (explaining that a plaintiff seeking a preliminary injunction must show a substantial likelihood of success in establishing standing); *Food & Water Watch*, 808 F.3d at 913 (same).

Once we understand that the no-standing determination is just that—a determination that the plaintiff lacks standing—the rest isn't complicated. Article III standing is "always an antecedent question," such that a court cannot "resolve contested questions of law when its jurisdiction is in doubt." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101 (1998). Once a federal court determines it lacks subject matter jurisdiction, "the court must dismiss the complaint in its entirety." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *see also* U.S. Const. art. III, § 2 (limiting jurisdiction of Article III courts to "Cases" or "Controversies").[9]

We note one additional factor that simplifies our analysis: this is not a case in which a plaintiff seeks or needs limited discovery on jurisdictional facts in order

---

[9] To the extent the district court issued alternative rulings rejecting Do No Harm's federal claims on the merits, that was error. Although we affirm the district court's dismissal of Do No Harm's claims because the organization lacks standing, the district court's alternate bases for dismissing Do No Harm's Title VI and ACA claims are void for lack of jurisdiction. To the extent the district court offered an alternative basis for concluding that Do No Harm lacks Article III standing to pursue its § 1981 claim, we do not reach that alternate holding because we affirm based on Do No Harm's general lack of Article III standing to pursue *any* of its claims.

to establish standing. We need not and do not decide whether dismissal would be proper in such a posture. *Cf. Klayman*, 800 F.3d at 564 (opinion of Brown, *J.*) (noting that, on remand, the district court could determine whether to allow limited discovery to explore jurisdictional facts); *id.* at 569 (opinion of Williams, *J.*) (same). That would present a different set of issues. *See Katz v. Donna Karan Company Co.*, 872 F.3d 114, 121 (2d Cir. 2017) ("[P]recisely because the plaintiff bears the burden of alleging facts demonstrating standing, we have encouraged district courts to 'give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction' where necessary." (quoting *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 149 (2d Cir. 2011))).

The impediment to Do No Harm's standing is not a lack of information relating to jurisdictional facts in Pfizer's exclusive possession. To the contrary, Do No Harm knows the identities of Members A and B—it doesn't need discovery to figure that out. The impediment to Do No Harm's standing is its own choice to withhold that information.

When Do No Harm moved for a preliminary injunction, it subjected itself to the heightened burden of demonstrating standing under a summary judgment standard. *Cacchillo*, 638 F.3d at 404. Do No Harm argues that dismissing its claims upon a determination in that context that it lacks standing amounts to "fast-

forward[ing] this case to another stage." Appellant's Reply Br. at 9. To the contrary, Do No Harm's approach would amount to *reversing* the case to a *prior* stage. Once the court concluded that Do No Harm lacked standing, dismissal, not further proceedings, was the logical next step here. *See* Fed. R. Civ. P. 12(h)(3).

## CONCLUSION

For the above reasons, we **DENY** Do No Harm's motion to supplement the record on appeal as moot,[10] and **AFFIRM** the district court's dismissal of Do No Harm's claims without prejudice.

---

[10] Even if we allowed Do No Harm to generate standing, and thus subject matter jurisdiction, by accepting new declarations into the record on appeal, granting Do No Harm's motion to supplement the record with Member C's declaration would not change our conclusion as to Article III standing because Member C is also unnamed.

W<span></span>ESLEY, *Circuit Judge*, concurring in part and concurring in the judgment:

The same day it filed this case, Do No Harm chose to seek an "extraordinary" remedy. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). It asked the district court to freeze Pfizer's Breakthrough Fellowship program—and reconfigure the Fellowship's selection process—through a preliminary injunction. Do No Harm did so knowing that it faced a demanding burden to prove its connection to the harm alleged, that it lacked a developed factual record, and that its members who claimed injury used pseudonyms. It also knew that none of its members had applied for the Fellowship in the first place.

