[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13138

_____

AMERICAN ALLIANCE FOR EQUAL RIGHTS,

Plaintiff-Appellant,

*versus*

FEARLESS FUND MANAGEMENT, LLC,
FEARLESS FUND II, GP, LLC,
FEARLESS FUND II, LP,
FEARLESS FOUNDATION, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

D.C. Docket No. 1:23-cv-03424-TWT

_____

Before ROSENBAUM, NEWSOM, and LUCK, Circuit Judges.

NEWSOM, Circuit Judge:

In this appeal from the denial of a preliminary injunction, we are asked to decide whether the Fearless Strivers Grant Contest, an entrepreneurship funding competition open only to businesses owned by black women, violates 42 U.S.C. § 1981, which prohibits private parties from discriminating on the basis of race when making or enforcing contracts. We must also decide, as a threshold matter, whether the plaintiff, the American Alliance for Equal Rights, has standing to challenge the contest.

After careful review, and with the benefit of oral argument, we hold (1) that the Alliance has standing and (2) that preliminary injunctive relief is appropriate because Fearless's contest is substantially likely to violate § 1981, is substantially unlikely to enjoy First Amendment protection, and inflicts irreparable injury. We therefore affirm the district court's determination that the Alliance has standing to sue but otherwise reverse its decision and remand with instructions to enter a preliminary injunction.

**I**

**A**

Fearless Fund describes itself as a "venture capital fund that invests in women of color-led businesses." Its stated mission is to "bridge the gap in venture capital funding for women of color

founders building scalable, growth aggressive companies." pursuit of that mission, Fearless supplies grants to businesses under its "Foundation" arm. Fearless makes those grants on the basis of a competitive application process.

The "Fearless Strivers Grant Contest" offers four winners $20,000 apiece and digital tools to assist with business growth, as well as mentorship. *See* Fearless Strivers Grant Contest Official Rules ("Official Rules") at 12. Importantly for our purposes, the contest is open, by its own terms, only to "black females who are . . . legal U.S. residents." *Id.* at 3. More particularly, to qualify for the competition, a business must be at least "51% black woman owned." 2023 Fearless Strivers Grant Contest Information at 2.

To select contest winners, Fearless assembles a team of three judges who evaluate eligible entries based on the "[v]iability and strength of [the] business," "[h]ow the business intends to use the grant," and "[p]otential for business growth." Official Rules at 10. The judges assign scores for each category, and the entry with the highest composite score wins. *Id.* The tiebreaker is the "[p]otential for business growth." *Id.* If a tie persists, Fearless "will bring in a tie breaking judge to apply the same judging criteria." *Id.*

Because Fearless's contest has been challenged here under 42 U.S.C. § 1981, which prohibits race discrimination in the making and enforcement of "contracts," whether the contest constitutes a contract is central to this dispute. Originally, the contest's rules expressly warned applicants, in all caps, that "BY ENTERING THIS CONTEST, YOU AGREE TO THESE OFFICIAL RULES,

WHICH ARE A CONTRACT . . . ." Official Rules at 3. The rules provided that the contest winner would receive $20,000 and other tangible benefits. *Id.* at 12. The rules then went on to explain that, in exchange, Fearless would obtain the right to "discuss or otherwise disclose the ideas" in the contestant's entry "or otherwise use th[ose] ideas without any additional compensation," *id.* at 8, as well as the right to use the contestant's name, image, and likeness for "public relations, advertising, promotional purposes," and in other "media," and that the contestant would release and indemnify Fearless for various liabilities and agree to forgo litigation in favor of arbitrating any and all disputes. *Id.* at 13.

Shortly after the Alliance brought suit, Fearless made changes to the contest rules. Most conspicuously, the rules were amended to eliminate the acknowledgment that they constituted "A CONTRACT." The new rules also vested the Foundation with "sole discretion" to "void and disqualify" entries that undermine its philanthropic agenda, such as those that espouse "any particular political agenda or message" or "communicat[e] messages inconsistent with the positive images" with which the Foundation wishes to associate. *See* Fearless Strivers Grant Contest Amended Rules. Although the amended rules tweaked the obligations and benefits exchanged by Fearless and winners, the contest's basic outline remained the same: An entrant still had the chance to win $20,000 and obtain benefits in exchange for its submission, it still had to give Fearless permission to use its submission, and it still had to waive various claims that it might have against Fearless. *Id.* at 18, 21.

Fearless planned to run the contest four successive times. Each entry period lasted a month, at the end of which Fearless would select a winner and, within several days, present the award.

**B**

The American Alliance for Equal Rights is a § 501(c)(3) membership organization that, according to its founder, is dedicated to "ending racial classifications and racial preferences in America." In this case, the Alliance represents several members—identified in this lawsuit as Owners A, B, and C—all of whom operate their own businesses and wish to participate in Fearless's contest but are not black women.

The Alliance sued Fearless the day after applications opened for the fourth entry period, challenging the contest under 42 U.S.C. § 1981. In particular, the Alliance contended (1) that Fearless's contest constitutes a contract for § 1981 purposes because entrants enter into a bargained-for exchange with Fearless when they apply and (2) that the contest violates § 1981 because, by its terms, it categorically excludes non-black applicants from eligibility because of their race. The Alliance sought a preliminary injunction to prevent Fearless from closing the application process.

As relevant here, Fearless opposed Alliance's request on three grounds. First, Fearless asserted that the Alliance lacked standing to sue because the individuals it purported to represent— Owners A, B, and C—were proceeding pseudonymously and hadn't adequately alleged that each member suffered a concrete and particularized injury. Second, Fearless argued that § 1981

didn't apply both because the contest isn't a contract and because it constitutes a valid "remedial program." Finally, Fearless argued that even if § 1981 applied to the contest, the First Amendment protects it. Fearless separately contended that the Alliance couldn't show that it had suffered irreparable harm of the sort sufficient to justify injunctive relief.

The district court refused to enter the requested injunction. It concluded that the Alliance had standing to sue, and, on the merits, it agreed with the Alliance's contentions that § 1981 applied to Fearless's contest and that the contest didn't qualify for any remedial-program exception. But the court thought that the First Amendment "may bar" the Alliance's § 1981 claim on the ground that the contest constitutes expressive conduct, and it therefore concluded that the Alliance hadn't shown a substantial likelihood of success on the merits. The district court separately concluded that the Alliance hadn't demonstrated that it would suffer irreparable injury, seemingly (or at least in part) because the court thought that § 1981 "does [not] authorize injunctive relief."

This is the Alliance's appeal.[1]

---

[1] Over a dissent, a motions panel granted an injunction pending appeal, finding it "substantially likely" that Fearless's contest violates § 1981 and that the First Amendment doesn't immunize it from attack. *See American Alliance for Equal Rights v. Fearless Fund Mgmt. LLC*, No. 23-13138, 2023 WL 6520763 at *1 (11th Cir. Sept. 30, 2023).

## II

We begin with the Alliance's standing to sue. According to the Supreme Court, standing doctrine is rooted in Article III of the Constitution, which authorizes federal courts to hear and decide certain classes of "[c]ases" and "[c]ontroversies." U.S. Const. art. III, § 2.

An organization may vindicate the rights of its members by suing on their behalf. *See Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 199–200 (2023). In order to demonstrate the requisite standing to do so, an organizational plaintiff like the Alliance must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 199 (citation omitted). There's no question here that the Alliance satisfies the second and third prerequisites—it seeks racial equality for its members, an interest germane to its purposes, and neither the civil-rights claim it asserts nor the preliminary injunction it seeks necessitates individual proof or requires the individual members' participation. The Alliance's standing thus turns entirely on whether its members would have standing to sue on their own.

### A

To determine whether any Alliance member has standing to sue in her own right, we ask, of course, whether she has (1) suffered an "injury in fact" that is both (2) fairly traceable to Fearless's

conduct and (3) redressable by the requested injunction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). To qualify for injury-in-fact status, a plaintiff's injury must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (quotation marks and citations omitted).

There's no doubt that the Alliance members' alleged injury—exclusion from the contest—is traceable to Fearless's conduct—denying entry to non-black applicants—and would be redressed by the injunction they seek—requiring Fearless to open the competition to non-black entrants. The second and third prongs, therefore, are satisfied. The standing question here turns on whether the Alliance adequately demonstrated that its members suffered the requisite injury in fact. Generally, when a plaintiff requests prospective relief, we evaluate whether she has sufficiently demonstrated an intent to take the action that she asserts is prohibited. *See Gratz v. Bollinger*, 539 U.S. 244, 260–61 (2003). If the plaintiff can show that she is "able and ready" to do so, she has demonstrated a concrete injury. *Northeastern Fla. Chapter, Assoc. Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993) (holding, in the context of an equal-protection challenge, that "[t]o establish standing . . . , a party . . . need only demonstrate that it is *able and ready* to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis" (emphasis added)). To be clear, though, the plaintiff must do more than baldly assert that she is "able and ready"—she must also come forward with some "supporting facts" indicating a likelihood that she will actually take the proscribed action. *See Aaron Private Clinic Mgmt. LLC v. Berry*, 912

F.3d 1330, 1338 (11th Cir. 2019); *see also Carney v. Adams*, 592 U.S. 53, 60 (2020).