I agree with the majority that Do No Harm lacks Article III standing. I fully endorse two important aspects of the majority's standing framework: (1) once it moved for a preliminary injunction, Do No Harm had to prove standing under a summary judgment standard, *see Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011); and (2) when Do No Harm failed to meet its heightened standing burden, the proper action was to dismiss the case.

But I part ways with the majority as to *why* Do No Harm lacks standing. In my view, Members A and B did not show an imminent injury from the Fellowship's selection process. As our precedents require, neither member provided sufficient evidence to show they were "ready" to apply to the

Fellowship.  That is the fundamental way that we analyze standing; it suffices to end this case.  The majority passes on that analysis, and instead holds that to check the standing box, an organizational plaintiff relying on injury to some of its members must *also* provide those members' actual names.  We have no basis to impose this new constitutional rule.

I concur in the judgment affirming dismissal, but I cannot concur in full because the majority pronounces an unfounded "real name" test for associational standing.  That is an unfortunate ruling for organizations everywhere.

I

When it comes to Article III cases and controversies, a person's name does not describe whether they have been injured.  Do No Harm's lawsuit contends that Pfizer's Fellowship discriminates on the basis of race, not on the basis of names.  We know that Member A is white, and Member B is Asian-American.  Both claim they will be injured by the Fellowship because of their race.  Their names bear not on standing.

The general rules for standing are well-established.  As an organization which seeks "associational" standing, Do No Harm must show that "its members would otherwise have standing to sue in their own right."  *Students for Fair Admissions, Inc. v. Pres. and Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). "[S]tanding requires an injury in fact that must be concrete and particularized, as well as actual or imminent.  It cannot be conjectural or hypothetical."  *Carney v. Adams*, 592 U.S. 53, 60 (2020) (citation and quotation marks omitted).  That injury must also be "fairly traceable to the challenged conduct of the defendant" and "likely to be redressed by a favorable judicial decision."  *Students for Fair Admissions*, 600 U.S. at 199 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). In the oft-repeated three-part test for standing—injury, traceability, and redressability—the Supreme Court has not included an *additional* requirement that plaintiffs must provide their names.

Indeed, at the pleading stage, our Court lets organizations establish standing without providing the name of an injured member.  *See Building & Construction Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 144–45 (2d Cir. 2006) (rejecting the notion that an organization must "name names" in its complaint to obtain standing).  We did suggest, however, that there might be "some validity" to a naming requirement "at the summary judgment stage."  *Id.*

Now, at the preliminary injunction stage (which incorporates the summary judgment burden), the majority takes that dictum and imposes a bright-line rule: A plaintiff organization must provide the real name of at least one injured member

3

or the case will be dismissed for lack of jurisdiction. In my view, neither Supreme Court precedent invoked by the majority supports this result.

In *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), an organizational plaintiff sought to challenge regulations concerning Sequoia National Forest. The issue was whether a single member of the organization would visit that national forest and thus incur injury from the regulations. No member had come forward; the organization instead maintained that it was statistically likely that *some* of its 700,000 members would be injured. *See id.* at 497. In rejecting that argument, the Supreme Court used the words "name" and "identify" interchangeably—to observe that the case didn't involve *any* individual members of the organization. *Id.* at 498–99. *Summers* wasn't concerned with the members' names because those names wouldn't indicate whether the members would visit Sequoia National Forest and incur an injury. A person's name says nothing about their interests, their habits, or their conduct from which a court could conclude the individual will incur an injury from the defendant's act. Instead, by suggesting that the organization "name" its members, the *Summers* Court wanted to confirm that individual injured members *existed* in the first place.

Unlike in *Summers*, Do No Harm does not rely on statistical probabilities about its membership. It has identified individual members—Members A and B—

who claim they are able and ready to apply to Pfizer's Fellowship. The real first and last names of those members have no connection to whether they could apply to the Fellowship and incur an injury.