## B

Fearless challenges the Alliance's standing on two grounds, both of which the district court rejected. First, Fearless contends that the Alliance can't establish standing because it has identified its members only by pseudonyms. Second, Fearless argues that the Alliance hasn't demonstrated that its members are "able and ready" to enter the contest should Fearless open it to non-black applicants. We agree with the district court that the Alliance has standing to sue.

## 1

In *Summers v. Earth Island Institute*, the Supreme Court observed that in order to establish standing, an organization suing on behalf of its members must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." 555 U.S. 488, 498 (2009). Similarly, in *Georgia Republican Party v. SEC*, we held that an organization lacked standing because it had "failed to identify" any affected members. 888 F.3d 1198, 1204 (11th Cir. 2018); *see also Jacobson v. Florida Secretary of State*, 974 F.3d 1236, 1249 (11th Cir. 2020) (same). Based on those statements, Fearless urges us to embrace a hard-and-fast constitutional requirement that an organizational plaintiff "identify" the members it represents *by name*. And, the argument goes, because the Alliance has

"identified" its members only by the pseudonyms "Owner A," "Owner B," and "Owner C," it lacks standing.

Fearless has overread *Summers* and *Georgia Republican Party*. Neither decision purported to impose a naming requirement simply by using the term "identify." Indeed, neither case had anything to do with anonymity or pseudonymity. In *Summers*, the Supreme Court held that an organization couldn't demonstrate standing simply by showing a statistical probability that some of its members would incur a concrete injury, without pointing to a member or members who had in fact suffered such an injury. *See* 555 U.S. at 497–98. The Court clarified, though, that an organization need only "make specific allegations" based on "specific facts . . . that one or more of [its] members would be directly affected." *Id.* at 498 (quotation marks and citation omitted). Likewise, in *Georgia Republican Party*, we held that the party lacked standing because it hadn't pointed to any particular member who "ha[d] or will [have suffer[ed] harm" as a result of the challenged rule. 888 F.3d at 1204. Neither decision, it should be clear, imposed a requirement that an organizational plaintiff identify affected members by their legal names.

In fact, the available precedent is to the contrary. Most notably, in *Doe v. Stincer*, we specifically declined to require an organizational plaintiff to identify by name the members on whose behalf it was suing. *See* 175 F.3d 879, 884 (11th Cir. 1999). And more generally, we have routinely permitted organizations to sue on behalf of pseudonymously identified members. *See, e.g., Speech First*

*v. Cartwright*, 32 F.4th 1110, 1114 (11th Cir. 2022) (identifying an organizational plaintiff's members as "Student A," "Student B," and "Student C"). Unsurprisingly to us, in cases addressing arguments materially identical to those here, at least two of our sister circuits have likewise held that pseudonymity poses no bar to a plaintiff's standing. *See, e.g., Speech First, Inc. v. Shrum*, 92 F.4th 947 (10th Cir. 2024) (organizational standing); *see also B.R. v. F.C.S.B.*, 17 F.4th 485 (4th Cir. 2021) (individual standing). *But see Do No Harm v. Pfizer Inc.*, 96 F.4th 106 (2d Cir. 2024) (holding that an organization lacked standing where it didn't identify its affected members by legal name). And as a first-principles matter, that just makes sense: Fearless has offered no persuasive reason to think that the *United States Constitution* concerns itself with the particular name by which a litigant is called.[2]

Accordingly, the Alliance's identification of its affected members by the pseudonyms Owner A, Owner B, and Owner C poses no bar to its standing to sue.

---

[2] To be clear, our decision in *Doe v. Frank*, 951 F.2d 320 (11th Cir. 1992), isn't to the contrary. There, we applied Federal Rule of Civil Procedure 10(a)—which explicitly requires a complaint to "include the names of all the parties"—to hold that the plaintiff couldn't proceed under a fictitious name because the case didn't present one of the "unusual situation[s]" in which anonymity was required. *Id.* at 322, 324. Fearless has never contended that the Alliance violated Rule 10(a); nor could it, as the Rule requires the complaint to name only "the parties," which the complaint here did by identifying the Alliance and Fearless.

**2**

Fearless separately asserts that the Alliance has failed to demonstrate that Owners A, B, and C are "able and ready" to enter the contest. *See Northeastern Fla.*, 508 U.S. at 666. For support, Fearless principally relies on the Supreme Court's decision in *Carney*, 592 U.S. at 53, and our decision in *Aaron*, 912 F.3d at 1330. Both, we think, are readily distinguishable.

The plaintiff in *Carney* brought a First Amendment challenge to a state statute that effectively prohibited non-major-party members from serving as judges. The Supreme Court held that the plaintiff lacked standing because he had alleged only, and vaguely, that he "would apply" to be a judge—but had never demonstrated that he was "able and ready" to do so. 592 U.S. at 61. He identified no "anticipated timeframe" in which he might apply, nor did he point to any "prior judgeship applications." *Id*. at 63. Nor, for that matter, did he know whether there would be any upcoming openings during the next cycle, and he made no "efforts to determine" whether there would be. *Id*. at 62–63. Similarly, the plaintiff in *Aaron* wanted to open a methadone clinic, but we held that its alleged injury was speculative because "[a]lthough the complaint allege[d] that [the plaintiff] aspired to open a methadone clinic someday, it offer[ed] no facts suggesting that the 'someday' was imminent or that [the plaintiff] had any concrete plan in place for bringing its clinic into operation." 912 F.3d at 1337.

The allegations here are different. The complaint and the owners' accompanying declarations go well beyond a boilerplate

"able and ready" recitation.  Together, they (1) assert that each owner is prepared enter the contest but is "ineligible because [she is] not a black woman"; (2) describe the size of each owner's business; (3) explain that each owner has met the contest's non-race-related prerequisites; (4) specify how each owner would use the $20,000 prize if selected—Owner A for "improvement and expansion," Owner B for "website development and marketing," and Owner C to "grow [her] online presence" in order "to expand awareness"—and (5) pinpoint when the owners would apply if permitted to participate—namely, in the "fourth promotion period." *See* Complaint at 6–10; Declaration of Owner A; Declaration of Owner B; Declaration of Owner C.  Those allegations, we think, are more than sufficient—by affirming that she is "ready and able" to apply for a grant in a specific and identified timeframe, each owner demonstrates that she would compete in Fearless's contest but for its race-exclusionary rules.  In fact, it's not clear what more the Alliance and its members should have done, short of actually entering the competition and prompting a certain rejection.  Article III doesn't require so futile a gesture.[3]

Before moving on, one word in response to our dissenting colleague's repeated accusation that the Alliance's members here

---

[3] Could the declarations have said more, as our dissenting colleague seems to think they should have?  *See* Dissenting Op. at 15–21.  Perhaps.  But the Constitution doesn't require chapter and verse; as relevant here, it requires a plaintiff to credibly allege "at least some facts" that demonstrate she is "able and ready" to do what she is being forbidden from doing.  *See Aaron*, 912 F.3d at 1338.  The Alliance's members' declarations meet that threshold.

are "flopping"—*i.e.*, disingenuously faking injuries for their own strategic advantage. *See* Dissenting Op. at 1, 3, 6, 21. Let us not forget: We're talking about real-live, flesh-and-blood individuals who were excluded from the opportunity to compete in Fearless's contest *solely on account of the color of their skin*. Respectfully, victims of race discrimination—whether white, black, or brown—are not floppers. *Cf. Allen v. Wright*, 468 U.S. 737, 755 (1984).

\* \* \*

In sum, because the Alliance has sufficiently identified members who are in fact "able and ready" to enter Fearless's contest, it has Article III standing to challenge the contest's exclusion of non-black applicants.

## III

On, then, to the merits. We consider four factors when determining the propriety of preliminary injunctive relief: (1) whether the plaintiff has a substantial likelihood of success on the merits of its claim; (2) whether the plaintiff will suffer irreparable harm in the absence of relief; (3) the balance of the equities; and (4) the public interest. *See Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020). Likelihood of success on the merits "is generally the most important of the four factors." *Id.* at 1271 n.12 (quotation marks and citation omitted). Accordingly, we begin with the questions whether Fearless's contest violated § 1981 and, if so, whether it fits within any exception to § 1981's prohibition or whether the contest enjoys First Amendment protection.