The same injury principle from *Summers* animated its predecessor, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990). Once again, *FW/PBS* didn't involve pseudonymous members of organizations. In fact, it didn't use the word "name" at all. Instead, the Supreme Court rejected an affidavit which failed to "identify" which individuals in the city had their business licenses revoked—*i.e.*, whether *any* of the individuals in the case had suffered an injury. *Id.* at 235.

In sum, these cases didn't require organizations to "name names" to establish their members' injuries. They simply echoed longstanding Article III concerns about identifying a particular person to ensure that at least one member of the plaintiff organization had an injury. Even the majority admits that these cases do "not directly address" whether names are necessary. Maj. Op. at 20. Despite one or two passing uses of the verb "name," the opinion in *Summers* cannot "be parsed as though we were dealing with the language of a statute," and we should expect a far clearer statement from the Supreme Court before imposing a naming rule ourselves. *Brown v. Davenport*, 596 U.S. 118, 120 (2022) (citation and brackets omitted). After all, the Supreme Court itself regularly allows

organizations to sue on behalf of unnamed members. *See, e.g., Students for Fair Admissions*, 600 U.S. at 200–01 (organization had standing "when it filed suit" where it "identified" individual harmed members but did not provide their real names). The Supreme Court's own practice speaks volumes: It has not read *Summers* to create a naming requirement; neither should we.

To be sure, at least one circuit seems to have plucked the word "name" from *Summers* to craft a naming requirement for injured members of organizations. *See Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, *J.*). But others have remained focused on identifying a member's injury (as *Summers* and *FW/PBS* did), not a member's name. *See Speech First, Inc. v. Shrum*, 92 F.4th 947, 948–52 (10th Cir. 2024) (concluding that organization had standing despite relying on injuries to "Student A, Student B, and Student C," and explaining why *Summers* did not require those students to provide their real names); *Advocates for Highway & Auto Safety v. FMCSA*, 41 F.4th 586, 594 & n.2 (D.C. Cir. 2022) (unnamed members submitted survey statements which supported their injuries, yet their lack of names was "no barrier to [organizational] standing on this record"). The Ninth Circuit, notwithstanding the majority's contention, has maintained similarly. *See Associated Gen. Contractors of Am., San Diego Chapter, Inc., v. California Dep't of Transp.*, 713 F.3d 1187, 1194–95 (9th Cir. 2013) ("*Caltrans*"). Just like in *Summers,*

*Caltrans* didn't hold that members needed to provide their real names—because *no* member had come forward. The organization had failed to identify "any specific members . . . who would be harmed by Caltrans' program." *Id.* at 1195. Even if there were any lingering doubt about the meaning of *Caltrans*, the Ninth Circuit subsequently explained why names don't bear on standing:

> Where it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, we see no purpose to be served by requiring an organization to identify by name the member or members injured.

*Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1038 (9th Cir. 2015). We should reaffirm the same.

With precedent absent, the majority is left to say that a constitutional naming requirement "makes sense." Maj. Op. at 21–22. The majority assures us that names show that members "are not merely enabling the organization to lodge a hypothetical legal challenge." *Id.* No doubt, we need "a real controversy with real impact on real persons." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (citation omitted). Yet this rationale for names—to ensure that Members A and B are real individuals and not fictitious enablers of the organization—is belied by the record. Both members declared that they are real students and real members

of Do No Harm.  The organization's Executive Director confirmed the same in her

own declaration.  As the majority observes, for standing purposes, we must take

these statements *as true*.  *See Cacchillo*, 638 F.3d at 404.  In other words, we have

already accepted that Members A and B are real people.[1]

Along the same vein, the majority claims that real names are "relevant" to

standing because they show a real controversy.  Apparently, they show "members

are genuinely ready and able to apply" to the Fellowship and incur an injury.  Maj.