### A

First up, does § 1981 cover Fearless's contest? In relevant part, § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The statute thereby "prohibits intentional race discrimination in the making and enforcement of public and private contracts." *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1320–21 (11th Cir. 2023) (quotation marks and citation omitted).

Fearless asserts, as an initial matter, that its contest is not a "contract[]" within the meaning of § 1981's guarantee. The district court rejected Fearless's argument and concluded that the contest is indeed a contract. We agree.

In seeking to avoid § 1981's reach, Fearless faces an uphill battle. Recall, for starters, that Fearless's original contest rules warned applicants, in no uncertain terms, that "BY ENTERING THIS CONTEST, YOU AGREE TO THESE OFFICIAL RULES, WHICH ARE A CONTRACT." Official Rules at 3. Of course, as already explained, shortly after the Alliance sued, Fearless conspicuously amended its rules to drop the "CONTRACT" designation and to adjust the precise benefits and obligations exchanged by the parties. *See supra* at 4–5. But the rose remained a rose. It is (literally) hornbook law that a contract is "an agreement to do, or refrain from doing, a particular thing, upon sufficient consideration." 17A Am. Jur. 2d Contracts § 1; *see also* 17 C.J.S. Contracts § 1 (defining a contract as an agreement between competent parties that is

16                     Opinion of the Court                    23-13138

supported by consideration, mutual consent, and mutual obliga-
tion). That definition fits Fearless's contest to a T. Under both the
original and the amended (*i.e.*, post-suit) rules, a winning entrant
obtains $20,000 and valuable mentorship and, in return, grants
Fearless permission to use its idea, name, image, and likeness for
promotional purposes and agrees to indemnify Fearless to arbitrate
any disputes that might arise. By any measure, that is a bargained-
for exchange supported by good and sufficient consideration. It is,
in other words, a contract. [4]

---

[4] Although perhaps needless to say, Fearless's unilateral post-suit amendment
of its contest rules doesn't moot the case. "[A] defendant's voluntary cessation
of a challenged practice does not deprive a federal court of its power to deter-
mine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455
U.S. 283, 289 (1982). "The basis for the voluntary-cessation exception [to the
mootness doctrine] is the commonsense concern that a defendant might will-
ingly change its behavior in the hope of avoiding a lawsuit but then, having
done so, 'return to [its] old ways.'" *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d
1257, 1267 (11th Cir. 2020) (citation omitted). To be sure, "[a] case might be-
come moot if subsequent events made it *absolutely clear* that the allegedly
wrongful behavior could not reasonably be expected to recur." *United States v.
Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968) (emphasis added).
But the party asserting mootness has the "heavy burden" of demonstrating as
much, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167,
189 (2000), and Fearless couldn't carry that burden here. The record shows
that it would be *easy* for Fearless to return to its old ways—indeed, it already
did so, when, having amended its contest rules in an effort to make them seem
less contract-y, it then briefly reverted to the old rules. Though Fearless now
claims it did so inadvertently, its conduct demonstrates how easily a switch-
eroo could be accomplished—just the click of a button, seemingly. *Cf., e.g.,
Keohane*, 952 F.3d at 1269 (explaining that the government would have "to do
some serious hoop-jumping" to "reenact the former . . . policy").

On appeal, Fearless seeks to recast its contest as nothing more than a vehicle for conveying "discretionary gifts" that confer "no enforceable rights on contest entrants." Br. of Appellee at 49. We don't think so. As already explained, the contest ends in the formation of a contractual relationship between Fearless and the winner. And it's no answer to say that the contest itself merely facilitates the making of the eventual contract. The Supreme Court has made clear that § 1981 protects "would-be contractor[s]"—here, the contestants—to the same extent that it protects contracting parties. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

The contest is exactly what Fearless originally acknowledged it is: "A CONTRACT." Accordingly, by its express terms, § 1981 applies.

**B**

Fearless next argues that even if its contest is a "contract[]" within the meaning of § 1981, it qualifies under a judge-made exception applicable to what Fearless calls valid "remedial programs." Br. of Appellee at 52–54. Like the district court, we disagree.

The Supreme Court initially devised the remedial-program exception to Title VII's antidiscrimination provision in *United Steelworkers of America, AFL-CIO-CLC v. Weber*, 443 U.S. 193 (1979), and it articulated a test to evaluate such programs several years later in *Johnson v. Transportation Agency,* 480 U.S. 616 (1987). A private, race-conscious remedial program, the Court said, is valid if it (1)

addresses "manifest racial imbalances" and (2) doesn't "unneces-
sarily trammel" the rights of others or "create[] an absolute bar to"
the advancement of other employees. *Id.* at 626–30.[5] Because Title
VII and § 1981 claims are often brought together in the employ-
ment context, we have since extended the remedial-program ex-
ception to employment-discrimination cases arising under § 1981.
*Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 474 n.12 (11th Cir. 1999).

Without deciding the issue, we'll simply assume for pur-
poses of this case that the remedial-program exception applies to
§ 1981 cases, like this one, that arise outside the employment con-
text. Even so, Fearless's contest flunks the *Johnson* test because it
unquestionably "create[s] an absolute bar" to the advancement of
non-black business owners. *Johnson*, 480 U.S. at 626. By its terms,
the contest is open *only* to "black females"—and thus categorically
bars non-black applicants.

Fearless's lone response seems to be that the contest doesn't
"absolute[ly] bar" non-black entrants because they can seek fund-
ing from "other sources." Br. of Appellee at 53–54. With respect,
that's no response at all. It's tantamount to an argument that so
long as there are prospective funders out there who aren't discrim-
inating on the basis of race, Fearless may continue to do so. Not

---

[5] We needn't decide whether the *Johnson* standard survived *Students for Fair
Admissions* or whether, in light of that decision, strict scrutiny should apply
instead. *See* 600 U.S. at 214. Because, as we explain in text, Fearless's contest
fails even the more lenient *Johnson* standard, it would surely also fail strict scru-
tiny; accordingly, the contest is covered by § 1981 either way.

only is that position anathema to the principles that underlie all antidiscrimination provisions, it would, so far as we can tell, render *Johnson*'s "absolute bar" caveat a nullity.[6]

## C

Up to this point, we have agreed with the district court's assessment:  The Alliance has standing to sue; Fearless's contest constitutes a "contract[]" within the meaning of § 1981; and the contest erects an "absolute bar" to non-black applicants and thus fails to qualify for any remedial-program exception that might apply.  The district court, though, ultimately concluded that the Alliance wasn't substantially likely to succeed on the merits of its claim because, the court said, the First Amendment "may" protect Fearless's contest as a form of expressive conduct.  For reasons we'll explain, we disagree with that conclusion.

The First Amendment, of course, broadly prohibits the government from "abridging" a private party's "freedom of speech." U.S. Const. amend. I.  And the Supreme Court has extended the First Amendment's reach to protect even so-called "expressive

---

[6] To tie up one loose end, we also reject any suggestion that § 1981 protects only members of minority groups.  *See American Alliance for Equal Rights,* No. 23-13138, 2023 WL 6520763 at *2–*3 (Wilson, J., dissenting) (citing *Lopez v. Target Corp.*, 676 F.3d 1230, 1233 (11th Cir. 2012), *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007), and *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1270 (11th Cir. 2004)).  Both the Supreme Court and this Court have recognized that § 1981 protects non-minorities, as well.  *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286–87 (1976); *Roper v. Edwards*, 815 F.2d 1474, 1476 (11th Cir. 1987).

conduct." *See, e.g., Texas v. Johnson*, 491 U.S. 397, 406 (1989). But—and it's a big "but," which effectively controls our analysis here—the Supreme Court has clearly held that the First Amendment does *not* protect the very act of discriminating on the basis of race.

Like this case, *Runyon v. McCrary,* 427 U.S. 160 (1976), involved a collision between § 1981's prohibition on race discrimination in contracting and an alleged First Amendment right. There, black children alleged that private schools had violated § 1981 by denying them admission on account of their race. As relevant here, the schools defended on the ground that the First Amendment protected their right to "associat[e]" with those of their choosing. In rejecting the schools' defense, the Supreme Court reaffirmed that the First Amendment guarantees a right "to engage in association for the advancement of beliefs and ideas" but denied that it extended to the act of discriminating on the basis of race. *Id.* at 175 (quoting *NAACP v. Alabama*, 357 U.S. 449, 460 (1958)). In particular, the Court "assumed that parents have a First Amendment right to send their children to educational institutions that promote the belief that racial segregation is desirable, and that the children have an equal right to attend such institutions." *Id.* at 176. But, in words with particular resonance here, the Court emphasized that "it does not follow that the [p]ractice of excluding racial minorities from such institutions is also protected by the same principle." *Id.* The Court reiterated that "the Constitution . . . places no value on discrimination" and that while "[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment . . . it has never been accorded

affirmative constitutional protections." *Id.* (quoting *Norwood v. Harrison*, 413 U.S. 455, 469–70 (1973)); *cf. Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (rejecting a business's argument that "application of Title VII" to a female employee's sex-discrimination claim would "infringe constitutional rights of expression or association").