Op. at 22.  This ready-and-able showing, as discussed below, is indeed the proper

inquiry for standing.  But the majority doesn't hold that members' names are

merely "relevant" to this inquiry.  Instead, in the very next paragraph, it says

names are henceforth "an essential component" of a member's standing.  *Id.*

Notice the unexplained leap—from names being "relevant," to names being

"essential."  It is unclear why someone must *always* give their name to a court to

show they are genuine about applying to a program.  What's more, according to

the majority, names are essential not only in cases where members haven't yet

applied to a program (the supposed justification for the rule), but also in the

garden-variety of associational standing cases where members have *already* been

---

[1] In any event, we already have procedural rules to address these concerns.  An organization can face serious consequences, for example, if it goes to court with fake injuries to fake members.  *See* Fed. R. Civ. P. 11.

injured.  *Cf. NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) (NAACP members were threatened with violence after opening an Alabama office to support desegregation; the First Amendment protected those members' right to associate without disclosing their names to authorities).  That rule will sweep broadly.

And the justification is particularly awkward here, because the majority says it *won't* decide whether Members A and B are genuine about applying to this Fellowship.  The majority suggests that if it did, it would hold that the members *are* ready and able to apply.  *See* Maj. Op. at 27 n.8.  Ironically, that holding would demonstrate why "naming names" is an empty gesture.  By implying that Do No Harm would have standing if its members had just told us their real names, the majority reveals that we didn't need those names for standing after all.

In fact, if members' real names implicated Article III jurisdiction, then it would "make sense" to require those names at the pleading stage, too.  But the majority doesn't purport to question our holding from *Building & Construction* that members can plead an injury without their real names.  One is left wondering why these concerns suddenly become important enough to justify the opposite rule at summary judgment.  Aside from a general observation that the burden of proof has increased, the majority never says.

The majority finally declares that a naming requirement will avoid "incongru[ity]" between plaintiff individuals and plaintiff organizations. Maj. Op. at 23. I agree with my colleagues that when an organization presses claims on behalf of its members, "at least one association member must have standing to sue in their own right." *Id.* at 13. Thus, an organization's claim to standing is the same as that of its members—as if those members were themselves party to the litigation. But when (and only when) the *organization* is the party, the majority sees fit to add a naming requirement to standing, as a "demonstration of the sincerity of the member's interest" in the litigation. *Id.* at 22.

Yet in the interest of avoiding incongruities, the majority creates one. Consider the following: Members A and B sue Pfizer individually—not as members of Do No Harm—and refuse to give their real names to the court. So long as they showed an injury, a court would dismiss the complaint on *pleading grounds*, not jurisdictional ones. *See* Fed. R. Civ. P. 10(a) (requiring the complaint to "name all the parties"); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 188–89

(2d Cir. 2008) (setting forth a multi-factor test for an individual plaintiff to proceed under a pseudonym despite Rule 10).[2]

By failing to give their names, the members would have run afoul of Rule 10, not Article III. Why, then, does Do No Harm instead run afoul of Article III, not Rule 10? Do No Harm's standing is dependent upon, and congruent with, that of its members. One would think the standing requirements we impose upon each should be the same. Instead, our Circuit has transformed a procedural rule into a bedrock constitutional obstacle.

What will be the upshot of this new rule? Adding a naming element to standing—to ensure that members are "sincere" in their claims of injury—will constrict access to the courts for organizations who seek redress of wrongs done

---

[2] We impose Rule 10 (and related rules of procedure) for a myriad of practical reasons, not to determine whether someone has an Article III injury. We have explained that Rule 10 "facilitates public scrutiny of judicial proceedings and the public's right to know who is using their courts. It also serves to ensure that a readily identifiable attorney or party takes responsibility for every paper, thus enabling the Court to exercise its authority to sanction attorneys and parties who file papers that contain misleading or frivolous assertions. Moreover, the Court cannot fulfill its statutory obligations to check for conflicts of interest or to give preclusive effect to state-court judgments in suits between the same parties without knowing the true identity of the parties at the outset of a case." *Publicola v. Lomenzo*, 54 F.4th 108, 112 (2d Cir. 2022) (cleaned up).