Since deciding *Runyon*, the Supreme Court has continued to recognize and enforce the critical distinction between *advocating* race discrimination and *practicing* it. In *R.A.V. v. City of St. Paul*, for instance, the Court emphasized that "[w]here the government does not target conduct on the basis of its expressive content, *acts* are not shielded from regulation merely because they express a discriminatory idea or philosophy." 505 U.S. 377, 390 (1992) (emphasis added). Notably, the Court cited as examples of lawful regulations of such "acts" both Title VII's prohibition against employment discrimination and § 1981's prohibition on race discrimination in contracting. *See id.* at 389–90. So too, in *Wisconsin v. Mitchell*, the Court cited *Runyon* as an example of a case in which it had "previously upheld against constitutional challenge" both "federal and state antidiscrimination laws" and reiterated *R.A.V.*'s invocation of Title VII and § 1981 as "examples of permissible content-neutral regulation[s] of conduct." 508 U.S. 476, 487 (1993).

The district court noted *Runyon*, but found it "difficult to square" with the Court's intervening decision in *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), which held that a website designer couldn't be compelled to create material celebrating a same-sex wedding. *See* District Court Op. at 16. Because the district court

deemed *Runyon* not to be precisely on point, and "considering the recency of the *303 Creative* decision," it felt "compelled to apply" the latter rather than the former.  *Id.* at 17.  With respect, the district court missed the critical distinction between the two decisions—namely, the distinction, as the *303 Creative* Court described it, between "status and message."  600 U.S. at 595 n.3.  *303 Creative* doesn't recognize—and in fact expressly disclaims—"a right to refuse to serve members of a protected class."  *Id.* at 597 (quotation marks omitted).  While the Supreme Court there recognized the web designer's First Amendment right to refuse to express messages with which she disagreed, it clarified that she didn't even *claim* a right to refuse to serve gay and lesbian customers.  *See 303 Creative*, 600 U.S. at 598; *see also id.* at 582 (emphasizing the parties' stipulation that while the web designer would "not produce content that 'contradicts biblical truth' regardless of who orders it," she was "willing to work with all people regardless of classifications such as race, creed, sexual orientation, and gender" and would "'gladly create custom graphics and websites' for clients of any sexual orientation") (some quotation marks omitted); *accord, e.g., Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston*, 515 U.S. 557, 568–72 (1995) (recognizing that a parade organizer had a First Amendment right to exclude would-be participants who

intended to express messages with which the organizer disagreed but no right to exclude would-be participants based on their status).[7]

To be sure, the line between "pure speech" that arguably entails discriminatory sentiments, *see 303 Creative*, 600 U.S. at 587, and *the very act of discrimination itself* may at times be hard to draw. And to be sure, Fearless characterizes its contest as reflecting its "commitment" to the "[b]lack women-owned" business community. The fact remains, though, that Fearless simply—and flatly—refuses to entertain applications from business owners who aren't "black females." Official Rules at 3. If that refusal were deemed sufficiently "expressive" to warrant protection under the Free Speech Clause, then so would be *every* act of race discrimination,

---

[7] The district court also cited our decision in *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247 (11th Cir. 2021), for the propositions (1) that "donating money qualifies as expressive conduct" and (2) that "except in perhaps the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does not want to support." District Court Op. at 14 (quoting *Coral Ridge*, 6 F.4th at 1254). *Coral Ridge* is triply inapposite. First, our decision there had nothing to do with race discrimination, and Supreme Court precedent indicates that prohibitions on race discrimination are uniquely resistant to First Amendment challenges. *See supra* at 20–21. Second, for reasons already explained, Fearless isn't simply donating money; it's orchestrating a bargained-for exchange in which both parties obtain valuable benefits and undertake meaningful obligations. *See supra* at 14–17. Finally, Fearless isn't being compelled to "subsidize speech"; rather, the question here is whether Fearless's contest ought to receive First Amendment protection by virtue of its rule excluding non-black entrants. *Coral Ridge* has nothing useful to say about that.

no matter at whom it was directed.  And on Fearless's theory, the more blatant and rampant the discrimination, the clearer the message:  To take just one particularly offensive example, surely a business owner who summarily fires all his black employees while retaining all the white ones has at the very least telegraphed his perspective on racial equality.  For better or worse, the First Amendment protects the owner's right to harbor bigoted views, but it does *not* protect his mass firing.  Fearless's position—that the First Amendment protects a similarly categorial race-based exclusion—risks sowing the seeds of antidiscrimination law's demise.

For all these reasons, we hold that it is substantially likely that the Alliance's § 1981 claim here would overcome a First Amendment defense.

\*    \*    \*

Because we think it probable that Fearless's contest (1) constitutes a "contract[]" within the meaning of § 1981, (2) doesn't qualify for any remedial-program exception that might apply, and (3) isn't protected by the First Amendment, we hold that the Alliance has established a substantial likelihood that it will succeed on the merits of its claim.

## D

Having concluded that the Alliance is likely to succeed on the merits of its § 1981 claim, we turn briefly to the remaining

factors to determine whether injunctive relief is appropriate. We conclude that it is.

First, contrary to the district court's determination, in the absence of a preliminary injunction, the Alliance's members would suffer irreparable injury.[8] As an initial matter, we have described race discrimination as "subtle, pervasive, and essentially irremediable." *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1424 (11th Cir. 1984); *see also Students for Fair Admissions*, 600 U.S. at 220 ("[I]t demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities.") (quotation marks and citation omitted). Moreover, and more specifically, each lost opportunity to enter Fearless's contest works an irreparable injury because it prevents the Alliance's members from competing at all—not just for the $20,000 cash prize but also for Fearless's ongoing mentorship and the ensuing business opportunities that a contest victory might provide.

Second, the balance of the equities weighs in the Alliance's favor. Although Fearless will presumably need to change its contest rules to bring itself into compliance with § 1981, that burden pales in comparison to the interest in rooting out race

---

[8] The district court held that the Alliance wouldn't suffer the sort of irreparable harm that justifies an injunction in part because it thought that § 1981 "does [not] authorize injunctive relief." District Court Op. at 22. That is incorrect. Indeed, the Supreme Court itself has expressly observed that "an individual who establishes a cause of action under § 1981 is entitled to both *equitable* and legal relief." *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460 (1975) (emphasis added).

discrimination in all its forms.  Finally, the public interest is well served by vindicating § 1981's terms and aims by ensuring racial equality in contracting.

## IV

For the foregoing reasons, we **AFFIRM** the district court's determination that the Alliance has the requisite Article III standing to sue, but we **REVERSE** the court's decision denying the Alliance's request for preliminary injunctive relief and **REMAND** with instructions to enter a preliminary injunction preventing Fearless from closing its contest.

ROSENBAUM, Circuit Judge, Dissenting:

No one doubts the sincerity of an Arsenal (soccer) player's desire to beat Tottenham.  But he can't be allowed to try to win by flopping on the field, faking an injury near Tottenham's goal.  For those not in the know, the object of flopping is to manufacture a foul that the player hasn't actually experienced to manipulate the referee into inappropriately exercising his power to award a penalty kick in the box, where it's likely to result in a goal.  Referees' vigilance prevents players who have a sincere desire to defeat their opponents—but who try to do so through manufactured fouls—from commandeering referees to improperly exercise their adjudicatory authority to award unwarranted penalty kicks.

Article III's standing requirement—which comes from the Constitution's limitation on the Judiciary to hear only "[c]ases" and "[c]ontroversies"—prevents the legal version of flopping.  Among other things, standing seeks to ensure that a party has a genuine and personal stake in the matter—a real alleged injury.  That way, the court's decision is not an impermissible advisory opinion but instead addresses a "real need to exercise the power of judicial review in order to protect the interests of the complaining party." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974).  As the Supreme Court has explained, "The powers of the federal judiciary will be adequate for the great burdens placed upon them only if they are employed prudently, with recognition of the strengths as well as the hazards that go with our kind of

representative government." *Id.* at 222 (citation and quotation marks omitted).