None of this speaks to whether someone has incurred an injury to invoke our jurisdiction. Our naming rules focus on "matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 556–57 (1996).

to those members.  Regardless of what organizations one joins or what causes one believes in, that is a troubling result.

II

That result becomes doubly troubling because it is doubly unnecessary.  We don't need to write a naming rule into the Constitution; in fact, we don't need a naming rule to resolve this case at all.  We could have determined standing the way we always have:  By analyzing the members' injuries themselves.

Members A and B did not prove they suffered actual or imminent injuries. Pseudonyms aside, the members offered precious little information about their lives and their future plans.  The only standing evidence they submitted were virtually identical declarations about their intentions to apply for Pfizer's Fellowship—a program to which they would dedicate at least five years of their lives.  Those declarations are not insufficient because they don't bear the members' real names.  They are insufficient because they are vague and conclusory.

When it comes to applying to discriminatory programs, the law allows a plaintiff to assert harm without formally applying.  The harm "is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

Pre-application standing, however, does not offer a blank check for anyone to challenge a discriminatory program they think violates the law. The plaintiff (or, in the organizational context, the plaintiff's members) must show they are "able and ready" to apply to the program. *Carney*, 592 U.S. at 60. That burden helps distinguish the plaintiff's grievance as something "more than an abstract and generalized harm to a citizen's interest in the proper application of the law." *Id.* at 59 (citation omitted).

In my view, Do No Harm has not met that burden. Most of the declarations' contents address the "ability" prong: The qualifications of Members A and B which make them eligible for the Fellowship. Those qualifications are pitched at a high level of generality. Both are Ivy League students (schools unknown), hold leadership positions (specifics unknown), and hold GPAs above 3.0 (majors, classes, extracurriculars, work history, etc., all unknown). But there will be many white and Asian-American juniors in the Ivy League—by my guess, thousands— who meet these same qualifications for the Fellowship. Once we set qualifications aside, the declarations have very little to offer on the "readiness" prong: The evidence that would truly distinguish Members A and B from the generalized Ivy League student population.

It is at this "readiness" prong that the declarations fall short.  In total, I count

five statements about readiness:

- "**I would like to apply** to the Pfizer Breakthrough Fellowship Program."

- "**I am interested in applying** to the Fellowship because it is a prestigious program.  And **it seems like a great professional development opportunity**.  I would benefit greatly from working in Pfizer's New York City office next summer and making professional connections and finding mentors through this Fellowship."

- "**I am also drawn by the fact that Pfizer will pay a full scholarship** for an MBA program.  A fully funded MBA program would be a wonderful way to enrich my professional experience."

- "**I am able and ready to apply** to the 2023 class of the Fellowship if Pfizer stops categorically excluding white [or Asian-American] applicants like me from the Fellowship."

- "If I get accepted and join the Fellowship, **I am prepared to meet the program's requirements** and expectations."

Joint App'x at 36–41 (emphases added).

Even read liberally, these are a "few words of general intent" which do not

suffice to prove readiness.  *Carney*, 592 U.S. at 64.  Our essential guidance

regarding such statements comes from *Carney*, a case, like this one, involving a

summary judgment burden to prove standing.  There, a lawyer sought to

challenge the constitutionality of judicial positions to which he had not applied.

He nevertheless argued that he was ready to apply because he swore that he

"would apply for any judicial position that [he] thought [he] was qualified for," and "would seriously consider and apply for any judicial position for which he feels qualified." *Id.* at 61. The Supreme Court concluded that these statements were too generalized to prove standing—they had not "differentiated" the lawyer "from a general population of individuals affected in the abstract" by the constitutional provision. *Id.* at 64.

Those statements in *Carney* (that the lawyer "would apply" and "would seriously consider and apply") are effectively indistinguishable from the statements here (that Members A and B "would like to apply" and are "interested in applying"). And when the members say they are "able and ready to apply," they simply "parrot" the legal standard. *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 76 (2d Cir. 2022) (dismissing for lack of standing based on conclusory statements of intent). If those conclusory statements of intent alone were enough to show standing, then thousands of students could claim injury in this case—just so long as they sign a short declaration saying they are interested in Pfizer's Fellowship.