Here, no one doubts the sincerity of American Alliance for Equal Rights's desire to challenge what it views as "distinctions and preferences made on the basis of race and ethnicity." Compl. ¶ 6. American Alliance seeks to do so by challenging the Fearless Foundation's Striver's Grant Contest (the "Contest") designed to help Black women in the business world, where they are grossly underrepresented as business owners.[1] But as American Alliance has

---

[1] Research shows that Black-women-founded companies have received far less than even one percent of all venture-capital funding in recent years. Brief for Black Economic Alliance Foundation et al. as Amici Curiae Supporting Appellee at 11, No. 23-13138 (Dec. 13, 2023) (citing Gizelle George-Joseph & Daniel Milo, *Black Womenomics: Equalizing Entrepreneurship*, Goldman Sachs 6–7 (Feb. 9, 2022), https://www.goldmansachs.com/intelligence/pages/gs-research/black-womenomics-equalizing-entrepreneurship/report.pdf [https://perma.cc/H4QU-TEBS]). Indeed, a study found that "firms started by Black women received only .0006% of [venture capital] funding raised by startups between 2009 and 2017." *Id.* at 12–13 (quoting Anne Kniggendorf, *The Barriers to Funding Equality Persist for Black Women*, Kauffman Found. (May 2, 2019), https://www.kauffman.org/currents/barriers-to-funding-equality-persist-for-black-women [https://perma.cc/Q7Y9-T2E7]). Not only that, but Black women entrepreneurs in the United States suffer the largest gap between their total capital demand and the amount of investment capital they receive when compared to other demographic groups. *Id.* at 11–12 (citing *Barriers to Capital Flow for Black Female Entrepreneurs*, Foreign, Commonwealth & Dev. Off. 5 (Apr. 2021), https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1001956/Barriers-to-Capital-Flow-for-BFEs.pdf [https://perma.cc/7789-NQ63]). Against this backdrop, Fearless Fund's "mission is to bridge the gap in venture capital

portrayed its members' alleged injuries, it has shown nothing more than flopping on the field.[2]

Although three of American Alliance's members pay lip service to the idea they are "ready and able" to participate in Fearless's Contest, their declarations show, in context, that none has a genuine interest in actually entering the Contest. Indeed, not one has established that she is, in fact, able and ready to enter the Contest and would do so in the upcoming period if the Contest were open to non-Black women. So American Alliance's alleged injuries don't

funding for women of color founders building scalable, growth aggressive companies." #*Fearless Freedom*, Fearless Fund, https://www.fearless.fund [https://perma.cc/652L-ET7B]. Fearless Foundation is a 501(c)(3) nonprofit that serves as the Fearless Fund's charitable arm.

[2] The Majority Opinion takes issue with this dissent's use of the word "flopping." The Majority Opinion says, "We're talking about real-live, flesh-and-blood individuals who were excluded from the opportunity to compete in Fearless's contest *solely on account of the color of their skin*. Respectfully, victims of race discrimination—whether white, black, or brown—are not floppers." Maj. Op. at 14. Of course, victims of race discrimination—no matter the color of their skin—are not floppers. That's obvious. But as the Majority Opinion is well aware, the issue here isn't whether people who've been discriminated against on the basis of their skin color are or are not floppers; it's whether *American Alliance* has established an injury in fact on behalf of its members. And that's where American Alliance has shown nothing more than flopping. Not every person in the world, or even the country, who isn't eligible to apply for the Contest is a "victim of race discrimination" with standing to sue Fearless, as this dissent explains. The Majority Opinion's mischaracterization of this dissent and its failure to grapple even a little bit with the deficiencies in American Alliance's standing allegations, *see infra* at 15–21, speak volumes about the impropriety of assuming jurisdiction here.

show "a real controversy with real impact on real persons" among its membership.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (citation and quotation marks omitted).  Rather, they reflect an attempt to manufacture an "injury" to allow American Alliance to challenge the Contest.  That is not enough for standing.

The Majority Opinion does not hold American Alliance to the required "able and ready" showing.  Instead, it incorrectly concludes that American Alliance has established that three of its members have a real and genuine stake in competing in Fearless's Contest.  So it wrongly holds that we have jurisdiction.  We don't.  And because we don't have jurisdiction, we lack the power to consider the merits under Article III, and we must dismiss this matter.

Section I of this dissent explains the governing law of standing when, as here, a party that seeks to enjoin a program has never applied to participate in that program.  Section II then recounts American Alliance's allegations and evidence and shows why it fails to establish standing under the governing law.

## I.

Article III of the Constitution limits the judicial power to "[c]ases" and "[c]ontroversies."  *See* U.S. Const. art. III, § 2, cl. 1.  For a matter to qualify as a justiciable "[c]ase[]" or "[c]ontrovers[y]," *id.*, the plaintiff bears the burden of satisfying, among other things, the standing requirement.  To establish standing, a plaintiff must show she has experienced or is threatened with an imminent injury in fact, the defendant likely caused or will cause

that injury, and a favorable decision can redress that injury. *See Drazen v. Pinto*, 74 F.4th 1336, 1342 (11th Cir. 2023) (en banc).

The problem here is that American Alliance has failed to establish an injury in fact—"the [f]irst and foremost of standing's three elements," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (alteration in original) (citation and quotation marks omitted). To meet the injury-in-fact requirement, a plaintiff must have a "personal stake" in the matter. *TransUnion*, 594 U.S. at 423 (citation and quotation marks omitted). That means that the plaintiff must show that she "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (citation and quotation marks omitted). In other words, the plaintiff must have "personally . . . suffered some actual or threatened injury." *Id.* (citation and quotation marks omitted).

And that injury must be of a certain kind. The Supreme Court has explained that a "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992). An "undifferentiated" alleged injury is not enough; the claimed injury must be "distinct" to the plaintiff. *Spokeo*, 578 U.S. at 339 (citations and quotation marks omitted).

As for "concreteness," in claims seeking injunctive relief, a plaintiff must show both intention and specific plans to engage in activity that is likely to expose her to injury. *See Lujan*, 504 U.S. at 564. That is, concreteness demands a showing that the plaintiff will

"suffer[] a particular injury caused by the action challenged as un-lawful." *Schlesinger*, 418 U.S. at 221. As the Supreme Court has explained, "concrete injury removes from the realm of speculation whether there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party." *Id*. In other words, the alleged injury must be "*de facto*; that is, it must actually exist." *Spokeo*, 578 U.S. at 340 (citation and quotation marks omitted). "Concrete" means a "real" injury. *Id.* (citation and quotation marks omitted). So a mere "desire to obtain (sweeping relief) cannot be accepted as a substitute for compliance with the general rule that the complainant must present facts sufficient to show that [her] individual need ***requires*** the remedy for which [s]he asks." *Schlesinger*, 418 U.S. at 221–22 (emphasis added) (citation and quotation marks omitted).

These standards "ensure[] that federal courts decide only 'the rights of individuals,' *Marbury v. Madison*, 5 U.S. 137, 170 (1803), and that federal courts exercise 'their proper function in a limited and separated government,' Roberts, *Article III Limits on Statutory Standing*, 42 Duke L. J. 1219, 1224 (1993)." *TransUnion*, 594 U.S. at 423 (citations omitted). Indeed, "[f]ederal courts do not issue advisory opinions." *Id*. at 424. These limitations on the judicial power protect the "democratic form of government" from the, "in large measure insulated, judicial branch." *Carney v. Adams*, 592 U.S. 53, 59 (2020) (citation and quotation marks omitted). Put simply, Article III limits our jurisdiction to resolving "only 'a real controversy with real impact on real persons.'" *TransUnion*, 594 U.S. at 424 (citation omitted). No flopping allowed.

American Alliance attempts to satisfy the standing requirement through associational standing—through the alleged injuries of three of its members. That means it must show that its members "would otherwise have standing to sue in their own right." *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1249 (11th Cir. 2020) (en banc) (citation and quotation marks omitted). It hasn't done that.

None of American Alliance's members have applied for the Fearless Strivers Grant Contest. So they haven't been rejected and can't claim they've already suffered an injury. But that, of course, is not the only way to establish an injury. After all, the Contest's rules limit eligibility to Black women, and Article III doesn't require the "futile gesture" of applying for a contest for which one is ineligible. *Carney*, 592 U.S. at 66 (citation and quotation marks omitted).

American Alliance's members can alternatively satisfy the injury requirement by showing that they are "able and ready" to apply to the Contest and are likely to do so if we invalidate the eligibility requirement. *See Carney*, 592 U.S. at 60. The Supreme Court has not decided whether a statement of intent alone in certain circumstances can ever be enough to show standing. *See id.* at 64.

But in *Carney*, it squarely held that even a clear expression of intent doesn't cut it when the context surrounding that expression calls its credibility into question. I spill considerable ink discussing the facts and the Supreme Court's legal analysis in *Carney* because that precedent controls our analysis here.

In *Carney*, lawyer James R. Adams challenged Delaware constitutional provisions governing judicial nominations. *Id.* at 55. Those provisions required judicial appointments to certain Delaware courts to reflect a partisan balance between the two major political parties and precluded individuals unaffiliated with one of those parties from serving on certain courts. *Id.* at 55–57. As a political independent, Adams complained that Delaware's provisions precluded him from having his judicial application considered. *Id.* at 60. The Supreme Court said that, to satisfy standing, Adams had to "at least show that he [was] likely to apply to become a judge in the reasonably foreseeable future if Delaware did not bar him because of political affiliation." *Id.* And as the Court explained, Adams could do this "only if he [was] able and ready to apply." *Id.* (citations and quotation marks omitted).