True, *Carney* did not decide for all time "whether [] statement[s] of intent alone . . . could" ever "be enough to show standing." 592 U.S. at 64. But it put a thumb on the scale against them. It required some additional evidence to support

the plaintiff's intent beyond his own statements—and identified several examples. For one, he had never applied to a similar position before. *Id.* at 61. Nor had he identified "an anticipated timeframe" for applying, any "prior relevant conversations," any "efforts to determine likely openings," any "other preparations or investigations," or plainly, "any other supporting evidence." *Id.* at 63.

What bolstering evidence have Members A and B put forth that would be similar to *Carney*'s examples? They have referenced an anticipated timeframe in that they had to apply during the Fellowship's 2023 cycle. But that's it. There is no "other supporting evidence" accompanying their words of general intent.

*Carney* therefore cuts decisively against Do No Harm. The Supreme Court's other "ready and able" cases are of no help either. They relied upon each plaintiff's history of previous applications to recurring programs to bolster standing. *See Gratz v. Bollinger*, 539 U.S. 244, 261–62 (2003); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211–12 (1995); *Ne. Fla. Chapter of Associated Gen. Contractors*, 508 U.S. at 668–69. Members A and B, of course, cannot rely on these cases or similar historical evidence—they can only apply to Pfizer's Fellowship once, during their junior year. Yet just because these cases are distinguishable does not mean we

should invert their holdings to *excuse* plaintiffs from providing some evidence besides historical applications when their own programs do not recur.

In *Carney*'s mold, our own precedents have required not just a stated intent to apply to a program, but some indicia of action—and crucially, have done so under a *lesser* burden at the pleading stage. For instance, we have held that members of an organization who alleged that they "intend[ed]" to apply for jobs at a university or "intend[ed]" to submit law review articles for publication failed to establish standing to challenge several of the university's allegedly discriminatory programs. *FASORP v. New York Univ.*, 11 F.4th 68, 76–77 (2d Cir. 2021). Those members described no "concrete plans" to actually apply; they just expressed "some day intentions" to apply. *Id.* at 77 (quoting *Summers*, 555 U.S. at 496). They had not identified anything they had done to apply for employment or submit an article (for example, by drafting an article for submission). *Id.* at 76. We have also held that a casino developer did not plead standing where it claimed to be "interested" in developing a casino and had even "made initial studies of the viability" of doing so, but had "not alleged any concrete plans to enter into a development agreement . . . or demonstrated any serious attempts at negotiation." *MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d 40, 47 (2d Cir. 2017).

This case is missing those same indicia of action. Members A and B described no concrete plans for applying to the Fellowship if it stopped discriminating against them tomorrow. Did they prepare any materials to submit to the Fellowship? Did they ask Pfizer for more specifics about the program, or talk to any Pfizer employees? Did they adjust their studies to strengthen their candidacies—perhaps by taking courses in biotechnology or business administration? Neither of them identified these or any other preparatory steps, big or small, to signal a concrete readiness to apply to the Fellowship—a life-changing program in which they would dedicate their careers to Pfizer for the next five years or more.[3]

Perspective is important here: On day one of this case, the plaintiff asked the district court to immediately alter a program, based solely on several members' claims that they "would like" to apply or were "interested" in applying to that program at some time in the future. In this context, to establish a case or controversy, these aspirational statements come up short.

---

[3] Like in *Carney*, these examples are not intended to be exhaustive. This is a "highly fact-specific" inquiry, and the record is not developed enough to determine every possible step that Members A and B could have taken to show they were ready to apply. *Carney*, 592 U.S. at 63. But we need not speculate about every piece of "supporting evidence" that the members could have provided. *Id.* The burden to do so was on Do No Harm.