Despite Adams's protestations to the contrary, the Court concluded that Adams failed to show he was able and ready to apply. *Id.* at 61–66. Adams attested that he "would apply for any judicial position that [he] thought [he] was qualified for, and [he] believe[d] [he was] qualified for any position that would come up on any of the courts." *Id.* at 61 (cleaned up). He also swore that he "would seriously consider and apply for any judicial position for which he feels he is qualified" and that he "believe[d] he me[t] the minimum qualifications to apply for any judicial officer position." *Id.* On their face, the Supreme Court suggested, these attestations seemed enough to show that Adams was "able and ready" to apply. *See id.*

23-13138          ROSENBAUM, J., Dissenting          9

But the Supreme Court cautioned that Adams's statements "must be considered in the context of the record." *Id.* And that, in turn, "contain[ed] evidence showing that, at the time he brought this lawsuit, Adams was not 'able and ready' to apply." *Id.* To support its conclusion, the Court noted that Adams had not applied for previous positions, had recently changed his party affiliation after reading a law-review article suggesting the unconstitutionality of the Delaware constitutional provisions at issue and telling the author that he'd "like to pursue this," and had taken no action to indicate that "he was 'able and ready' to apply for a judgeship," among other record evidence. *See id.* at 61–62.

In the Supreme Court's view, this context smothered Adams's representations that he was "able and ready" to apply for a judgeship. The Court reached this conclusion even though Adams offered explanations for the contextual evidence on which the Supreme Court relied in finding that Adams had failed to show he was "able and ready." *See id.* at 62–63. Adams said, for instance, that he failed to apply for a judgeship earlier because he wasn't interested at that time, and he changed his party affiliation to reflect his "progressive" views. *Id.* And, he argued, "the lack of other evidence prove[d] little or nothing about his intentions." *Id.*

The Supreme Court was not persuaded. *See id.* To be sure, the Court recognized that Adams's words indicated that he was "able and ready." *See id.* But the Court observed that "the context offer[ed] Adams no support" for his words. *Id.* Rather, the Court concluded, the context reflected only a mere "desire to vindicate

[Adams's] view of the law," "*not an actual desire* to become a judge." *Id.* at 63–64 (emphasis added).  Under these circumstances, the Court warned that finding Adams had satisfied the injury requirement "would significantly weaken the longstanding legal doctrine preventing [the] Court from providing advisory opinions . . . ." *Id.* at 64.  The problem, the Court said, was that Adams had not "sufficiently differentiated himself from a general population of individuals affected in the abstract by the legal provision he attack[ed]." *Id.*  At bottom, "injury in fact requires an intent that is concrete." *Id.*

        In other cases, the Supreme Court has also required contextual facts showing that the plaintiff is likely to apply to the challenged program in other cases.  In *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995), a subcontractor challenged a race-based program for allocating contracts.  Based on the context there, the Supreme Court determined that the subcontractor had "made an adequate showing that sometime in the relatively near future it [would] bid on another Government contract that offer[ed] financial incentives to a prime contractor for hiring disadvantaged subcontractors." *Id.* at 211–12.  In reaching this conclusion, the Court found it relevant that the company bid on "every guardrail project in Colorado," nothing in the record suggested that would change, and the company often had to compete against others who qualified for the advantage.  *Id.* at 212.

        And in *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993), the

Supreme Court reached the same conclusion for similar reasons. There, an association of contractors challenged the constitutionality of an ordinance that gave preferential treatment, in awarding city contracts, to certain minority-owned businesses. *Id.* at 658–59. The Court noted that the association alleged—and the city did not contest—that its members regularly bid on construction contracts with the city and that "they would have bid on contracts set aside pursuant to the city's ordinance were they so able." *Id.* at 668–69. In other words, the association showed it was in fact able and ready to apply for city contracts if the Court declared the ordinance invalid. As a result, the Court concluded, the association had shown a cognizable injury and had standing. *See id.* at 669.

*Gratz v. Bollinger*, 539 U.S. 244 (2003), provides yet another example of how a plaintiff can show an imminent, concrete, and particularized injury when the challenged program requires an application. There, a plaintiff sought admission at the University of Michigan. *Id.* at 251. He was denied. *Id.* The complaint alleged he "would transfer to [the University] if offered an opportunity" and "intend[ed] to apply to transfer" if the admissions system changed. Complaint ¶ 5, *Gratz v. Bollinger*, No. 2:97-cv-75231 (E.D. Mich. Oct. 14, 1997). Among other relief, he sought an order requiring the program to offer him admission as a transfer student. *Id.* at 252.

The Supreme Court determined that the plaintiff had sufficiently shown that he was "able and ready" to apply for transfer if the Court invalidated the University's challenged admissions

practice. *Id.* at 262. It reached this conclusion based on the plaintiff's prior application for admission, the fact that an underrepresented minority applicant with his qualifications would have been admitted under the University's system, and the fact that the University had a "rolling" transfer program open for application each year. *Id.*

As the Supreme Court observed in *Carney*, in all these cases where it found that the plaintiffs were "able and ready" to apply, each plaintiff "introduced at least some evidence that, *e.g.*, they had applied in the past, there were regular opportunities available with relevant frequency, and they were 'able and ready' to apply for them." *Carney*, 592 U.S. at 65−66. But in *Carney*, when Adams merely said he would apply—but the record evidence failed to support that contention—the Supreme Court determined that Adams lacked "an actual desire to become a judge," so he had not shown he was in fact "able and ready" to seek a judgeship. *Id.* at 63−66.

We have also found we lacked jurisdiction when a plaintiff failed to allege facts supporting the plaintiff's bare claim that it intended to do something in the future. *See Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330 (11th Cir. 2019). In *Aaron*, the plaintiff company challenged a state law that interfered with its ability to open a clinic. *Id.* at 1333. The plaintiff's complaint alleged that it planned to open a clinic and included details on the technologies it would use and the medical conditions it would treat. *Id.* at 1334. Even so, we held the plaintiff offered no facts that it "had any concrete plan in place for bringing its clinic into operation." *Id.* at 1337.

We emphasized that the plaintiff failed to allege it had taken any concrete steps, like selecting a location for the clinic, securing a lease option, making progress towards governmental approvals, or interacting with potential clients.  *Id.*

Even more on point, the Second Circuit recently considered associational standing and applied *Carney* in a case quite similar to ours.  In *Do No Harm v. Pfizer*, 96 F.4th 106 (2d Cir. 2024), the organization Do No Harm sued Pfizer, alleging that one of its fellowship programs that seeks "to advance students and early career colleagues of Black/African American, Latino/Hispanic, and Native American descent" unlawfully excludes white and Asian-American applicants.  *Id.* at 108.  Do No Harm sought to establish associational standing.  It alleged that it had "at least two members" who were "ready and able to apply for the 2023 class" if Pfizer eliminated its allegedly discriminatory criteria.  *Id.* at 110–11.

In support, Do No Harm submitted declarations from Members A and B.  *Id.* at 111.  Each member averred that he or she "met all the eligibility requirements set by Pfizer, including that they were undergraduate juniors, maintained GPAs of 3.0 or higher, and were involved in campus life and held leadership positions in various campus activities."  *Id.* (cleaned up).  Both members attested that they were "able and ready to apply to the 2023 class of the Fellowship" if Pfizer removed the allegedly discriminatory race requirement.  *Id.*

The Second Circuit affirmed dismissal of the case, holding that Do No Harm failed to establish standing.[3] *Id.* at 119, 121. In relevant part, in a separate concurrence, Judge Wesley concluded that "Members A and B did not prove they suffered actual or imminent injuries." *Id.* at 126 (Wesley, J., concurring). Rather, Judge Wesley noted that "[t]he only standing evidence [Do No Harm] submitted were virtually identical declarations about [Members A and B's] intentions to apply for Pfizer's Fellowship . . . ." *Id.* But those declarations were "insufficient because they [were] vague and conclusory." *Id.* Though they addressed the "ability" prong of the "able and ready" requirement, the declarations offered "very little . . . on the 'readiness' prong." *Id.* at 127 (Wesley, J., concurring). They said only that the members "would like to apply," were "interested in applying . . . because it is a prestigious program[] [a]nd it seems like a great professional development opportunity," were "drawn by the fact that Pfizer w[ould] pay a full scholarship for an MBA program," "were able and ready to apply to the 2023 class," and were "prepared to meet the program's requirements

---

[3] The panel opinion concluded that Do No Harm failed to satisfy standing based solely on the fact that Members A and B did not identify themselves by name. *See Do No Harm*, 96 F.4th at 114−19. For the reasons the Majority Opinion here explains, I agree with the Majority Opinion that, provided a plaintiff otherwise satisfies standing requirements, including by establishing a genuine personal stake in the matter, a plaintiff may proceed anonymously. As the *Do No Harm* panel opinion found that it lacked jurisdiction because Members A and B did not identify themselves, it did not "purport to decide" whether the members' declarations established a genuine interest in applying for the fellowship. *See id.* at 119 n.8.

and expectations" if accepted. *Id.* Judge Wesley explained that, "[e]ven read liberally, these are a 'few words of general intent' which do not suffice to prove readiness." *Id.*

As Judge Wesley reasoned, Members A and B "described no concrete plans for applying to the Fellowship if it stopped discriminating against them tomorrow." *Id.* at 129 (Wesley, J., concurring). For instance, they never indicated whether they "prepare[d] any materials to submit to the Fellowship," whether they "ask[ed] Pfizer for more specifics about the program, or talk[ed] to any Pfizer employees," or whether they "adjust[ed] their studies to strengthen their candidacies—perhaps by taking courses in biotechnology or business administration." *Id.* Based on this context and applying *Carney*, Judge Wesley explained that Members A and B had failed to "signal a concrete readiness to apply to the Fellowship." *Id.* at 129 (Wesley, J., concurring). So, Judge Wesley said, Members A and B did not establish an injury in fact (and thus standing).

## II.

Owners A, B, and C—on whom American Alliance hangs its bid for standing—fare no better than Adams, Do No Harm Members A and B, and Aaron Private Clinic Management, all of whom failed to establish standing. This matter is not like *Adarand Constructors* or *Northeastern Florida Chapter*, where the plaintiffs had a history of bidding on the types of contracts at issue, showing the genuineness of their claim that they would bid on future contracts. Instead, it's like *Carney*, *Aaron*, and *Do No Harm*. In all these

matters, like the matter before us now, the plaintiffs failed to show they had concrete plans to engage in the relevant conduct even if they could do so.

True, Owners A, B, and C each profess to be "ready and able to apply for a grant" through the Contest in the fourth promotion period. *See* Declarations of each Owner ("Decls.") ¶ 3 (attached as Appendix A). But those words aren't enough because the surrounding context tells another story. Like the situation with Adams and Do No Harm Members A and B, the context here betrays Owners A, B, and C's lack of "an actual desire" to enter the Contest. *Carney*, 592 U.S. at 63. At least six circumstances belie the Owners' professions that they are "ready and able."

First, the Majority Opinion contends that the declarations show that each Owner "would compete" in the Contest if they could. Maj. Op. at 13. But in fact, not a single declaration actually says that. The declarations don't say that any of the Owners would enter the Contest, or plans to enter the Contest, or intends to enter the contest, or is even thinking about entering the Contest. Rather, each says simply that the Owner is "ready and able to apply for a grant for Business A[, B, or C] through the Fearless Strivers Grant Contest in the fourth promotion period, but [she is] ineligible because [she is] not a black woman." Decls. at ¶ 3.

Even Adams said more. He at least said he "would apply," *Carney*, 592 U.S. at 61; none of the Owners have said as much.

Second, each declaration is precisely fifteen paragraphs long and is almost exactly the same. The only differences between the

declarations appear in each Owner's state of location and the va-guest descriptions of what each Owner says she would do with the money. *See*, *e.g.*, Owner A Decl. ¶ 4 ("Business A would use the $20,000 grant for improvement and expansion [sic] the business."). Other than that, the declarations' only substantive statements pur-port to show, in the most generic possible way, that the Owners meet the Contest's eligibility requirements, except that they are not Black. *See*, *e.g.*, Decls. at ¶ 11 ("Business A [or B or C] had an-nual revenue of more than $50,000 but less than $3 million in 2022."). These cookie-cutter declarations are even more thread-bare and devoid of substance than the near-carbon-copy ones at is-sue in *Do No Harm*.

Third, not a single Owner attests that she has ever sought a grant of any other kind or entered a similar contest for her business in any other circumstances. So while the Owners need not have applied for the Contest here to show they have a personal stake in entering it, they've established no past interest of any type in busi-ness grants of the sort that Fearless awards—regardless of eligibility criteria. In this way, they are like Adams, who never applied for a judgeship, and Members A and B, who did not indicate that they had previously applied for a fellowship-type program of any kind. They are unlike the plaintiffs in *Adarand Constructors* and *Northeast-ern Florida Chapter*, who supported their statements of intent by showing that they had historically and regularly applied for the same kinds of bids as the ones at issue.

18                    ROSENBAUM, J., Dissenting                    23-13138

Fourth, the declarations otherwise betray the Owners' lack of "an actual desire," *Carney*, 592 U.S. at 63, to enter the Contest. The Contest rules expressly state that Fearless will judge entries based on "1) Viability and strength of business (0–30 points), 2) How the business intends to use the grant (0–30 points), and 3) Potential for business growth (0–40 points)." And if there's a tie, the tied entries "will be re-judged based on: Potential for business growth (0–100 points)." Given that these are the public criteria on which Fearless would judge the Owners if they actually entered the Contest, what do the Owners' declarations say about these things?

Almost nothing. None so much as mention viability and strength of business or potential for business growth. We don't even know what kinds of businesses these are, how long they've been operating, or any other facts that would be relevant to assuring ourselves these are operating businesses, let alone ones that genuinely desire to enter the Contest. And as I've noted, the Owners could not be vaguer about how they would use the grant if they won. To be sure, to establish standing, a plaintiff need not show she would be successful in the contest if she were eligible. But the declarations' utter lack of relevant information (other than that the owners meet the other eligibility criteria)—like the surface-level declarations of Members A and B in *Do No Harm* (novels in comparison to Owners A, B, and C's declarations)—shows the Owners haven't even really considered entering the Contest. Indeed, it unmasks the owners' lack of "an actual desire," *Carney*, 592 U.S. at 63, to in fact enter Fearless's Contest.

Fifth, paragraph 13 of each declaration professes, "Both I and Business A[, B, or C] became members of American Alliance for Equal Rights because we support its mission as well as this lawsuit." Decls. at ¶ 13.  So although the record contains no indication that they've ever applied for or even been interested in any grants in the past, Owners A, B, and C apparently decided to join American Alliance so they could sue Fearless to enter Fearless's Contest. This circumstance echoes that of Adams's contact with the law-review article's author advising the author that he "just read [the author's] Law Review article[] [and would] like to pursue this," with the author responding by suggesting several attorneys who might handle the matter, *Carney*, 592 U.S. at 62.

And sixth, American Alliance's president's declaration only further confirms what the Owners' declarations betray:  the Owners have no real interest in or intention of in fact entering the Contest.  For starters, American Alliance's president, Edward Blum, attests that the organization "has **at least two** members who are ready and able to apply to the . . . Contest, but cannot because they are the wrong race."  Blum Decl. ¶ 5 (attached at Appendix B) (emphasis added).  And it says this even though the declaration also avers that Blum has "spoken with Owner[s] A[, B, and C] and ha[s] discussed business[es] A[, B, and C] with [them]."  *Id.* ¶ 6–8.  So which of the three Owners are the two he asserts are "ready and able"?  Or more to the point, which is the one who, by Blum's

implicit admission, is not?[4]  As I've noted, all three of the Owners' declarations say essentially the same thing.  So the fact that at least one of the three is not "ready and able" undermines the likelihood that the other two in fact are.

Not only that, but as I've mentioned, Blum's declaration asserts only that he has "spoken with Owner[s] A[, B, and C] and ha[s] discussed Business[es A, B, and C] with [them]."  It says nothing more about any of the businesses or Owners, not to mention anything that might show the Owners had a genuine interest to participate in the Contest.

Blum's affidavit also reflects that he has financed other race-based challenges involving other organizations and programs.  In particular, he mentions *Fisher v. University of Texas at Austin*, 570 U.S. 297 (2013), and *Fisher v. University of Texas at Austin*, 579 U.S. 365 (2016).  *Id.* ¶ 9.  He's also sponsored litigation making race-based challenges in *Shelby County v. Holder*, 570 U.S. 529 (2013), *Students for Fair Admissions v. Harvard* [and *University of North Carolina*],

---

[4] American Alliance argues we should ignore that Blum's declaration says "at least two" members are ready and able, seemingly suggesting it was a simple mistake.  But Blum's statement appears in his sworn declaration, and that statement is directly relevant to a factual question controlling our ability to exercise jurisdiction.  Maybe it was a mistake—but it seems unlikely that the written-out word "two" was a typographical error, given that typing the word "three" is a matter of different and extra keystrokes.  After all, Blum's declaration did not use the numerical "2."  And in any case, Blum easily could have filed another affidavit or declaration correcting his assertion under oath had he wished to do so.  But he filed no such supplementary sworn statement.

600 U.S. 181 (2023),[5] and others. There's certainly nothing wrong with bringing multiple lawsuits on behalf of allegedly injured parties. Rather, it could reflect a "sincere [and] deeply committed" desire to "vindicat[e]" what one perceives to be a "general interest on behalf of the public," *Carney*, 592 U.S. at 59 (citation and quotation marks omitted). The problem for Blum and American Alliance, though, is that such a desire is not enough to establish a cognizable injury in fact.

So just as the context in *Carney* and *Do No Harm* revealed that Adams and Do No Harm Members A and B, respectively, did not genuinely seek to apply for a judgeship or fellowship despite their assertions that they were "able and ready," the contextual evidence here establishes that Owners A, B, and C—and by extension, American Alliance—are not "able and ready" to enter the Contest, even though they attest that they are.

The Majority Opinion offers no answer to the utter dearth of contextual support for the Owners' naked assertions that they are "ready and able" to apply. It can't; there's no good answer that can successfully navigate precedent.

At bottom, American Alliance and its members have shown nothing more than flopping on the field when it comes to establishing an injury in fact. For that reason, they have failed to satisfy

---

[5] Robert Barnes, *How one man brought affirmative action to the Supreme Court. Again and again.*, The Washington Post (Oct. 24, 2022), https://www.washingtonpost.com/politics/2022/10/24/edward-blum-supreme-court-harvard-unc/[https://perma.cc/HLE6-854Z].

22                    ROSENBAUM, J., Dissenting                    23-13138

standing, and we lack jurisdiction.  In short, this is not a "genuine, live dispute."  *Carney*, 592 U.S. at 58.  And we have "no business," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006), deciding it.

### III.

I would dismiss this matter for lack of jurisdiction.  I respect-fully dissent from the panel's decision to the contrary.

# Appendix A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

|  |  |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, *Plaintiff,*<br><br>v.<br><br>FEARLESS FUND MANAGEMENT, LLC, *et al.* *Defendants.* | Case No. |

**DECLARATION OF OWNER A**

I, Owner A, declare as follows:

1.    I am over the age of 18, of sound mind, and otherwise competent to sign this declaration.

2.    I am the primary and sole owner of Business A. I am authorized to sign for Business A. I submit this declaration on behalf of myself and Business A.

3.    I am ready and able to apply for a grant for Business A through the Fearless Strivers Grant Contest in the fourth promotion period, but I am ineligible because I am not a black woman.

4.    Business A would use the $20,000 grant for improvement and expansion the business.

5.    I meet all the nonracial requirements for the contest.

6.    I am a woman.

7.    I live in New York.

1

8.     I am above the age of majority in New York.

9.     Business A is located in New York.

10.    Business A is organized as a Limited Liability Company under the laws of New York and employs fewer than 50 individuals on a full-time or part-time basis.

11.    Business A had annual revenue of more than $50,000 but less than $3 million in 2022.

12.    I am not an officer, director, or employee of Fearless Fund, Mastercard International Incorporated, or teamDigital Promotions or any of their affiliated companies or agents. Nor is any member of my immediate family or household of an officer, director, or employee of any of those entities.

13.    Both I and Business A became members of American Alliance for Equal Rights because we support its mission as well as this lawsuit.

14.    I am signing this declaration under a pseudonym because I operate a small business and, if my participation in this litigation becomes public, I fear reprisal against Business A and myself.

15.    Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

2

Executed on August 1, 2023

_____
Owner A

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, *Plaintiff,* | |
| v. | Case No. |
| FEARLESS FUND MANAGEMENT, LLC, *et al.* *Defendants.* | |

**DECLARATION OF OWNER B**

I, Owner B, declare as follows:

1.    I am over the age of 18, of sound mind, and otherwise competent to sign this declaration.

2.    I am the primary and sole owner of Business B. I am authorized to sign for Business B. I submit this declaration on behalf of myself and Business B.

3.    I am ready and able to apply for a grant for Business B through the Fearless Strivers Grant Contest in the fourth promotion period, but I am ineligible because I am not a black woman.

4.    Business B would use the $20,000 grant for website development and marketing.

5.    I meet all the nonracial requirements for the contest.

6.    I am a woman.

7.    I live in Virginia.

1

8.    I am above the age of majority in Virginia.

9.    Business B is located in Virginia.

10.    Business B is organized as a Limited Liability Company under the laws of Virginia and employs fewer than 50 individuals on a full-time or part-time basis.

11.    Business B had annual revenue of more than $50,000 but less than $3 million in 2022.

12.    I am not an officer, director, or employee of Fearless Fund, Mastercard International Incorporated, or teamDigital Promotions or any of their affiliated companies or agents. Nor is any member of my immediate family or household of an officer, director, or employee of any of those entities.

13.    Both I and Business B became members of American Alliance for Equal Rights because we support its mission as well as this lawsuit.

14.    I am signing this declaration under a pseudonym because I operate a small business and, if my participation in this litigation becomes public, I fear reprisal against Business B and myself.

15.    Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

2

Executed on August 1, 2023



Owner B

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, *Plaintiff,* v. FEARLESS FUND MANAGEMENT, LLC, *et al.* *Defendants.* | Case No. |

**DECLARATION OF OWNER C**

I, Owner C, declare as follows:

1.    I am over the age of 18, of sound mind, and otherwise competent to sign this declaration.

2.    I am the primary and sole owner of Business C. I am authorized to sign for Business C. I submit this declaration on behalf of myself and Business C.

3.    I am ready and able to apply for a grant for Business C through the Fearless Strivers Grant Contest in the fourth promotion period, but I am ineligible because I am not a black woman.

4.    Business C would use the $20,000 grant for growing my online presence in order to expand awareness to potential customers.

5.    I meet all the nonracial requirements for the contest.

6.    I am a woman.

7.    I live in Virginia.

1

8.    I am above the age of majority in Virginia.

9.    Business C is located in Virginia.

10.   Business C is organized as a Limited Liability Company under the laws of Virginia and employs fewer than 50 individuals on a full-time or part-time basis.

11.   Business C had annual revenue of more than $50,000 but less than $3 million in 2022.

12.   I am not an officer, director, or employee of Fearless Fund, Mastercard International Incorporated, or teamDigital Promotions or any of their affiliated companies or agents. Nor is any member of my immediate family or household of an officer, director, or employee of any of those entities.

13.   Both I and Business C became members American Alliance for Equal Rights because we support its mission as well as this lawsuit.

14.   I am signing this declaration under a pseudonym because I operate a small business and, if my participation in this litigation becomes public, I fear reprisal against Business C and myself.

15.   Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

2

Executed on August 1, 2023

_____
Owner C

# Appendix B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, | |
| *Plaintiff,* | |
| v. | Case No. |
| FEARLESS FUND MANAGEMENT, LLC, *et al.* | |
| *Defendant.* | |

**DECLARATION OF EDWARD BLUM**

I, Edward Blum, declare as follows:

1.    I am over the age of 18, of sound mind, and otherwise competent to sign this declaration.

2.    I am the President of the American Alliance for Equal Rights.

3.    American Alliance for Equal Rights is a nationwide membership organization dedicated to challenging distinctions and preferences made on the basis of race and ethnicity.

4.    AAER's members are harmed by racially exclusionary programs and policies like the Fearless Fund's Fearless Striver's Grant Contest. This contest excludes some of AAER's members solely because of their race.

5.    AAER has at least two members who are ready and able to apply to the Fearless Strivers Grant Contest, but cannot because they are the wrong race.

1

6.    I have spoken with Owner A and have discussed Business A with her.

7.    I have spoken with Owner B and have discussed Business B with her.

8.    I have spoken with Owner C and have discussed Business C with her.

9.    I have witnessed firsthand the retaliation that individuals can receive for bringing litigation challenging racial preferences. I supported Abigail Fisher in her challenge to affirmative action in *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297 (2013), and *Fisher v. Univ. of Texas at Austin*, 579 U.S. 365 (2016). Ms. Fisher "endured consistent harassment since 2008" "[a]s a direct result of [her] involvement in that case." *SFFA v. Harvard Coll.*, No. 1:14-cv-14176 (D. Mass. Apr. 29, 2016), ECF 150-4 ¶3. She experienced "threats" and "insults" from across the country, and she suffered professionally. *See id.* ¶¶5, 9-10. Ms. Fisher explained that these experiences "often led [her] to second-guess [her] involvement in the case and as an advocate against unlawful affirmative action policies." ¶11.

10.    Based on my experience and discussions with many individuals, I believe many individuals would not challenge programs like Fearless Fund's absent the anonymity protections that associations provide.

11.    Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury

that the foregoing is true and correct.

Executed on August 1, 2023

Edward Blum
President of American Alliance for
Equal Rights

3